# Complaint
# Exhibit A

CMS-9940-IFC



This document is scheduled to be published in the Federal Register on 10/13/2017 and available online at **https://federalregister.gov/d/2017-21851**, and on **FDsys.gov**

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD-9827]**

**RIN 1545-BN92**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210-AB83**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS-9940-IFC]**

**RIN 0938-AT20**

**Religious Exemptions and Accommodations for Coverage of Certain Preventive Services**

**Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** The United States has a long history of providing conscience protections in the regulation of health care for entities and individuals with objections based on religious beliefs and moral convictions. These interim final rules expand exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive

Exhibit A

coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act.

These rules do not alter the discretion of the Health Resources and Services Administration

(HRSA), a component of the United States Department of Health and Human Services (HHS), to

maintain the guidelines requiring contraceptive coverage where no regulatorily recognized

objection exists.  These rules also leave the "accommodation" process in place as an optional

process for certain exempt entities that wish to use it voluntarily.  These rules do not alter

multiple other Federal programs that provide free or subsidized contraceptives for women at risk

of unintended pregnancy.

**DATES:**  Effective date:  These interim final rules and temporary regulations are effective on

October 6, 2017.

Comment date:  Written comments on these interim final rules are invited and must be received

by December 5, 2017.

**ADDRESSES**:  Written comments may be submitted to the Department of Health and Human

Services as specified below.  Any comment that is submitted will be shared with the Department

of Labor and the Department of the Treasury, and will also be made available to the public.

**Warning:**  Do not include any personally identifiable information (such as name, address, or

other contact information) or confidential business information that you do not want publicly

disclosed.  All comments may be posted on the Internet and can be retrieved by most Internet

search engines.  No deletions, modifications, or redactions will be made to the comments

received, as they are public records.  Comments may be submitted anonymously.

Comments, identified by "Preventive Services," may be submitted one of four ways (please

choose only one of the ways listed)

Exhibit A

1. <u>Electronically</u>.  You may submit electronic comments on this regulation to **http://www.regulations.gov**.  Follow the "Submit a comment" instructions.

2. <u>By regular mail</u>.  You may mail written comments to the following address ONLY:

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

Attention:  CMS-9940-IFC,

P.O. Box 8016,

Baltimore, MD  21244- 8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. <u>By express or overnight mail</u>.  You may send written comments to the following address ONLY:

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

Attention:  CMS-9940-IFC,

Mail Stop C4-26-05,

7500 Security Boulevard,

Baltimore, MD 21244-1850

Exhibit A

4.    <u>By hand or courier</u>.  Alternatively, you may deliver (by hand or courier) your written comments ONLY to the following addresses prior to the close of the comment period:

a.  For delivery in Washington, DC--

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

Room 445-G, Hubert H. Humphrey Building,

200 Independence Avenue, SW.,

Washington, DC  20201

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building.  A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b.  For delivery in Baltimore, MD--

Centers for Medicare & Medicaid Services,

Department of Health and Human Services,

7500 Security Boulevard,

Baltimore, MD  21244-1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786-9994 in advance to schedule your arrival with one of our staff members.

Exhibit A

Comments erroneously mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

Comments received will be posted without change to www.regulations.gov.

**FOR FURTHER INFORMATION CONTACT:** Jeff Wu (310) 492-4305 or marketreform@cms.hhs.gov for Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), Amber Rivers or Matthew Litton, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693-8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 317-5500.

Customer Service Information:  Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1-866-444-EBSA (3272) or visit the Department of Labor's website (www.dol.gov/ebsa).  Information from HHS on private health insurance coverage can be found on CMS's website (www.cms.gov/cciio), and information on health care reform can be found at www.HealthCare.gov.

**SUPPLEMENTARY INFORMATION:**

**I.  Background**

Congress has consistently sought to protect religious beliefs in the context of health care and human services, including health insurance, even as it has sought to promote access to health services.[1]  Against that backdrop, Congress granted the Health Resources and Services

---

[1] See, for example, 42 U.S.C. 300a-7 (protecting individuals and health care entities from being required to provide or assist sterilizations, abortions, or other lawful health services if it would violate their "religious beliefs or moral convictions"); 42 U.S.C. 238n (protecting individuals and entities that object to abortion); Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d) (Departments of Labor, HHS, and Education, and Related Agencies Appropriations Act), Pub. L. No. 115-31 (protecting any "health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan" in objecting to abortion for any reason); Id. at Div. C, Title VIII, Sec. 808 (regarding

CMS-9940-IFC                                                                    6

Administration (HRSA), a component of the United States Department of Health and Human

Services (HHS), discretion under the Patient Protection and Affordable Care Act to specify that

certain group health plans and health insurance issuers shall cover, "with respect to women, such

additional preventive care and screenings … as provided for in comprehensive guidelines

supported by" by HRSA (the "Guidelines").  Public Health Service Act section 2713(a)(4).

HRSA exercised that discretion under the last Administration to require health coverage for,

among other things, certain contraceptive services,[2] while the administering agencies—the

Departments of Health and Human Services, Labor, and the Treasury (collectively, "the

---

any requirement of "the provision of contraceptive coverage by health insurance plans" in the District of Columbia, "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions."); Id. at Div. C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act) (protecting individuals who object to prescribing or providing contraceptives contrary to their "religious beliefs or moral convictions"); Id. at Div. I, Title III (Department of State, Foreign Operations, and Related Programs Appropriations Act) (protecting applicants for family planning funds based on their "religious or conscientious commitment to offer only natural family planning"); 42 U.S.C. 290bb-36 (prohibiting the statutory section from being construed to require suicide related treatment services for youth where the parents or legal guardians object based on "religious beliefs or moral objections"); 42 U.S.C. 290kk-1 (protecting the religious character of organizations participating in certain programs and the religious freedom of beneficiaries of the programs); 42 U.S.C. 300x-65 (protecting the religious character of organizations and the religious freedom of individuals involved in the use of government funds to provide substance abuse services); 42 U.S.C. 604a (protecting the religious character of organizations and the religious freedom of beneficiaries involved in the use of government assistance to needy families); 42 U.S.C. 1395w-22(j)(3)(B) (protecting against forced counseling or referrals in Medicare Choice, now Medicare Advantage, managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 1396a(w)(3) (ensuring particular Federal law does not infringe on "conscience" as protected in State law concerning advance directives); 42 U.S.C. 1396u-2(b)(3) (protecting against forced counseling or referrals in Medicaid managed care plans with respect to objections based on "moral or religious grounds"); 42 U.S.C. 5106i (prohibiting certain Federal statutes from being construed to require that a parent or legal guardian provide a child any medical service or treatment against the religious beliefs of the parent or legal guardian); 42 U.S.C. 2996f(b) (protecting objection to abortion funding in legal services assistance grants based on "religious beliefs or moral convictions"); 42 U.S.C. 14406 (protecting organizations and health providers from being required to inform or counsel persons pertaining to assisted suicide); 42 U.S.C. 18023 (blocking any requirement that issuers or exchanges must cover abortion); 42 U.S.C. 18113 (protecting health plans or health providers from being required to provide an item or service that helps cause assisted suicide); also, see 8 U.S.C. 1182(g) (protecting vaccination objections by "aliens" due to "religious beliefs or moral convictions"); 18 U.S.C. 3597 (protecting objectors to participation in Federal executions based on "moral or religious convictions"); 20 U.S.C. 1688 (prohibiting sex discrimination law to be used to require assistance in abortion for any reason); 22 U.S.C. 7631(d) (protecting entities from being required to use HIV/AIDS funds contrary to their "religious or moral objection").
[2] This document's references to "contraception," "contraceptive," "contraceptive coverage," or "contraceptive services" generally includes contraceptives, sterilization, and related patient education and counseling, unless otherwise indicated.

Departments"[3])—exercised the same discretion to allow exemptions to those requirements.

Through rulemaking, including three interim final rules, the Departments allowed exemptions

and accommodations for certain religious objectors where the Guidelines require coverage of

contraceptive services.  Many individuals and entities challenged the contraceptive coverage

requirement and regulations (hereinafter, the "contraceptive Mandate," or the "Mandate") as

being inconsistent with various legal protections, including the Religious Freedom Restoration

Act, 42 U.S.C. 2000bb-1.  Much of that litigation continues to this day.

        The Departments have recently exercised our discretion to reevaluate these exemptions

and accommodations.  This evaluation includes consideration of various factors, such as the

interests served by the existing Guidelines, regulations, and accommodation process[4]; the

extensive litigation; Executive Order 13798, "Promoting Free Speech and Religious Liberty"

(May 4, 2017); protection of the free exercise of religion in the First Amendment and by

Congress in the Religious Freedom Restoration Act of 1993; Congress' history of providing

protections for religious beliefs regarding certain health services (including contraception,

sterilization, and items or services believed to involve abortion); the discretion afforded under

section 2713(a)(4) of the PHS Act; the structure and intent of that provision in the broader

context of section 2713 and the Patient Protection and Affordable Care Act; the regulatory

process and comments submitted in various requests for public comments (including in the

Departments' 2016 Request for Information).

        In light of these factors, the Departments issue these new interim final rules to better

balance the Government's interest in ensuring coverage for contraceptive and sterilization

---

[3] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.
[4] In this document, we generally use "accommodation" and "accommodation process" interchangeably.

services in relation to the Government's interests, including as reflected throughout Federal law,

to provide conscience protections for individuals and entities with sincerely held religious beliefs

in certain health care contexts, and to minimize burdens in our regulation of the health insurance

market.

A.   The Affordable Care Act

Collectively, the Patient Protection and Affordable Care Act (Pub. L. 111-148), enacted

on March 23, 2010, and the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-

152), enacted on March 30, 2010, are known as the Affordable Care Act.  In signing the

Affordable Care Act, President Obama issued Executive Order 13535 (March 24, 2010), which

declared that, "[u]nder the Act, longstanding Federal laws to protect conscience (such as the

Church Amendment, 42 U.S.C. 300a-7, and the Weldon Amendment, section 508(d)(1) of Public

Law 111-8) remain intact" and that "[n]umerous executive agencies have a role in ensuring that

these restrictions are enforced, including the HHS."

The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of

title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health

insurance issuers in the group and individual markets.  In addition, the Affordable Care Act adds

section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section

9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title

XXVII of the PHS Act into ERISA and the Code, and thereby make them applicable to certain

group health plans regulated under ERISA or the Code.  The sections of the PHS Act

incorporated into ERISA and the Code are sections 2701 through 2728 of the PHS Act.

These interim final rules concern section 2713 of the PHS Act.  Where it applies, section

2713(a)(4) of the PHS Act requires coverage without cost sharing for "such additional" women's

preventive care and screenings "as provided for" and "supported by" guidelines developed by HRSA/HHS.  The Congress did not specify any particular additional preventive care and screenings with respect to women that HRSA could or should include in its Guidelines, nor did Congress indicate whether the Guidelines should include contraception and sterilization.

The Departments have consistently interpreted section 2714(a)(4) PHS Act's grant of authority to include broad discretion to decide the extent to which HRSA will provide for and support the coverage of additional women's preventive care and screenings in the Guidelines.  In turn, the Departments have interpreted that discretion to include the ability to exempt entities from coverage requirements announced in HRSA's Guidelines.  That interpretation is rooted in the text of section 2713(a)(4) of the PHS Act, which allows HRSA to decide the extent to which the Guidelines will provide for and support the coverage of additional women's preventive care and screenings.

Accordingly, the Departments have consistently interpreted section 2713(a)(4) of the PHS Act's reference to "comprehensive guidelines supported by HRSA for purposes of this paragraph" to grant HRSA authority to develop such Guidelines.  And because the text refers to Guidelines "supported by HRSA for purposes of this paragraph," the Departments have consistently interpreted that authority to afford HRSA broad discretion to consider the requirements of coverage and cost-sharing in determining the nature and extent of preventive care and screenings recommended in the guidelines.  (76 FR 46623).  As the Departments have noted, these Guidelines are different from "the other guidelines referenced in section 2713(a) of the PHS Act, which pre-dated the Affordable Care Act and were originally issued for purposes of identifying the non-binding recommended care that providers should provide to patients."  Id. Guidelines developed as nonbinding recommendations for care implicate significantly different

legal and policy concerns than guidelines developed for a mandatory coverage requirement.  To guide HRSA in exercising the discretion afforded to it in section 2713(a)(4) of the PHS Act, the Departments have previously promulgated regulations defining the scope of permissible exemptions and accommodations for such guidelines.  (45 CFR 147.131).  The interim final rules set forth herein are a necessary and appropriate exercise of the authority of HHS, of which HRSA is a component, and of the authority delegated to the Departments collectively as administrators of the statutes.  (26 U.S.C. 9833; 29 U.S.C. 1191c; 42 U.S.C. 300gg-92)

Our interpretation of section 2713(a)(4) of the PHS Act is confirmed by the Affordable Care Act's statutory structure.  Congress did not intend to require entirely uniform coverage of preventive services (76 FR 46623).  To the contrary, Congress carved out an exemption from section 2713 of the PHS Act for grandfathered plans.  In contrast, this exemption is not applicable to many of the other provisions in Title I of the Affordable Care Act—provisions previously referred to by the Departments as providing "particularly significant protections." (75 FR 34540).  Those provisions include: section 2704 of the PHS Act, which prohibits preexisting condition exclusions or other discrimination based on health status in group health coverage; section 2708 of the PHS Act, which prohibits excessive waiting periods (as of January 1, 2014); section 2711 of the PHS Act, which relates to lifetime limits; section 2712 of the PHS Act, which prohibits rescission of health insurance coverage; section 2714 of the PHS Act, which extends dependent coverage until age 26; and section 2718 of the PHS Act, which imposes a medical loss ratio on health insurance issuers in the individual and group markets (for insured coverage), or requires them to provide rebates to policyholders. (75 FR 34538, 34540, 34542). Consequently, of the 150 million nonelderly people in America with employer-sponsored health coverage, approximately 25.5 million are estimated to be enrolled in grandfathered plans not

subject to section 2713 of the PHS Act.[5]  As the Supreme Court observed, "there is no legal

requirement that grandfathered plans ever be phased out."  Burwell v. Hobby Lobby Stores, Inc.,

134 S. Ct. 2751, 2764 n.10 (2014).

The Departments' interpretation of section 2713(a)(4) of the PHS Act to permit HRSA to

establish exemptions from the Guidelines, and of the Departments' own authority as

administering agencies to guide HRSA in establishing such exemptions, is also consistent with

Executive Order 13535.  That order, issued upon the signing of the Affordable Care Act,

specified that "longstanding Federal laws to protect conscience . . . remain intact," including

laws that protect religious beliefs (and moral convictions) from certain requirements in the health

care context.  While the text of Executive Order 13535 does not require the expanded

exemptions issued in these interim final rules, the expanded exemptions are, as explained below,

consistent with longstanding Federal laws to protect religious beliefs regarding certain health

matters, and are consistent with the intent that the Affordable Care Act would be implemented in

accordance with the protections set forth in those laws.

B.  The Regulations Concerning Women's Preventive Services

On July 19, 2010, the Departments issued interim final rules implementing section 2713

of the PHS Act (75 FR 41726).  Those interim final rules charged HRSA with developing the

Guidelines authorized by section 2713(a)(4) of the PHS.

1.  The Institute of Medicine Report

In developing the Guidelines, HRSA relied on an independent report from the Institute of

Medicine (IOM, now known as the National Academy of Medicine) on women's preventive

services, issued on July 19, 2011, "Clinical Preventive Services for Women, Closing the Gaps"

---

[5] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2017 Annual
Survey," available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

(IOM 2011).  The IOM's report was funded by the HHS Office of the Assistant Secretary for
Planning and Evaluation (ASPE), pursuant to a funding opportunity that charged the IOM to
conduct a review of effective preventive services to ensure women's health and well-being.[6]

The IOM made a number of recommendations with respect to women's preventive
services.  As relevant here, the IOM recommended that the Guidelines cover the full range of
Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures,
and patient education and counseling for women with reproductive capacity.  Because FDA
includes in the category of "contraceptives" certain drugs and devices that may not only prevent
conception (fertilization), but may also prevent implantation of an embryo,[7] the IOM's
recommendation included several contraceptive methods that many persons and organizations
believe are abortifacient—that is, as causing early abortion—and which they conscientiously
oppose for that reason distinct from whether they also oppose contraception or sterilization.

One of the 16 members of the IOM committee, Dr. Anthony LoSasso, a Professor at the
University of Illinois at Chicago School of Public Health, wrote a formal dissenting opinion. He
argued that the IOM committee did not have sufficient time to evaluate fully the evidence on
whether the use of preventive services beyond those encompassed by the United States
Preventive Services Task Force (USPSTF), HRSA's Bright Futures Project, and the Advisory
Committee on Immunization Practices (ACIP) leads to lower rates of disability or disease and
increased rates of well-being.  He further argued that "the recommendations were made without
high quality, systematic evidence of the preventive nature of the services considered," and that

---

[6] Because section 2713(a)(4) of the PHS Act specifies that the HRSA Guidelines shall include preventive care and
screenings "with respect to women," the Guidelines exclude services relating to a man's reproductive capacity, such
as vasectomies and condoms.

[7] FDA's guide "Birth Control: Medicines To Help You," specifies that various approved contraceptives, including
Levonorgestrel, Ulipristal Acetate, and IUDs, work mainly by preventing fertilization and "may also work ... by
preventing attachment (implantation) to the womb (uterus)" of a human embryo after fertilization.  Available at
https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm.

Exhibit A

"the committee process for evaluation of the evidence lacked transparency and was largely

subject to the preferences of the committee's composition.  Troublingly, the process tended to

result in a mix of objective and subjective determinations filtered through a lens of advocacy."

Dr. LoSasso also raised concerns that the committee did not have time to develop a framework

for determining whether coverage of any given preventive service leads to a reduction in

healthcare expenditure.[8]  (IOM 2011 at 231–32).  In its response to Dr. LoSasso, the other 15

committee members stated, in part, that "At the first committee meeting, it was agreed that cost

considerations were outside the scope of the charge, and that the committee should not attempt to

duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and

Bright Futures. HHS, with input from this committee, may consider other factors including cost

in its development of coverage decisions."

2.  HRSA's 2011 Guidelines and the Departments' Second Interim Final Rules

On August 1, 2011, HRSA released onto its website its Guidelines for women's

preventive services, adopting the recommendations of the IOM.

https://www.hrsa.gov/womensguidelines/  The Guidelines included coverage for all FDA-

approved contraceptives, sterilization procedures, and related patient education and counseling

for women with reproductive capacity, as prescribed by a health care provider.

In administering this Mandate, on August 1, 2011, the Departments promulgated interim

final rules amending our 2010 interim final rules. (76 FR 46621) (2011 interim final rules).  The

2011 interim final rules specify that HRSA has the authority to establish exemptions from the

contraceptive coverage requirement for certain group health plans established or maintained by

certain religious employers and for health insurance coverage provided in connection with such

---

[8] The Departments do not relay these dissenting remarks as an endorsement of the remarks, but to describe the
history of the Guidelines, which includes this part of the report that IOM provided to HRSA.

plans.[9]  The 2011 interim final rules defined an exempt "religious employer" narrowly as one that: (1) had the inculcation of religious values as its purpose; (2) primarily employed persons who shared its religious tenets; (3) primarily served persons who shared its religious tenets; and (4) was a nonprofit organization, as described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code.  Those relevant sections of the Code include only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of a religious order.  The practical effect of the rules' definition of "religious employer" was to create potential uncertainty about whether employers, including many of those houses of worship or their integrated auxiliaries, would fail to qualify for the exemption if they engaged in outreach activities toward persons who did not share their religious tenets.[10]  As the basis for adopting that limited definition of religious employer, the 2011 interim final rules stated that they relied on the laws of some "States that exempt certain religious employers from having to comply with State law requirements to cover contraceptive services."  (76 FR 46623).  That same day, HRSA exercised the discretion described in the 2011 interim final rules to provide the exemption.

3.   The Departments' Subsequent Rulemaking on the Accommodation and Third Interim Final Rules

    Final regulations issued on February 10, 2012, adopted the definition of "religious employer" in the 2011 interim final rules without modification (2012 final regulations).[11]  (77 FR 8725).  The exemption did not require religious employers to file any certification form or comply with any other information collection process.

---

[9] The 2011 amended interim final rules were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011. (76 FR 46621).

[10] See, for example, Comments of the United States Conference of Catholic Bishops on Interim Final Rules on Preventive Services, File Code CMS-9992-IFC2 (Aug. 31, 2011).

[11] The 2012 final regulations were published on February 15, 2012 (77 FR 8725).

Contemporaneous with the issuance of the 2012 final regulations, HHS—with the agreement of the Department of Labor (DOL) and the Department of the Treasury—issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments with respect to group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and the group health insurance coverage provided in connection with such plans).[12]  The guidance provided that the temporary safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013.  The temporary safe harbor did not apply to for-profit entities.  The Departments stated that, during the temporary safe harbor, the Departments would engage in rulemaking to achieve "two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, nonprofit organizations' religious objections to covering contraceptive services."  (77 FR 8727).

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described possible approaches to achieve those goals with respect to religious nonprofit organizations, and solicited public comments on the same.  (77 FR 16501).  Following review of the comments on the ANPRM, the Departments published proposed regulations on February 6, 2013 (2013 NPRM) (78 FR 8456).

---

[12] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at: http://www.lb7.uscourts.gov/documents/12cv3932.pdf.  The guidance, as reissued on August 15, 2012, clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance.  See final rule entitled "Student Health Insurance Coverage" published March 21, 2012 (77 FR 16457).

The 2013 NPRM proposed to expand the definition of "religious employer" for purposes of the religious employer exemption.  Specifically, it proposed to require only that the religious employer be organized and operate as a nonprofit entity and be referred to in section 6033(a)(3)(A)(i) or (iii) of the Code, eliminating the requirements that a religious employer (1) have the inculcation of religious values as its purpose, (2) primarily employ persons who share its religious tenets, and (3) primarily serve persons who share its religious tenets.

The 2013 NPRM also proposed to create a compliance process, which it called an accommodation, for group health plans established, maintained, or arranged by certain eligible religious nonprofit organizations that fell outside the houses of worship and integrated auxiliaries covered by section 6033(a)(3)(A)(i) or (iii) of the Code (and, thus, outside of the religious employer exemption).  The 2013 NPRM proposed to define such eligible organizations as nonprofit entities that hold themselves out as religious, oppose providing coverage for certain contraceptive items on account of religious objections, and maintain a certification to this effect in their records.  The 2013 NPRM stated, without citing a supporting source, that employees of eligible organizations "may be less likely than" employees of exempt houses of worship and integrated auxiliaries to share their employer's faith and opposition to contraception on religious grounds.  (78 FR 8461).  The 2013 NPRM therefore proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries enrolled in the eligible organization's plan—

and without any cost to the eligible organization.[13]  In the case of a self-insured group health plan established or maintained by an eligible organization, the 2013 NPRM presented potential approaches under which the third party administrator of the plan would provide or arrange for contraceptive coverage to plan participants and beneficiaries.

On August 15, 2012, the Departments also extended our temporary safe harbor until the first plan year beginning on or after August 1, 2013.

The Departments published final regulations on July 2, 2013 (July 2013 final regulations).  (78 FR 39869).  The July 2013 final regulations finalized the expansion of the exemption for houses of worship and their integrated auxiliaries. Although some commenters had suggested that the exemption be further expanded, the Departments declined to adopt that approach.  The July 2013 regulations stated that, because employees of objecting houses of worship and integrated auxiliaries are relatively likely to oppose contraception, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement."  (78 FR 39874).  But, like the 2013 NPRM, the July 2013 regulations assumed that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection" to contraceptives. (Id.)

The July 2013 regulations also finalized an accommodation for eligible organizations. Under the accommodation, an eligible organization was required to submit a self-certification to its group health insurance issuer or third party administrator, as applicable.  Upon receiving that self-certification, the issuer or third party administrator would provide or arrange for payments for the contraceptive services to the plan participants and beneficiaries enrolled in the eligible

---

[13] The NPRM proposed to treat student health insurance coverage arranged by eligible organizations that are institutions of higher education in a similar manner.

organization's plan, without requiring any cost sharing on the part of plan participants and beneficiaries and without cost to the eligible organization.  With respect to self-insured plans, the third party administrators (or issuers they contracted with) could receive reimbursements by reducing user fee payments (to Federally facilitated Exchanges) by the amounts paid out for contraceptive services under the accommodation, plus an allowance for certain administrative costs, as long as the Secretary of the Department of Health and Human Services requests and an authorizing exception under OMB Circular No. A-25R is in effect.[14]  With respect to fully insured group health plans, the issuer was expected to bear the cost of such payments,[15] and HHS intended to clarify in guidance that the issuer could treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk corridor program calculations.

With respect to self-insured group health plans, the July 2013 final regulations specified that the self-certification was an instrument under which the plan was operated and that it obligated the third party administrator to provide or arrange for contraceptive coverage by operation of section 3(16) of ERISA.  The regulations stated that, by submitting the self-certification form, the eligible organization "complies" with the contraceptive coverage requirement and does not have to contract, arrange, pay, or refer for contraceptive coverage. See, for example, Id. at 39874, 39896.  Consistent with these statements, the Departments, through the Department of Labor, issued a self-certification form, EBSA Form 700.  The form stated, in indented text labeled as a "Notice to Third Party Administrators of Self-Insured Health Plans," that "[t]he obligations of the third party administrator are set forth in 26 CFR 54.9815-

---

[14] See also 45 CFR 156.50. Under the regulations, if the third party administrator does not participate in a Federally facilitated Exchange as an issuer, it is permitted to contract with an insurer which does so participate, in order to obtain such reimbursement.  The total contraceptive user fee adjustment for the 2015 benefit year was $33 million.
[15] "[P]roviding payments for contraceptive services is cost neutral for issuers." (78 FR 39877).

2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A" and concluded, in unindented text, that "[t]his form is an instrument under which the plan is operated."

The Departments extended the temporary safe harbor again on June 20, 2013, to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014.  The guidance extending the safe harbor included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary safe harbor if no prior form had been submitted.

4.   Litigation Over the Mandate and the Accommodation Process

During the period when the Departments were publishing and modifying our regulations, organizations and individuals filed dozens of lawsuits challenging the Mandate.  Plaintiffs included religious nonprofit organizations, businesses run by religious families, individuals, and others. Religious plaintiffs principally argued that the Mandate violated the Religious Freedom Restoration Act of 1993 (RFRA) by forcing them to provide coverage or payments for sterilization and contraceptive services, including what they viewed as early abortifacient items, contrary to their religious beliefs.  Based on this claim, in July 2012 a Federal district court issued a preliminary injunction barring the Departments from enforcing the Mandate against a family-owned business. Newland v. Sebelius, 881 F. Supp. 2d. 1287 (D. Colo. 2012). Multiple other courts proceeded to issue similar injunctions against the Mandate, although a minority of courts ruled in the Departments' favor. Compare Tyndale House Publishers, Inc. v. Sebelius, 904 F. Supp. 2d 106 (D.D.C. 2012), and The Seneca Hardwood Lumber Company, Inc. v. Sebelius (sub nom Geneva Coll. v. Sebelius), 941 F. Supp. 2d 672 (W.D. Pa. 2013), with O'Brien v. U.S. Dep't of Health & Human Servs., 894 F. Supp. 2d 1149 (E.D. Mo. 2012).

A circuit split swiftly developed in cases filed by religiously motivated for-profit businesses, to which neither the religious employer exemption nor the eligible organization accommodation (as then promulgated) applied. Several for-profit businesses won rulings against the Mandate before the Unites States Court of Appeals for the Tenth Circuit, sitting en banc, while similar rulings against the Departments were issued by the Seventh and District of Columbia (D.C.) Circuits. Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013); Korte v. Sebelius, 735 F.3d 654 (7th Cir. 2013); Gilardi v. U.S. Dep't of Health & Human Servs., 733 F.3d 1208 (D.C. Cir. 2013). The Third and Sixth Circuits disagreed with similar plaintiffs, and in November 2013 the U.S. Supreme Court granted certiorari in Hobby Lobby and Conestoga Wood Specialties Corp. v. Secretary of U.S. Department of Health & Human Services, 724 F.3d 377 (3d Cir. 2013), to resolve the circuit split.

On June 30, 2014, the Supreme Court ruled against the Departments and held that, under RFRA, the Mandate could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage.[16] Burwell v. Hobby Lobby Stores, Inc. 134 S. Ct. 2751 (2014). The Court held that the "contraceptive mandate 'substantially burdens' the exercise of religion" as applied to employers that object to providing contraceptive coverage on religious grounds, and that the plaintiffs were therefore entitled to an exemption unless the Mandate was the least restrictive means of furthering a compelling governmental interest. Id. at 2775. The Court observed that, under the compelling interest test of RFRA, the Departments could not rely on interests "couched in very broad terms, such as promoting 'public health' and 'gender equality,' but rather, had to demonstrate that a compelling interest was served by refusing an exemption to the "particular claimant[s]" seeking

---

[16] The Supreme Court did not decide whether RFRA would apply to publicly traded for-profit corporations. See 134 S. Ct. at 2774.

an exemption.  Id. at 2779.  Assuming without deciding that a compelling interest existed, the

Court held that the Government's goal of guaranteeing coverage for contraceptive methods

without cost sharing could be achieved in a less restrictive manner.  The Court observed that

"[t]he most straightforward way of doing this would be for the Government to assume the cost of

providing the four contraceptives at issue to any women who are unable to obtain them under

their health-insurance policies due to their employers' religious objections."  Id. at 2780.  The

Court also observed that the Departments had "not provided any estimate of the average cost per

employee of providing access to these contraceptives," nor "any statistics regarding the number

of employees who might be affected because they work for corporations like Hobby Lobby,

Conestoga, and Mardel".  Id. at 2780–81.  But the Court ultimately concluded that it "need not

rely on the option of a new, government-funded program in order to conclude that the HHS

regulations fail the least-restrictive means test" because "HHS itself ha[d] demonstrated that it

ha[d] at its disposal an approach that is less restrictive than requiring employers to fund

contraceptive methods that violate their religious beliefs."  Id. at 2781-82.  The Court explained

that the "already established" accommodation process available to nonprofit organizations was a

less-restrictive alternative that "serve[d] HHS's stated interests equally well," although the Court

emphasized that its ruling did not decide whether the accommodation process "complie[d] with

RFRA for purposes of all religious claims".  Id. at 2788–82.

        Meanwhile, another plaintiff obtained temporary relief from the Supreme Court in a case

challenging the accommodation under RFRA.  Wheaton College, a Christian liberal arts college

in Illinois, objected that the accommodation was a compliance process that rendered it complicit

in delivering payments for abortifacient contraceptive services to its employees.  Wheaton

College refused to execute the EBSA Form 700 required under the July 2013 final regulations.  It

was denied a preliminary injunction in the Federal district and appellate courts, and sought an

emergency injunction pending appeal from the Unites States Supreme Court on June 30, 2014.

On July 3, 2014, the Supreme Court issued an interim order in favor of the College, stating that,

"[i]f the [plaintiff] informs the Secretary of Health and Human Services in writing that it is a

nonprofit organization that holds itself out as religious and has religious objections to providing

coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and

the Treasury] are enjoined from enforcing [the Mandate] against the [plaintiff] . . .  pending final

disposition of appellate review." Wheaton College v. Burwell. 134 S. Ct. 2806, 2807 (2014).

The order stated that Wheaton College did not need to use EBSA Form 700 or send a copy of the

executed form to its health insurance issuers or third party administrators to meet the condition

for injunctive relief.  Id.

       In response to this litigation, on August 27, 2014, the Departments simultaneously issued

a third set of interim final rules (August 2014 interim final rules) (79 FR 51092), and a notice of

proposed rulemaking (August 2014 proposed rules) (79 FR 51118).  The August 2014 interim

final rules changed the accommodation process so that it could be initiated either by self-

certification using EBSA Form 700 or through a notice informing the Secretary of the

Department of Health and Human Services that an eligible organization had religious objections

to coverage of all or a subset of contraceptive services.  (79 FR 51092).  In response to Hobby

Lobby, the August 2014 proposed rules extended the accommodation process to closely held for-

profit entities with religious objections to contraceptive coverage, by including them in the

definition of eligible organizations.  (79 FR 51118).  Neither the August 2014 interim final rules

nor the August 2014 proposed rules extended the exemption, and neither added a certification

requirement for exempt entities.

In October 2014, based on an interpretation of the Supreme Court's interim order, HHS deemed Wheaton College as having submitted a sufficient notice to HHS.  HHS conveyed that interpretation to the DOL, so as to trigger the accommodation process.

On July 14, 2015, the Departments finalized both the August 2014 interim final rules and the August 2014 proposed rules in a set of final regulations (the July 2015 final regulations) (80 FR 41318).  (The July 2015 final regulations also encompassed issues related to other preventive services coverage.)  The preamble to the July 2015 final regulations stated that, through the accommodation, payments for contraceptives and sterilization would be provided in a way that is "seamless" with the coverage that eligible employers provide to their plan participants and beneficiaries.  Id. at 41328.  The July 2015 final regulations allowed eligible organizations to submit a notice to HHS as an alternative to submitting the EBSA Form 700, but specified that such notice must include the eligible organization's name and an expression of its religious objection, along with the plan name, plan type, and name and contact information for any of the plan's third party administrators or health insurance issuers.  The Departments indicated that such information represents the minimum information necessary for us to administer the accommodation process.

When an eligible organization maintains an insured group health plan or student health plan and provides the alternative notice, the July 2015 final regulations provide that HHS will inform the health insurance issuer of its obligations to cover contraceptive services to which the eligible organization objects.  Where an eligible organization maintains a self-insured plan under ERISA and provides the alternative notice, the regulations provide that DOL will work with HHS to send a separate notification to the self-insured plan's third party administrator(s).  The regulations further provide that such notification is an instrument under which the plan is

Exhibit A

operated for the purposes of section 3(16) of ERISA, and the instrument would designate the third party administrator as the entity obligated to provide or arrange for payments for contraceptives to which the eligible organization objects.  The July 2015 final regulations continue to apply the amended notice requirement to eligible organizations that sponsor church plans exempt from ERISA pursuant to section 4(b)(2) of ERISA, but acknowledge that, with respect to the operation of the accommodation process, section 3(16) of ERISA does not provide a mechanism to impose an obligation to provide contraceptive coverage as a plan administrator on those eligible organizations' third party administrators.  (80 FR 41323).

Meanwhile, a second split among Federal appeals courts had developed involving challenges to the Mandate's accommodation.  Many religious nonprofit organizations argued that the accommodation impermissibly burdened their religious beliefs because it utilized the plans the organizations themselves sponsored to provide services to which they objected on religious grounds.  They objected to the self-certification requirement on the same basis. Federal district courts split in the cases, granting preliminary injunction motions to religious groups in the majority of cases, but denying them to others.  In most appellate cases, religious nonprofit organizations lost their challenges, where the courts often concluded that the accommodation imposed no substantial burden on their religious exercise under RFRA.  For example, Priests for Life v. U.S. Dep't of Health and Human Servs., 772 F. 3d 229 (D.C. Cir. 2014); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151 (10th Cir. 2015); Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs., 778 F.3d 422 (3d Cir. 2015).  But the Eighth Circuit disagreed and ruled in favor of religious nonprofit employers. Dordt College v. Burwell, 801 F.3d 946, 949–50 (8th Cir. 2015) (relying on Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., 801 F.3d 927 (8th Cir. 2015)).

On November 6, 2015, the U.S. Supreme Court granted certiorari in seven similar cases

under the title of a filing from the Third Circuit, <u>Zubik v. Burwell</u>.  The Court held oral argument

on March 23, 2016, and, after the argument, asked the parties to submit supplemental briefs

addressing "whether and how contraceptive coverage may be obtained by petitioners' employees

through petitioners' insurance companies, but in a way that does not require any involvement of

petitioners beyond their own decision to provide health insurance without contraceptive coverage

to their employees".  In a brief filed with the Supreme Court on April 12, 2016, the Government

stated on behalf of the Departments that the accommodation process for eligible organizations

with insured plans could operate without any self-certification or written notice being submitted

by eligible organizations.

On May 16, 2016, the Supreme Court issued a per curiam opinion in <u>Zubik</u>, vacating the

judgments of the Courts of Appeals and remanding the cases "in light of the substantial

clarification and refinement in the positions of the parties" in their supplemental briefs.  (136 S.

Ct. 1557, 1560 (2016).)  The Court stated that it anticipated that, on remand, the Courts of

Appeals would "allow the parties sufficient time to resolve any outstanding issues between

them."  <u>Id.</u>  The Court also specified that "the Government may not impose taxes or penalties on

petitioners for failure to provide the relevant notice" while the cases remained pending. <u>Id.</u> at

1561.

After remand, as indicated by the Departments in court filings, some meetings were held

between attorneys for the Government and for the plaintiffs in those cases.  Separately, at various

times after the Supreme Court's remand order, HHS and DOL sent letters to the issuers and third

party administrators of certain plaintiffs in <u>Zubik</u> and other pending cases, directing the issuers

and third party administrators to provide contraceptive coverage for participants in those

plaintiffs' group health plans under the accommodation.  The Departments also issued a Request

for Information (RFI) on July 26, 2016, seeking public comment on options for modifying the

accommodation process in light of the supplemental briefing in <u>Zubik</u> and the Supreme Court's

remand order.  (81 FR 47741).  Public comments were submitted in response to the RFI, during a

comment period that closed on September 20, 2016.

On December 20, 2016, HRSA updated the Guidelines via its website,

https://www.hrsa.gov/womensguidelines2016/index.html.  HRSA announced that, for plans

subject to the Guidelines, the updated Guidelines would apply to the first plan year beginning

after December 20, 2017.  Among other changes, the updated Guidelines specified that the

required contraceptive coverage includes follow-up care (for example, management and

evaluation, as well as changes to, and removal or discontinuation of, the contraceptive method).

They also specified that coverage should include instruction in fertility awareness-based methods

for women desiring an alternative method of family planning.  HRSA stated that, with the input

of a committee operating under a cooperative agreement, HRSA would review and periodically

update the Women's Preventive Services' Guidelines.  The updated Guidelines did not alter the

religious employer exemption or accommodation process.

On January 9, 2017, the Departments issued a document entitled, "FAQs About

Affordable Care Act Implementation Part 36" (FAQ).[17]  The FAQ stated that, after reviewing

comments submitted in response to the 2016 RFI and considering various options, the

Departments could not find a way at that time to amend the accommodation so as to satisfy

---

[17] Available at: https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf and https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/ACA-FAQs-Part36_1-9-17-Final.pdf.

objecting eligible organizations while pursuing the Departments' policy goals.  Thus, the

litigation on remand from the Supreme Court remains unresolved.

A separate category of unresolved litigation involved religious employees as plaintiffs.

For example, in two cases, the plaintiff-employees work for a nonprofit organization that agrees

with the employees (on moral grounds) in opposing coverage of certain contraceptives they

believe to be abortifacient, and that is willing to offer them insurance coverage that omits such

services.  See March for Life v. Burwell, 128 F. Supp. 3d 116 (D.D.C. 2015); Real Alternatives,

150 F. Supp. 3d 419, *affirmed by* 867 F.3d 338 (3d Cir. 2017).  In another case, the plaintiff-

employees work for a State government entity that the employees claim is willing, under State

law, to provide a plan omitting contraception consistent with the employees' religious beliefs.

See Wieland v. HHS, 196 F. Supp. 3d 1010 (E.D. Mo. 2016).  Those and similar employee-

plaintiffs generally contend that the Mandate violates their rights under RFRA by making it

impossible for them to obtain health insurance consistent with their religious beliefs, either from

their willing employer or in the individual market, because the Departments offer no exemptions

encompassing either circumstance. Such challenges have seen mixed success.  Compare, for

example, Wieland, 196 F. Supp. 3d at 1020 (concluding that the Mandate violates the employee

plaintiffs' rights under RFRA and permanently enjoining the Departments) and March for Life,

128 F. Supp. 3d at 133–34 (same), with Real Alternatives, 2017 WL 3324690 at *18 (affirming

dismissal of employee plaintiffs' RFRA claim).

On May 4, 2017, the President issued an "Executive Order Promoting Free Speech and

Religious Liberty." Regarding "Conscience Protections with Respect to Preventive-Care

Mandate," that order instructs "[t]he Secretary of the Treasury, the Secretary of Labor, and the

Secretary of Health and Human Services [to] consider issuing amended regulations, consistent

with applicable law, to address conscience-based objections to the preventive-care mandate

promulgated under section 300gg-13(a)(4) of title 42, United States Code."

## II.    RFRA and Government Interests Underlying the Mandate

RFRA provides that the Government "shall not substantially burden a person's exercise

of religion even if the burden results from a rule of general applicability" unless the Government

"demonstrates that application of the burden to the person—(1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest."  42 U.S.C. 2000bb-1(a) and (b).  In Hobby Lobby, the Supreme Court

had "little trouble concluding" that, in the absence of an accommodation or exemption, "the HHS

contraceptive mandate 'substantially burden[s]' the exercise of religion. 42 U.S.C. 2000bb-1(a)."

134 S. Ct. at 2775.  And although the Supreme Court did not resolve the RFRA claims presented

in Zubik on their merits, it instructed the parties to consider alternative accommodations for the

objecting plaintiffs, after the Government suggested that such alternatives might be possible.

Despite multiple rounds of rulemaking, however, the Departments have not assuaged the

sincere religious objections to contraceptive coverage of numerous organizations, nor have we

resolved the pending litigation.  To the contrary, the Departments have been litigating RFRA

challenges to the Mandate and related regulations for more than 5 years, and dozens of those

challenges remain pending today.  That litigation, and the related modifications to the

accommodation, have consumed substantial governmental resources while creating uncertainty

for objecting organizations, issuers, third party administrators, employees, and beneficiaries.

Consistent with the President's Executive Order and the Government's desire to resolve the

pending litigation and prevent future litigation from similar plaintiffs, the Departments have

Exhibit A

concluded that it is appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate.

These interim final rules (and the companion interim final rules published elsewhere in this **Federal Register**) are the result of that reexamination.  The Departments acknowledge that coverage of contraception is an important and highly sensitive issue, implicating many different views, as reflected in the comments received on multiple rulemakings over the course of implementation of section 2713(a)(4) of the PHS Act.  After reconsidering the interests served by the Mandate in this particular context, the objections raised, and the applicable Federal law, the Departments have determined that an expanded exemption, rather than the existing accommodation, is the most appropriate administrative response to the religious objections raised by certain entities and organizations concerning the Mandate.  The Departments have accordingly decided to revise the regulations channeling HRSA authority under section 2713(a)(4) of the PHS to provide an exemption from the Mandate to a broader range of entities and individuals that object to contraceptive coverage on religious grounds, while continuing to offer the existing accommodation as an optional alternative.  The Departments have also decided to create a process by which a willing employer and issuer may allow an objecting individual employee to obtain health coverage without contraceptive coverage.  These interim final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the Guidelines.  These rules also do not change the many other mechanisms by which the Government advances contraceptive coverage, particularly for low-income women.

In addition to relying on the text of section 2713(a)(4) of the PHS Act and the Departments' discretion to promulgate rules to carry out the provisions of the PHS Act, the

Departments also draw on Congress' decision in the Affordable Care Act neither to specify that contraception must be covered nor to require inflexible across-the-board application of section 2713 of the PHS Act.  The Departments further consider Congress' extensive history of protecting religious objections when certain matters in health care are specifically regulated—often specifically with respect to contraception, sterilization, abortion, and activities connected to abortion.

Notable among the many statutes (listed in footnote 1 in Section I-Background) that include protections for religious beliefs are, not only the Church Amendments, but also protections for health plans or health care organizations in Medicaid or Medicare Advantage to object "on moral or religious grounds" to providing coverage of certain counseling or referral services.  (42 U.S.C. 1395w-22(j)(3)(B); 42 U.S.C. 1396u-2(b)(3)).  In addition, Congress has protected individuals who object to prescribing or providing contraceptives contrary to their religious beliefs.  Consolidated Appropriations Act of 2017, Division C, Title VII, Sec. 726(c) (Financial Services and General Government Appropriations Act), Pub. L. No. 115-31 (May 5, 2017).  Congress likewise provided that, if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans," "it is the intent of Congress that any legislation enacted on such issue should include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions".  Id.  at Division C, Title VIII, Sec. 808.  In light of the fact that Congress did not require HRSA to include contraception in Guidelines issued under section 2713 of the PHS Act, we consider it significant, in support of the implementation of those Guidelines by the expanded exemption in these interim final rules, that Congress' most recent statement on the prospect of Government mandated contraceptive coverage was to express

the specific intent that a conscience clause be provided and that it should protect religious

beliefs.

The Departments' authority to guide HRSA's discretion in determining the scope of any

contraceptive coverage requirement under section 2713(a)(4) of the PHS Act includes the

authority to provide exemptions and independently justifies this rulemaking.  The Departments

have also determined that requiring certain objecting entities or individuals to choose between

the Mandate, the accommodation, or penalties for noncompliance violates their rights under

RFRA.

A.  Elements of RFRA

1.  Substantial Burden

The Departments believe that agencies charged with administering a statute or associated

regulations or guidance that imposes a substantial burden on the exercise of religion under RFRA

have discretion in determining how to avoid the imposition of such burden.  The Departments

have previously contended that the Mandate does not impose a substantial burden on entities and

individuals.  With respect to the coverage Mandate itself, apart from the accommodation, and as

applied to entities with religious objections, our argument was rejected in Hobby Lobby, which

held that the Mandate imposes a substantial burden.  (134 S. Ct. at 2775–79.)  With respect to

whether the Mandate imposes a substantial burden on entities that may choose the

accommodation, but must choose between the accommodation, the Mandate, or penalties for

noncompliance, a majority of Federal appeals courts have held that the accommodation does not

impose a substantial burden on such entities (mostly religious nonprofit entities).

The Departments have reevaluated our position on this question, however, in light of all

the arguments made in various cases, public comments that have been submitted, and the

concerns discussed throughout these rules. We have concluded that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA. We believe that the Court's analysis in Hobby Lobby extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the accommodation process or the straightforward Mandate, and is subject to penalties or disadvantages that apply in this context if it chooses neither. As the Eighth Circuit stated in Sharpe Holdings, "[i]n light of [nonprofit religious organizations'] sincerely held religious beliefs, we conclude that compelling their participation in the accommodation process by threat of severe monetary penalty is a substantial burden on their exercise of religion…. That they themselves do not have to arrange or pay for objectionable contraceptive coverage is not determinative of whether the required or forbidden act is or is not religiously offensive". (801 F.3d at 942.)

Our reconsideration of these issues has also led us to conclude, consistent with the rulings in favor of religious employee plaintiffs in Wieland and March for Life cited above, that the Mandate imposes a substantial burden on the religious beliefs of individual employees who oppose contraceptive coverage and would be able to obtain a plan that omits contraception from a willing employer or issuer (as applicable), but cannot obtain one solely because of the Mandate's prohibition on that employer and/or issuer providing them with such a plan.

Consistent with our conclusion earlier this year after the remand of cases in Zubik and our reviewing of comments submitted in response to the 2016 RFI, the Departments believe there is not a way to satisfy all religious objections by amending the accommodation.

Exhibit A

Accordingly, the Departments have decided it is necessary and appropriate to provide the expanded exemptions set forth herein.

2.   Compelling Interest

Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not.  Under such circumstances, the Departments are required by law to alleviate the substantial burden created by the Mandate. Here, informed by the Departments' reassessment of the relevant interests, as well as by our desire to bring to a close the more than 5 years of litigation over RFRA challenges to the Mandate, the Departments have determined that the appropriate administrative response is to create a broader exemption, rather than simply adjusting the accommodation process.

RFRA requires the Government to respect religious beliefs under "the most demanding test known to constitutional law": where the Government imposes a substantial burden on religious exercise, it must demonstrate a compelling governmental interest and show that the law or requirement is the least restrictive means of furthering that interest. City of Boerne v. Flores, 521 U.S. 507, 534 (1997).  For an interest to be compelling, its rank must be of the "highest order".  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993); see also Sherbert v. Verner, 374 U.S. 398, 406–09 (1963); Wisconsin v. Yoder, 406 U.S. 205, 221–29 (1972).  In applying RFRA, the Supreme Court has "looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431 (2006).  To justify a substantial

burden on religious exercise under RFRA, the Government must show it has a compelling interest in applying the requirement to the "particular claimant[s] whose sincere exercise of religion is being substantially burdened." Id. at 430–31. Moreover, the Government must meet the "exceptionally demanding" least-restrictive-means standard. Hobby Lobby, 134 S. Ct. at 2780. Under that standard, the Government must establish that "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." Id.

Upon further examination of the relevant provisions of the Affordable Care Act and the administrative record on which the Mandate was based, the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest. The Departments have reached that conclusion for multiple reasons, no one of which is dispositive.

First, Congress did not mandate that contraception be covered at all under the Affordable Care Act. Instead, Congress merely provided for coverage of "such additional preventive care and screenings" for women "provided for in comprehensive guidelines supported by [HRSA]." Congress, thus, left the identification of any additional required preventive services for women to administrative discretion. The fact that Congress granted the Departments the authority to promulgate all rules appropriate and necessary for the administration of the relevant provisions of the Code, ERISA, and the PHS Act, including by channeling the discretion Congress afforded to HRSA to decide whether to require contraceptive coverage, indicates that the Departments' judgment should carry particular weight in considering the relative importance of the Government's interest in applying the Mandate to the narrow population of entities exempted in these rules.

Exhibit A

Second, while Congress specified that many health insurance requirements added by the Affordable Care Act—including provisions adjacent to section 2713 of the PHS Act—were so important that they needed to be applied to all health plans immediately, the preventive services requirement in section 2713 of the PHS Act was not made applicable to "grandfathered plans." That feature of the Affordable Care Act is significant: as cited above, seven years after the Affordable Care Act's enactment, approximately 25.5 million people are estimated to be enrolled in grandfathered plans not subject to section 2713 of the PHS Act. We do not suggest that a requirement that is inapplicable to grandfathered plans or otherwise subject to exceptions could never qualify as a serving a compelling interest under RFRA. For example, "[e]ven a compelling interest may be outweighed in some circumstances by another even weightier consideration." Hobby Lobby, 134 S. Ct. at 2780. But Congress' decision not to apply section 2713 of the PHS Act to grandfathered plans, while deeming other requirements closely associated in the same statute as sufficiently important to impose immediately, is relevant to our assessment of the importance of the Government interests served by the Mandate. As the Departments observed in 2010, those immediately applicable requirements were "particularly significant." (75 FR 34540). Congress' decision to leave section 2713 out of that category informs the Departments' assessment of the weight of the Government's interest in applying the Guidelines issued pursuant to section 2713 of the PHS Act to religious objectors.

Third, various entities that brought legal challenges to the Mandate (including some of the largest employers) have been willing to provide coverage of some, though not all, contraceptives. For example, the plaintiffs in Hobby Lobby were willing to provide coverage with no cost sharing of 14 of 18 FDA-approved women's contraceptive and sterilization methods. (134 S. Ct. at 2766.) With respect to organizations and entities holding those beliefs,

the fact that they are willing to provide coverage for various contraceptive methods significantly detracts from the government interest in requiring that they provide coverage for other contraceptive methods to which they object.

Fourth, the case for a compelling interest is undermined by the existing accommodation process, and how it applies to certain similarly situated entities based on whether or not they participate in certain self-insured group health plans, known as church plans, under applicable law.  The Departments previously exempted eligible organizations from the contraceptive coverage requirement, and created an accommodation under which those organizations bore no obligation to provide for such coverage after submitting a self-certification or notice.  Where a non-exempt religious organization uses an insured group health plan instead of a self-insured church plan, the health insurance issuer would be obliged to provide contraceptive coverage or payments to the plan's participants under the accommodation.  Even in a self-insured church plan context, the preventive services requirement in section 2713(a)(4) of the PHS Act applies to the plan, and through the Code, to the religious organization that sponsors the plan.  But under the accommodation, once a self-insured church plan files a self-certification or notice, the accommodation relieves it of any further obligation with respect to contraceptive services coverage.  Having done so, the accommodation process would normally transfer the obligation to provide or arrange for contraceptive coverage to a self-insured plan's third party administrator (TPA).  But the Departments lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it.  This is because church plans are exempt from ERISA pursuant to section 4(b)(2) of ERISA.  Section 2761(a) of the PHS Act provides that States may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but not as they pertain to church plans that do not provide coverage

through a policy issued by a health insurance issuer.  The combined result of PHS Act section

2713's authority to remove contraceptive coverage obligations from self-insured church plans,

and HHS's and DOL's lack of authority under the PHS Act or ERISA to require TPAs to

become administrators of those plans to provide such coverage, has led to significant incongruity

in the requirement to provide contraceptive coverage among nonprofit organizations with

religious objections to the coverage.

     More specifically, issuers and third party administrators for some, but not all, religious

nonprofit organizations are subject to enforcement for failure to provide contraceptive coverage

under the accommodation, depending on whether they participate in a self-insured church plan.

Notably, many of those nonprofit organizations are not houses of worship or integrated

auxiliaries.  Under section 3(33)(C)(iv) of ERISA, many organizations in self-insured church

plans need not be churches, but can merely "share[] common religious bonds and convictions

with [a] church or convention or association of churches".  The effect is that many similar

religious organizations are being treated very differently with respect to their employees

receiving contraceptive coverage—depending on whether the organization is part of a church

plan—even though the Departments claimed a compelling interest to deny exemptions to all such

organizations. In this context, the fact that the Mandate and the Departments' application thereof

"leaves appreciable damage to [their] supposedly vital interest unprohibited" is strong evidence

that the Mandate "cannot be regarded as protecting an interest 'of the highest order." Lukumi,

508 U.S. at 520 (citation and quotation marks omitted).

     Fifth, the Departments' previous assertion that the exemption for houses of worship was

offered to respect a certain sphere of church autonomy (80 FR 41325) does not adequately

explain some of the disparate results of the existing rules.  And the desire to respect church

autonomy is not grounds to prevent the Departments from expanding the exemption to other

religious entities.  The Departments previously treated religious organizations that operate in a

similar fashion very differently for the purposes of the Mandate.  For example, the Departments

exempted houses of worship and integrated auxiliaries that may conduct activities, such as the

operating of schools, that are also conducted by non-exempt religious nonprofit organizations.

Likewise, among religious nonprofit groups that were not exempt as houses of worship or

integrated auxiliaries, many operate their religious activities similarly even if they differ in

whether they participate in self-insured church plans.  As another example, two religious

colleges might have the same level of religiosity and commitment to defined ideals, but one

might identify with a specific large denomination and choose to be in a self-insured church plan

offered by that denomination, while another might not be so associated or might not have as

ready access to a church plan and so might offer its employees a fully insured health plan. Under

the accommodation, employees of the college using a fully insured plan (or a self-insured plan

that is not a church plan) would receive coverage of contraceptive services without cost sharing,

while employees of the college participating in the self-insured church plan would not receive

the coverage where that plan required its third party administrator to not offer the coverage.

        As the Supreme Court recently confirmed, a self-insured church plan exempt from

ERISA through ERISA 3(33) can include a plan that is not actually established or maintained by

a church or by a convention or association of churches, but is maintained by "an organization …

the principal purpose or function of which is the administration or funding of a plan or program

for the provision of retirement benefits or welfare benefits, or both, for the employees of a

church or a convention or association of churches, if such organization is controlled by or

associated with a church or a convention or association of churches" (a so-called  "principal-

purpose organization"). See <u>Advocate Health Care Network v. Stapleton</u>, 137 S. Ct. 1652, 1656-

57 (U.S. June 5, 2017); ERISA 3(33)(C). While the Departments take no view on the status of

these particular plans, the Departments acknowledge that the church plan exemption not only

includes some non-houses-of-worship as organizations whose employees can be covered by the

plan, but also, in certain circumstances, may include plans that are not themselves established

and maintained by houses of worship. Yet, such entities and plans—if they file a self-

certification or notice through the existing accommodation—are relieved of obligations under the

contraceptive Mandate and their third party administrators are not subject to a requirement that

they provide contraceptive coverage to their plan participants and beneficiaries.

After considering the differential treatment of various religious nonprofit organizations

under the previous accommodation, the Departments conclude that it is appropriate to expand the

exemption to other religious nonprofit organizations with sincerely held religious beliefs

opposed to contraceptive coverage. We also conclude that it is not appropriate to limit the scope

of a religious exemption by relying upon a small minority of State laws that contain narrow

exemptions that focus on houses of worship and integrated auxiliaries. (76 FR 46623.)

Sixth, the Government's interest in ensuring contraceptive coverage for employees of

particular objecting employers is undermined by the characteristics of many of those employers,

especially nonprofit employers. The plaintiffs challenging the existing accommodation include,

among other organizations, religious colleges and universities, and religious orders that provide

health care or other charitable services. Based in part on our experience litigating against such

organizations, the Departments now disagree with our previous assertion that "[h]ouses of

worship and their integrated auxiliaries that object to contraceptive coverage on religious

grounds are more likely than other employers to employ people of the same faith who share the

Exhibit A

same objection."[18] (78 FR 39874.)  Although empirical data was not required to reach our

previous conclusion, we note that the conclusion was not supported by any specific data or other

source, but instead was intended to be a reasonable assumption.  Nevertheless, in the litigation

and in numerous public comments submitted throughout the regulatory processes described

above, many religious nonprofit organizations have indicated that they possess deep religious

commitments even if they are not houses of worship or their integrated auxiliaries.  Some of the

religious nonprofit groups challenging the accommodation claim that their employees are

required to adhere to a statement of faith which includes the entities' views on certain

contraceptive items.[19]  The Departments recognize, of course, that not all of the plaintiffs

challenging the accommodation require all of their employees (or covered students) to share their

religious objections to contraceptives.  At the same time, it has become apparent from public

comments and from court filings in dozens of cases—encompassing hundreds of organizations—

that many religious nonprofit organizations express their beliefs publicly and hold themselves

out as organizations for whom their religious beliefs are vitally important.  Employees of such

organizations, even if not required to sign a statement of faith, often have access to, and

knowledge of, the views of their employers on contraceptive coverage, whether through the

organization's published mission statement or statement of beliefs, through employee benefits

disclosures and other communications with employees and prospective employees, or through

publicly filed lawsuits objecting to providing such coverage and attendant media coverage. In

---

[18] In changing its position, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

[19] See, for example, Geneva College v. Sebelius, 929 F. Supp. 2d 402, 411 (W.D. Pa. 2013); Grace Schools v. Sebelius, 988 F. Supp. 2d 935, 943 (N.D. Ind. 2013); Comments of the Council for Christian Colleges & Universities, re: CMS-9968-P (filed Apr. 8, 2013) ("On behalf of [] 172 higher education institutions…a requirement for membership in the CCCU is that full-time administrators and faculty at our institutions share the Christian faith of the institution.").

many cases, the employees of religious organizations will have chosen to work for those organizations with an understanding—explicit or implicit—that they were being employed to advance the organization's goals and to be respectful of the organization's beliefs even if they do not share all of those beliefs. Religious nonprofit organizations that engage in expressive activity generally have a First Amendment right of expressive association and religious free exercise to choose to hire persons (or, in the case of students, to admit them) based on whether they share, or at least will be respectful of, their beliefs.[20]

Given the sincerely held religious beliefs of many religious organizations, imposing the contraceptive-coverage requirement on those that object based on such beliefs might undermine the Government's broader interests in ensuring health coverage by causing the entities to stop providing health coverage.  For example, because the Affordable Care Act does not require institutions of higher education to arrange student coverage, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or be subject to the accommodation with respect to such populations.[21]

Seventh, we now believe the administrative record on which the Mandate rests is insufficient to meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans.  To begin, in support of the IOM's recommendations, which HRSA adopted, the IOM identified several studies showing a preventive services gap because

---

[20] Notably, "the First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 655 (2000).
[21] See, for example, Manya Brachear Pashman, "Wheaton College ends coverage amid fight against birth control mandate," Chicago Tribune (July 29, 2015); Laura Bassett, "Franciscan University Drops Entire Student Health Insurance Plan Over Birth Control Mandate," HuffPost (May 15, 2012).

women require more preventive care than men.  (IOM 2011 at 19–21).  Those studies did not

identify contraceptives or sterilization as composing a specific portion of that gap, and the IOM

did not consider or establish in the report whether any cost associated with that gap remains after

all other women's preventive services are covered without cost-sharing.  Id.  Even without

knowing what the empirical data would show about that gap, the coverage of the other women's

preventive services required under both the HRSA Guidelines and throughout section 2713(a) of

the PHS Act—including annual well-woman visits and a variety of tests, screenings, and

counseling services—serves at a minimum to diminish the cost gap identified by IOM for

women whose employers decline to cover some or all contraceptives on religious grounds.[22]

Moreover, there are multiple Federal, State, and local programs that provide free or

subsidized contraceptives for low-income women.  Such Federal programs include, among

others, Medicaid (with a 90 percent Federal match for family planning services), Title X,

community health center grants, and Temporary Assistance for Needy Families.  According to

the Guttmacher Institute, government-subsidized family planning services are provided at 8,409

health centers overall.[23]  The Title X program, for example, administered by the HHS Office of

Population Affairs (OPA), provides a wide variety of voluntary family planning information and

services for clients based on their ability to pay, through a network that includes nearly 4,000

family planning centers. http://www.hhs.gov/opa/title-x-family-planning/  Individuals with

family incomes at or below the HHS poverty guideline (for 2017, $24,600 for a family of four in

the 48 contiguous States and the District of Columbia) receive services at no charge unless a

third party (governmental or private) is authorized or obligated to pay for these services.

---

[22] The Departments are not aware of any objectors to the contraceptive Mandate that are unwilling to cover any of the other preventive services without cost sharing as required by PHS Act section 2713.
[23] "Facts on Publicly Funded Contraceptive Services in the United States," March 2016.

Individuals with incomes in excess of 100 percent up to 250 percent of the poverty guideline are

charged for services using a sliding fee scale based on family size and income. Unemancipated

minors seeking confidential services are assessed fees based on their own income level rather

than their family's income.  The availability of such programs to serve the most at-risk women

(as defined in the IOM report) diminishes the Government's interest in applying the Mandate to

objecting employers. Many forms of contraception are available for around $50 per month,

including long-acting methods such as the birth control shot and intrauterine devices (IUDs).[24]

Other, more permanent forms of contraception like implantables bear a higher one-time cost, but

when calculated over the duration of use, cost a similar amount.[25]  Various State programs

supplement the Federal programs referenced above, and 28 States have their own mandates of

contraceptive coverage as a matter of State law.  This existing inter-governmental structure for

obtaining contraceptives significantly diminishes the Government's interest in applying the

Mandate to employers over their sincerely held religious objections.

       The record also does not reflect that the Mandate is tailored to the women most likely to

experience unintended pregnancy, identified by the 2011 IOM report as "women who are aged

18 to 24 years and unmarried, who have a low income, who are not high school graduates, and

who are members of a racial or ethnic minority".  (IOM 2011 at 102).  For example, with respect

to religiously objecting organizations, the Mandate applies in employer-based group health plans

and student insurance at private colleges and universities.  It is not clear that applying the

Mandate among those objecting entities is a narrowly tailored way to benefit the most at-risk

---

[24] See, for example, Caroline Cunningham, "How Much Will Your Birth Control Cost Once the Affordable Care
Act Is Repealed?" Washingtonian (Jan. 17, 2017), available at https://www.washingtonian.com/2017/01/17/how-
much-will-your-birth-control-cost-once-the-affordable-care-act-is-repealed/; also, see
https://www.plannedparenthood.org/learn/birth-control.
[25] Id.

population.  The entities appear to encompass some such women, but also appear to omit many

of them and to include a significantly larger cross-section of women as employees or plan

participants.  At the same time, the Mandate as applied to objecting employers appears to

encompass a relatively small percentage of the number of women impacted by the Mandate

overall, since most employers do not appear to have conscientious objections to the Mandate.[26]

The Guttmacher Institute, on which the IOM relied, further reported that 89 percent of women

who are at risk of unintended pregnancy and are living at 0 through 149 percent of the poverty

line are already using contraceptives, as are 92 percent of those with incomes of 300 percent or

more of the Federal poverty level.[27]

The rates of—and reasons for—unintended pregnancy are notoriously difficult to

measure.[28]  In particular, association and causality can be hard to disentangle, and the studies

referred to by the 2011 IOM Report speak more to association than causality.  For example, IOM

2011 references Boonstra, et al. (2006), as finding that, "as the rate of contraceptive use by

unmarried women increased in the United States between 1982 and 2002, rates of unintended

[26] Prior to the implementation of the Affordable Care Act approximately 6 percent of employer survey respondents did not offer contraceptive coverage, with 31 percent of respondents not knowing whether they offered such coverage Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2010 Annual Survey" at 196, available at https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf. It is not clear whether the minority of employers who did not cover contraception refrained from doing so for conscientious reasons or for other reasons. Estimates of the number of women who might be impacted by the exemptions offered in these rules, as compared to the total number of women who will likely continue to receive contraceptive coverage, is discussed in more detail below.
[27] "Contraceptive Use in the United States," September 2016.
[28] The IOM 2011 Report reflected this when it cited the IOM's own 1995 report on unintended pregnancy, "The Best Intentions" (IOM 1995). IOM 1995 identifies various methodological difficulties in demonstrating the interest in reducing unintended pregnancies by means of a coverage mandate in employer plans. These include:  the ambiguity of intent as an evidence-based measure (does it refer to mistimed pregnancy or unwanted pregnancy, and do studies make that distinction?); "the problem of determining parental attitudes at conception" and inaccurate methods often used for that assessment, such as "to use the request for an abortion as a marker"; and the overarching problem of "association versus causality," that is, whether intent causes negative outcomes or is merely correlated with them. IOM 1995 at 64–66. See also IOM 1995 at 222 ("the largest public sector funding efforts, Title X and Medicaid, have not been well evaluated in terms of their net effectiveness, including their precise impact on unintended pregnancy").

pregnancy and abortion for unmarried women also declined,"[29] and Santelli and Melnikas as

finding that "increased rates of contraceptive use by adolescents from the early 1990s to the early

2000s was associated with a decline in teen pregnancies and that periodic increases in the teen

pregnancy rate are associated with lower rates of contraceptive use". IOM 2011 at 105.[30]  In this

respect, the report does not show that access to contraception causes decreased incidents of

unintended pregnancy, because both of the assertions rely on association rather than causation,

and they associate reduction in unintended pregnancy with increased use of contraception, not

merely with increased access to such contraceptives.

    Similarly, in a study involving over 8,000 women between 2012 and 2015, conducted to

determine whether contraceptive coverage under the Mandate changed contraceptive use

patterns, the Guttmacher Institute concluded that "[w]e observed no changes in contraceptive use

patterns among sexually active women."[31]  With respect to teens, the Santelli and Melnikas study

cited by IOM 2011 observes that, between 1960 and 1990, as contraceptive use increased, teen

sexual activity outside of marriage likewise increased (although the study does not assert a causal

relationship).[32]  Another study, which proposed an economic model for the decision to engage in

sexual activity, stated that "[p]rograms that increase access to contraception are found to

decrease teen pregnancies in the short run but increase teen pregnancies in the long run."[33]

Regarding emergency contraception in particular, "[i]ncreased access to emergency

---

[29] H. Boonstra, et al., "Abortion in Women's Lives" at 18, <u>Guttmacher Inst.</u> (2006).
[30] Citing John S. Santelli & Andrea J. Melnikas, "Teen Fertility in Transition: Recent and Historic Trends in the United States," 31 <u>Ann. Rev. Pub. Health</u> 371 (2010).
[31] Bearak, J.M. and Jones, R.K., "Did Contraceptive Use Patterns Change after the Affordable Care Act? A Descriptive Analysis," 27 <u>Women's Health Issues</u> 316 (Guttmacher Inst. May-June 2017), available at http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.
[32] 31 <u>Ann. Rev. Pub. Health</u> at 375–76.
[33] Peter Arcidiacono, et al., "Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?" (2005), <u>available at</u> http://public.econ.duke.edu/~psarcidi/teensex.pdf.

contraceptive pills enhances use but has not been shown to reduce unintended pregnancy rates."[34]  In the longer term—from 1972 through 2002—while the percentage of sexually experienced women who had ever used some form of contraception rose to 98 percent,[35] unintended pregnancy rates in the Unites States rose from 35.4 percent[36] to 49 percent."[37]  The Departments note these and other studies[38] to observe the complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy.

Contraception's association with positive health effects might also be partially offset by an association with negative health effects.  In 2013 the National Institutes of Health indicated, in funding opportunity announcement for the development of new clinically useful female contraceptive products, that "hormonal contraceptives have the disadvantage of having many undesirable side effects[,] are associated with adverse events, and obese women are at higher risk

---

[34] G. Raymond et al., "Population effect of increased access to emergency contraceptive pills: a systematic review," 109 Obstet. Gynecol. 181 (2007).

[35] William D. Mosher & Jo Jones, U.S. Dep't of HHS, CDC, National Center for Health Statistics, "Use of Contraception in the United States: 1982–2008" at 5 fig. 1, 23 Vital and Health Statistics 29 (Aug. 2010), available at https://www.cdc.gov/nchs/data/series/sr_23/sr23_029.pdf.

[36] Helen M. Alvaré, "No Compelling Interest: The 'Birth Control' Mandate and Religious Freedom," 58 Vill. L. Rev. 379, 404–05 & n.128 (2013), available at http://digitalcommons.law.villanova.edu/vlr/vol58/iss3/2 (quoting Christopher Tietze, "Unintended Pregnancies in the United States, 1970-1972," 11 Fam. Plan. Persp. 186, 186 n.* (1979) ("in 1972, 35.4 percent percent of all U.S. pregnancies were 'unwanted' or 'wanted later'")).

[37] Id. (citing Lawrence B. Finer & Stanley K. Henshaw, "Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001" 38 Persp. on Sexual Reprod. Health 90 (2006) ("In 2001, 49 percent of pregnancies in the United States were unintended")).

[38] See, for example, J.L Dueñas, et al., "Trends in the Use of Contraceptive Methods and Voluntary Interruption of Pregnancy in the Spanish Population during 1997–2007," 83 Contraception 82 (2011) (as use of contraceptives increased from 49 percent to 80 percent, the elective abortion rate more than doubled); D. Paton, "The economics of family planning and underage conceptions," 21 J. Health Econ. 207 (2002) (data from the UK confirms an economic model which suggests improved family planning access for females under 16 increases underage sexual activity and has an ambiguous impact on underage conception rates); T. Raine et al., "Emergency contraception: advance provision in a young, high-risk clinic population," 96 Obstet. Gynecol. 1 (2000) (providing advance provision of emergency contraception at family planning clinics to women aged 16–24 was associated with the usage of less effective and less consistently used contraception by other methods); M. Belzer et al., "Advance supply of emergency contraception: a randomized trial in adolescent mothers," 18 J. Pediatr. Adolesc. Gynecol. 347 (2005) (advance provision of emergency contraception to mothers aged 13–20 was associated with increased unprotected sex at the 12-month follow up).

Exhibit A

for serious complications such as deep venous thrombosis."[39]  In addition, IOM 2011 stated that

"[l]ong-term use of oral contraceptives has been shown to reduce a woman's risk of endometrial

cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases

(PRB, 1998.  The Agency for Healthcare Research and Quality (AHRQ) is currently

undertaking a systematic evidence review to evaluate the effectiveness of oral contraceptives as

primary prevention for ovarian cancer (AHRQ, 2011)."  (IOM 2011 at 107).  However, after

IOM 2011 made this statement, AHRQ (a component of HHS) completed its systematic evidence

review.[40]  Based on its review, AHRQ stated that: "[o]varian cancer incidence was significantly

reduced in OC [oral contraceptive] users"; "[b]reast cancer incidence was slightly but

significantly increased in OC users"; "[t]he risk of cervical cancer was significantly increased in

women with persistent human papillomavirus infection who used OCs, but heterogeneity

prevented a formal meta-analysis"; "[i]ncidences of both colorectal cancer [] and endometrial

cancer [] were significantly reduced by OC use"; "[t]he risk of vascular events was increased in

current OC users compared with nonusers, although the increase in myocardial infarction was

not statistically significant"; "[t]he overall strength of evidence for ovarian cancer prevention

was moderate to low"; and "[t]he simulation model predicted that the combined increase in risk

of breast and cervical cancers and vascular events was likely to be equivalent to or greater than

---

[39] NIH, "Female Contraceptive Development Program (U01)" (Nov. 5, 2013), available at
https://grants.nih.gov/grants/guide/rfa-files/RFA-HD-14-024.html.  Thirty six percent of women in the United States
are obese. https://www.niddk.nih.gov/health-information/health-statistics/overweight-obesity.  Also see "Does birth
control raise my risk for health problems?" and "What are the health risks for smokers who use birth control?" HHS
Office on Women's Health, available at https://www.womenshealth.gov/a-z-topics/birth-control-methods; Skovlund,
CW, "Association of Hormonal Contraception with Depression," 73 JAMA Psychiatry 1154 (Nov. 1, 2016),
available at https://www.ncbi.nlm.nih.gov/pubmed/27680324.
[40] Havrilesky, L.J, et al., "Oral Contraceptive User for the Primary Prevention of Ovarian Cancer," Agency for
Healthcare Research and Quality, Report No.: 13-E002-EF (June 2013), available at
https://archive.ahrq.gov/research/findings/evidence-based-reports/ocusetp.html.

the decreased risk in ovarian cancer."[41]   Based on these findings, AHRQ concluded that "[t]here is insufficient evidence to recommend for or against the use of OCs solely for the primary prevention of ovarian cancer…. the harm/benefit ratio for ovarian cancer prevention alone is uncertain, particularly when the potential quality-of-life impact of breast cancer and vascular events are considered."[42]

In addition, in relation to several studies cited above, imposing a coverage Mandate on objecting entities whose plans cover many enrollee families who may share objections to contraception could, among some populations, affect risky sexual behavior in a negative way. For example, it may not be a narrowly tailored way to advance the Government interests identified here to mandate contraceptive access to teenagers and young adults who are not already sexually active and at significant risk of unintended pregnancy.[43]

Finally, evidence from studies that post-date the Mandate is not inconsistent with the observations the Departments make here.  In 2016, HRSA awarded a 5-year cooperative agreement to the American College of Obstetricians and Gynecologists to develop recommendations for updated Women's Preventive Services Guidelines.  The awardee formed an expert panel called the Women's Preventive Services Initiative that issued a report (the WPSI report).[44]   After observing that "[p]rivate companies are increasingly challenging the contraception provisions in the Affordable Care Act," the WPSI report cited studies through 2013 stating that application of HRSA Guidelines had applied preventive services coverage to

---

[41] Id.
[42] Id.  Also, see Kelli Miller, "Birth Control & Cancer: Which Methods Raise, Lower Risk," The Am. Cancer Society, (Jan. 21, 2016), available at http://www.cancer.org/cancer/news/features/birth-control-cancer-which-methods-raise-lower-risk.
[43] For further discussion, see Alvaré, 58 Vill. L. Rev. at 400–02 (discussing the Santelli & Melnikas study and the Arcidiacono study cited above, and other research that considers the extent to which reduction in teen pregnancy is attributable to sexual risk avoidance rather than to contraception access).
[44] "WPSI 2016 Recommendations: Evidence Summaries and Appendices," at 54–64, available at https://www.womenspreventivehealth.org/wp-content/uploads/2016/12/Evidence-Summaries-and-Appendices.pdf.

55.6 million women and had led to a 70 percent decrease in out-of-pocket expenses for

contraceptive services among commercially insured women.  Id. at 57–58.  The WPSI report

relied on a 2015 report of the HHS Office of the Assistant Secretary for Planning and Evaluation

(ASPE), "The Affordable Care Act Is Improving Access to Preventive Services for Millions of

Americans," which estimated that persons who have private insurance coverage of preventive

services without cost sharing includes 55.6 million women.[45]

      As discussed above and based on the Departments' knowledge of litigation challenging

the Mandate, during the time ASPE estimated the scope of preventive services coverage (2011–

2013), houses of worship and integrated auxiliaries were exempt from the Mandate, other

objecting religious nonprofit organizations were protected by the temporary safe harbor, and

hundreds of accommodated self-insured church plan entities were not subject to enforcement of

the Mandate through their third party administrators.  In addition, dozens of for-profit entities

that had filed lawsuits challenging the Mandate were protected by court orders pending the

Supreme Court's resolution of Hobby Lobby in June 2014.  It would therefore appear that the

benefits recorded by the report occurred even though most objecting entities were not in

compliance.[46]  Additional data indicates that, in 28 States where contraceptive coverage

---

[45] Available at https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans; also, see Abridged Report, available at https://www.womenspreventivehealth.org/wp-content/uploads/2017/01/WPSI_2016AbridgedReport.pdf.

[46] In addition, as in IOM 2011, the WPSI report bases its evidentiary conclusions relating to contraceptive coverage, use, unintended pregnancy, and health benefits, on conclusions that the phenomena are "associated" with the intended outcomes, without showing there is a causal relationship.  For example, the WPSI report states that "[c]ontraceptive counseling in primary care may increase the uptake of hormonal methods and [long-acting reversible contraceptives], although data on structured counseling in specialized reproductive health settings demonstrated no such effect." Id. at 63.  The WPSI report also acknowledges that a large-scale study evaluating the effects of providing no-cost contraception had "no randomization or control group." Id. at 63.
The WPSI report also identifies the at-risk population as young, low-income, and/or minority women: "[u]nintended pregnancies disproportionately occur in women age 18 to 24 years, especially among those with low incomes or from racial/ethnic minorities." Id. at 58.  The WPSI report acknowledges that many in this population are already served by Title X programs, which provide family planning services to "approximately 1 million teens each year." Id. at 58.  The WPSI report observes that between 2008 and 2011—before the contraceptive coverage requirement

mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall.[47]

The Departments need not take a position on these empirical questions. Our review is sufficient to lead us to conclude that significantly more uncertainty and ambiguity exists in the record than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals as set forth herein, and that no compelling interest exists to counsel against us extending the exemption.

During public comment periods, some commenters noted that some drugs included in the preventive services contraceptive Mandate can also be useful for treating certain existing health conditions. The IOM similarly stated that "the non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." IOM 2011 at 107. Consequently, some commenters suggested that religious objections to the Mandate should not be permitted in cases where such methods are used to treat such conditions, even if those methods can also be used for contraceptive purposes. Section 2713(a)(4) of the PHS Act does not, however, apply to non-preventive care provided solely for treatment of an existing condition. It applies only to "such additional preventive care and screenings . . . as provided for" by HRSA (Section 2713(a)(4) of the PHS Act). HRSA's Guidelines implementing this section state repeatedly that they apply to "preventive" services or care, and with respect to the coverage of contraception specifically, they declare that the methods covered are "contraceptive" methods as a "Type of Preventive Service," and that they are to be covered only

was implemented—unintended pregnancy decreased to the lowest rate in 30 years. Id. at 58. The WPSI report does not address how to balance contraceptive coverage interests with religious objections, nor does it specify the extent to which applying the Mandate among commercially insured at objecting entities serves to deliver contraceptive coverage to women most at risk of unintended pregnancy.

[47] See Michael J. New, "Analyzing the Impact of State Level Contraception Mandates on Public Health Outcomes," 13 Ave Maria L. Rev. 345 (2015), available at http://avemarialaw-law-review.avemarialaw.edu/Content/articles/vXIII.i2.new.final.0809.pdf.

"[a]s prescribed" by a physician or other health care provider.

https://www.hrsa.gov/womensguidelines/  The contraceptive coverage requirement in the

Guidelines also only applies for "women with reproductive capacity."

https://www.hrsa.gov/womensguidelines/;  (80 FR 40318).   Therefore, the Guidelines' inclusion

of contraceptive services requires coverage of contraceptive methods as a type of preventive

service only when a drug that the FDA has approved for contraceptive use is prescribed in whole

or in part for such use.   The Guidelines and section 2713(a)(4) of the PHS Act do not require

coverage of such drugs where they are prescribed exclusively for a non-contraceptive and non-

preventive use to treat an existing condition.[48]   As discussed above, the last Administration

decided to exempt houses of worship and their integrated auxiliaries from the Mandate, and to

relieve hundreds of religious nonprofit organizations of their obligations under the Mandate and

not further require contraceptive coverage to their employees.   In several of the lawsuits

challenging the Mandate, some religious plaintiffs stated that they do not object and are willing

to cover drugs prescribed for the treatment of an existing condition and not for contraceptive

purposes—even if those drugs are also approved by the FDA for contraceptive uses.   Therefore,

the Departments conclude that the fact that some drugs that are approved for preventive

---

[48] The Departments previously cited the IOM's listing of existing conditions that contraceptive drugs can be used to treat (menstrual disorders, acne, and pelvic pain), and said of those uses that "there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy." 77 FR 8727 & n.7.  This was not, however, an assertion that PHS Act section 2713(a)(4) or the Guidelines require coverage of "contraceptive" methods when prescribed for an exclusively *non*-contraceptive, *non*-preventive use.  Instead it was an observation that such drugs—generally referred to as "contraceptives"—also have some alternate beneficial uses to treat existing conditions.  For the purposes of these interim final rules, the Departments clarify here that our previous reference to the benefits of using contraceptive drugs exclusively for some non-contraceptive and non-preventive uses to treat existing conditions did not mean that the Guidelines require coverage of such uses, and consequently is not a reason to refrain from offering the expanded exemptions provided here.  Where a drug approved by the FDA for contraceptive use is prescribed for both a contraceptive use and a non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage.  Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines.

contraceptive purposes can also be used for exclusively non-preventive purposes to treat existing conditions is not a sufficient reason to refrain from expanding the exemption to the Mandate.

An additional consideration supporting the Departments' present view is that alternative approaches can further the interests the Departments previously identified behind the Mandate. As noted above, the Government already engages in dozens of programs that subsidize contraception for the low-income women identified by the IOM as the most at risk for unintended pregnancy.  The Departments have also acknowledged in legal briefing that contraception access can be provided through means other than coverage offered by religious objectors, for example, through "a family member's employer," "an Exchange," or "another government program."[49]

Many employer plan sponsors, institutions of education arranging student health coverage, and individuals enrolled in plans where their employers or issuers (as applicable) are willing to offer them a religiously acceptable plan, hold sincerely held religious beliefs against (respectively) providing, arranging, or participating in plans that comply with the Mandate either by providing contraceptive coverage or by using the accommodation.  Because we have concluded that requiring such compliance through the Mandate or accommodation has constituted a substantial burden on the religious exercise of many such entities or individuals, and because we conclude requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances.  We recognize that this is a change of position on this issue, and we make that change based on all the matters discussed in this preamble.

---

[49] Brief for the Respondents at 65, Zubik v. Burwell, 136 S. Ct. 1557 (2016) (No. 14-1418).

Exhibit A

B.  Discretion to Provide Religious Exemptions

Even if RFRA does not compel the religious exemptions provided in these interim final rules, the Departments believe they are the most appropriate administrative response to the religious objections that have been raised.  RFRA identifies certain circumstance under which government must accommodate religious exercise-when a government action imposes a substantial burden on the religious exercise of an adherent and imposition of that burden is not the least restrictive means of achieving a compelling government interest.  RFRA does not, however, prescribe the accommodation that the government must adopt.  Rather, agencies have discretion to fashion an appropriate and administrable response to respect religious liberty interests implicated by their own regulations.  We know from Hobby Lobby that, in the absence of any accommodation, the contraceptive-coverage requirement imposes a substantial burden on certain objecting employers.  We know from other lawsuits and public comments that many religious entities have objections to complying with the accommodation based on their sincerely held religious beliefs.  Previously, the Departments attempted to develop an accommodation that would either alleviate the substantial burden imposed on religious exercise or satisfy RFRA's requirements for imposing that burden.

Now, however, the Departments have reassessed the relevant interests and determined that, even if exemptions are not required by RFRA, they would exercise their discretion to address the substantial burden identified in Hobby Lobby by expanding the exemptions from the Mandate instead of revising accommodations previously offered.  In the Departments' view, a broader exemption is a more direct, effective means of satisfying all bona fide religious objectors.  This view is informed by the fact that the Departments' previous attempt to develop an appropriate accommodation did not satisfy all objectors.  That previous accommodation

consumed Departmental resources not only through the regulatory process, but in persistent

litigation and negotiations.  Offering exemptions as described in these interim final rules is a

more workable way to respond to the substantial burden identified in Hobby Lobby and bring

years of litigation concerning the Mandate to a close.

C.  General Scope of Expanded Religious Exemptions

 1.  Exemption and Accommodation for Religious Employers, Plan Sponsors, and Institutions of

 Higher Education

        For all of these reasons, and as further explained below, the Departments now believe it

is appropriate to modify the scope of the discretion afforded to HRSA in the July 2015 final

regulations to direct HRSA to provide the expanded exemptions and change the accommodation

to an optional process if HRSA continues to otherwise provide for contraceptive coverage in the

Guidelines.  As set forth below, the expanded exemption encompasses non-governmental plan

sponsors that object based on sincerely held religious beliefs, and institutions of higher education

in their arrangement of student health  plans.  The accommodation is also maintained as an

optional process for exempt employers, and will provide contraceptive availability for persons

covered by the plans of entities that use it (a legitimate program purpose).

        The Departments believe this approach is sufficiently respectful of religious objections

while still allowing the Government to advance other interests.  Even with the expanded

exemption, HRSA maintains the discretion to require contraceptive coverage for nearly all

entities to which the Mandate previously applied (since most plan sponsors do not appear to

possess the requisite religious objections), and to reconsider those interests in the future where

no covered objection exists.  Other Government subsidies of contraception are likewise not

affected by this rule.

Exhibit A

2.  Exemption for Objecting Individuals Covered by Willing Employers and Issuers

     As noted above, some individuals have brought suit objecting to being covered under an

insurance policy that includes coverage for contraceptives.  See, for example, <u>Wieland v. HHS</u>,

196 F.  Supp. 3d 1010 (E.D. Mo. 2016); <u>Soda v. McGettigan</u>, No. 15-cv-00898 (D. Md.).  Just as

the Departments have determined that the Government does not have a compelling interest in

applying the Mandate to employers that object to contraceptive coverage on religious grounds,

we have also concluded that the Government does not have a compelling interest in requiring

individuals to be covered by policies that include contraceptive coverage when the individuals

have sincerely held religious objections to that coverage.  The Government does not have an

interest in ensuring the provision of contraceptive coverage to individuals who do not wish to

have such coverage.  Especially relevant to this conclusion is the fact that the Departments have

described their interests of health and gender equality as being advanced among women who

"want" the coverage so as to prevent "unintended" pregnancy.  (77 FR 8727).[50]  No asserted

interest is served by denying an exemption to individuals who object to it.  No unintended

pregnancies will be avoided or costs reduced by imposing the coverage on those individuals.

     Although the Departments previously took the position that allowing individual religious

exemptions would undermine the workability of the insurance system, the Departments now

agree with those district courts that have concluded that an exemption that allows—but does not

require—issuers and employers to omit contraceptives from coverage provided to objecting

individuals does not undermine any compelling interest.  See <u>Wieland</u>, 196 F. Supp. 3d at 1019–

20; <u>March for Life</u>, 128 F. Supp. 3d at 132.  The individual exemption will only apply where the

---

[50] In this respect, the Government's interest in contraceptive coverage is different than its interest in persons
receiving some other kinds of health coverage or coverage in general, which can lead to important benefits that are
not necessarily conditional on the recipient's desire to use the coverage and the specific benefits that may result
from their choice to use it.

employer and issuer (or, in the individual market, the issuer) are willing to offer a policy

accommodating the objecting individual.  As a result, the Departments consider it likely that

where an individual exemption is invoked, it will impose no burdens on the insurance market

because such burdens may be factored into the willingness of an employer or issuer to offer such

coverage.  At the level of plan offerings, the extent to which plans cover contraception under the

prior rules is already far from uniform.  Congress did not require compliance with section 2713

of the PHS Act by all entities—in particular by grandfathered plans.  The Departments' previous

exemption for houses of worship and integrated auxiliaries, and our lack of authority to enforce

the accommodation with respect to self-insured church plans, show that the importance of a

uniform health insurance system is not significantly harmed by allowing plans to omit

contraception in many contexts.[51]  Furthermore, granting exemptions to individuals who do not

wish to receive contraceptive coverage where the plan and, as applicable, issuer and plan sponsor

are willing, does not undermine the Government's interest in ensuring the provision of such

coverage to other individuals who wish to receive it.  Nor do such exemptions undermine the

operation of the many other programs subsidizing contraception.  Rather, such exemptions serve

the Government's interest in accommodating religious exercise.  Accordingly, as further

explained below, the Departments have provided an exemption to address the concerns of

objecting individuals.

---

[51] Also, see Real Alternatives, 2017 WL 3324690 at *36 (3d Cir. Aug. 4, 2017) (Jordan, J., concurring in part and dissenting in part) ("Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government's interest in a sustainable and functioning market.…  Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the Affordable Care Act) would be unworkable, it has not satisfied strict scrutiny." (citation and internal quotation marks omitted)).

D.  Effects on Third Parties of Exemptions

The Departments note that the exemptions created here, like the exemptions created by the last Administration, do not burden third parties to a degree that counsels against providing the exemptions.  Congress did not create a right to receive contraceptive coverage, and Congress explicitly chose not to impose the section 2713 of the PHS Act requirements on grandfathered plans that cover millions of people.  Individuals who are unable to obtain contraceptive coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules, or because of other exemptions to the Mandate, have other avenues for obtaining contraception, including the various governmental programs discussed above.  As the Government is under no constitutional obligation to fund contraception, cf. Harris v. McRae, 448 United States 297 (1980), even more so may the Government refrain from requiring private citizens to cover contraception for other citizens in violation of their religious beliefs.  Cf. Rust v. Sullivan, 500 U.S. 173, 192–93 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.").[52]

That conclusion is consistent with the Supreme Court's observation that RFRA may require exemptions even from laws requiring claimants "to confer benefits on third parties." Hobby Lobby, 134 S. Ct. at 2781 n.37.  The burdens imposed on such third parties may be relevant to the RFRA analysis, but they cannot be dispositive. "Otherwise, for example, the Government could decide that all supermarkets must sell alcohol for the convenience of customers (and thereby exclude Muslims with religious objections from owning supermarkets), or it could decide that all restaurants must remain open on Saturdays to give employees an

---

[52] Cf. also Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists, 257 P.3d 181, 196 (Ariz. Ct. App. 2011) ("a woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

opportunity to earn tips (and thereby exclude Jews with religious objections from owning

restaurants)." Id.  Where, as here, contraceptives are readily accessible and, for many low

income persons, are available at reduced cost or for free through various governmental programs,

and contraceptive coverage may be available through State sources or family plans obtained

through non-objecting employers, the Departments have determined that the expanded

exemptions rather than accommodations are the appropriate response to the substantial burden

that the Mandate has placed upon the religious exercise of many religious employers.

**III.    Provisions of the Interim Final Rules With Comment Period**

The Departments are issuing these interim final rules in light of the full history of

relevant rulemaking (including prior interim final rules), public comments, and litigation

throughout the Federal court system.  The interim final rules seek to resolve this matter and the

long-running litigation with respect to religious objections by extending the exemption under the

HRSA Guidelines to encompass entities, and individuals, with sincerely held religious beliefs

objecting to contraceptive or sterilization coverage, and by making the accommodation process

optional for eligible organizations.

The Departments acknowledge that the foregoing analysis represents a change from the

policies and interpretations we previously adopted with respect to the Mandate and the

governmental interests that underlie the Mandate.  These changes in policy are within the

Departments' authority.  As the Supreme Court has acknowledged, "[a]gencies are free to

change their existing policies as long as they provide a reasoned explanation for the change."

Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016).  This "reasoned analysis"

requirement does not demand that an agency "demonstrate to a court's satisfaction that the

reasons for the new policy are better than the reasons for the old one; it suffices that the new

policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates".  United Student Aid Funds, Inc. v. King, 200 F. Supp. 3d 163, 169–70 (D.D.C. 2016) (citing FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009)); also, see New Edge Network, Inc. v. FCC, 461 F.3d 1105, 1112–13 (9th Cir. 2006) (rejecting an argument that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").

Here, for all of the reasons discussed above, the Departments have determined that the Government's interest in the application of contraceptive coverage requirements in this specific context to the plans of certain entities and individuals does not outweigh the sincerely held religious objections of those entities and individuals based on the analyses set forth above.  Thus, these interim final rules amend the Departments' July 2015 final regulations to expand the exemption to include additional entities and persons that object based on sincerely held religious beliefs.  These rules leave in place HRSA's discretion to continue to require contraceptive and sterilization coverage where no such objection exists, and to the extent that section 2713 of the PHS Act applies.  These interim final rules also maintain the existence of an accommodation process, but consistent with our expansion of the exemption, we make the process optional for eligible organizations.  HRSA is simultaneously updating its Guidelines to reflect the requirements of these interim final rules.[53]

A.  Regulatory Restatements of section 2713(a) and (a)(4) of the PHS Act

These interim final rules modify the restatements of the requirements of section 2713(a) and (a)(4) of the PHS Act, contained in 26 CFR 54.9815-2713(a)(1) introductory text and

---

[53] See https://www.hrsa.gov/womensguidelines/ and https://www.hrsa.gov/womensguidelines2016/index.html .

(a)(1)(iv), 29 CFR 2590.715-2713(a)(1) introductory text and (a)(1)(iv), and 45 CFR

147.130(a)(1) introductory text and (a)(1)(iv), so that they conform to the statutory text of

section 2713 of the PHS Act.

B.   Prefatory Language of the Exemption in 45 CFR 147.132

        These interim final rules move the religious exemption from 45 CFR 147.131 to a new §

147.132 and expand it as follows.  In the prefatory language of § 147.132, these interim final

rules specify that not only are certain entities "exempt," but the Guidelines shall not support or

provide for an imposition of the contraceptive coverage requirement to such entities.  This is an

acknowledgement that section 2713(a)(4) of the PHS Act requires women's preventive services

coverage only "as provided for in comprehensive guidelines supported by the Health Resources

and Services Administration."  To the extent the HRSA Guidelines do not provide for or support

the application of such coverage to exempt entities, the Affordable Care Act does not require the

coverage.  Section 147.132 not only describes the exemption of certain entities and plans, but

does so by specifying that the HRSA Guidelines do not provide for, or support the application of,

such coverage to exempt entities and plans.

C.   General Scope of Exemption for Objecting Entities

        In the new 45 CFR 147.132 as created by these interim final rules, these rules expand the

exemption that was previously located in § 147.131(a).  With respect to employers that sponsor

group health plans, the new language of § 147.132(a)(1) introductory text and (a)(1)(i) provides

exemptions for employers that object to coverage of all or a subset of contraceptives or

sterilization and related patient education and counseling based on sincerely held religious

beliefs.

For avoidance of doubt, the Departments wish to make clear that the expanded exemption created in § 147.132(a) applies to several distinct entities involved in the provision of coverage to the objecting employer's employees.  This explanation is consistent with how prior rules have worked by means of similar language.  Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that "[a] group health plan and health insurance coverage provided in connection with a group health plan" is exempt "to the extent the plan sponsor objects as specified in paragraph (a)(2)," exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections).  Consequently, with respect to Guidelines issued under § 147.130(a)(1)(iv), or the parallel provisions in 26 CFR 54.9815-2713(a)(1)(iv) and 29 CFR 2590.715-2713(a)(1)(iv), the plan sponsor, issuer, and plan covered in the exemption of that paragraph would face no penalty as a result of omitting contraceptive coverage from the benefits of the plan participants and beneficiaries.

Consistent with the restated exemption, exempt entities will not be required to comply with a self-certification process.  Although exempt entities do not need to file notices or certifications of their exemption, and these interim final rules do not impose any new notice requirements on them, existing ERISA rules governing group health plans require that, with respect to plans subject to ERISA, a plan document must include a comprehensive summary of the benefits covered by the plan and a statement of the conditions for eligibility to receive benefits.  Under ERISA, the plan document provides what benefits are provided to participants and beneficiaries under the plan and, therefore, if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document.  Moreover, if there is a reduction in a covered service or benefit, the plan has to

disclose that change to plan participants.[54]  Thus, where an exemption applies and all or a subset

of contraceptive services are omitted from a plan's coverage, otherwise applicable ERISA

disclosures must reflect the omission of coverage in ERISA plans.  These existing disclosure

requirements serve to help provide notice to participants and beneficiaries of what ERISA plans

do and do not cover.  The Departments invite public comment on whether exempt entities, or

others, would find value either in being able to maintain or submit a specific form of certification

to claim their exemption, or in otherwise receiving guidance on a way to document their

exemption.

The exemptions in § 147.132(a) apply "to the extent" of the objecting entities' sincerely

held religious beliefs.  Thus, entities that hold a requisite objection to covering some, but not all,

contraceptive items would be exempt with respect to the items to which they object, but not with

respect to the items to which they do not object.  Likewise, the requisite objection of a plan

sponsor or institution of higher education in § 147.132(a)(1)(i) and (ii) exempts its group health

plan, health insurance coverage offered by a health insurance issuer in connection with such

plan, and its issuer in its offering of such coverage, but that exemption does not extend to

coverage provided by that issuer to other group health plans where the plan sponsor has no

qualifying objection.  The objection of a health insurance issuer in § 147.132(a)(1)(iii) similarly

operates only to the extent of its objection, and as otherwise limited as described below.

D.  Exemption of Employers and Institutions of Higher Education

The scope of the exemption is expanded for non-governmental plan sponsors and certain

entities that arrange health coverage under these interim final rules.  The Departments have

---

[54] See, for example, 29 U.S.C. 1022, 1024(b), 29 CFR 2520.102-2, 2520.102-3, & 2520.104b-3(d), and 29 CFR
2590.715-2715.  Also, see 45 CFR 147.200 (requiring disclosure of the "exceptions, reductions, and limitations of
the coverage," including group health plans and group & individual issuers).

Exhibit A

consistently taken the position that section 2713(a)(4) of the PHS Act grants HRSA authority to

issue Guidelines that provide for and support exemptions from a contraceptive coverage

requirement.  Since the beginning of rulemaking concerning the Mandate, HRSA and the

Departments have repeatedly exercised their discretion to create and modify various exemptions

within the Guidelines.[55]

The Departments believe the approach of these interim final rules better aligns our

implementation of section 2713(a)(4) of the PHS Act with Congress' intent in the Affordable

Care Act and throughout other Federal health care laws.  As discussed above, many Federal

health care laws and regulations provide exemptions for objections based on religious beliefs,

and RFRA applies to the Affordable Care Act.  Expanding the exemption removes religious

obstacles that entities and certain individuals may face when they otherwise wish to participate in

the health care market.  This advances the Affordable Care Acts goal of expanding health

coverage among entities and individuals that might otherwise be reluctant to participate.  These

rules also leave in place many Federal programs that subsidize contraceptives for women who

are most at risk of unintended pregnancy and who may have more limited access to

contraceptives.[56]  These interim final rules achieve greater uniformity and simplicity in the

regulation of health insurance by expanding the exemptions to include entities that object to the

Mandate based on their sincerely held religious beliefs.

---

[55] "The fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 863–64 (1984).
[56] See, for example, Family Planning grants in 42 U.S.C. 300, et seq.; the Teenage Pregnancy Prevention Program, Public Law 112-74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c-8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; Maternal and Child Health Block Grants, 42 U.S.C. 703; 42 U.S.C. 247b-12; Title XIX of the Social Security Act, 42 U.S.C. 1396, et seq.; the Indian Health Service, 25 U.S.C. 13, 42 U.S.C. 2001(a), & 25 U.S.C. 1601, et seq.; Health center grants, 42 U.S.C. 254b(e), (g), (h), & (i); the NIH Clinical Center, 42 U.S.C. 248; and the Personal Responsibility Education Program, 42 U.S.C. 713.

The Departments further conclude that it would be inadequate to merely attempt to amend the accommodation process instead of expand the exemption.  The Departments have stated in our regulations and court briefings that the existing accommodation with respect to self-insured plans requires contraceptive coverage as part of the same plan as the coverage provided by the employer, and operates in a way "seamless" to those plans.  As a result, in significant respects, the accommodation process does not actually accommodate the objections of many entities.  The Departments have engaged in an effort to attempt to identify an accommodation that would eliminate the plaintiffs' religious objections, including seeking public comment through an RFI, but we stated in January 2017 that we were unable to develop such an approach at that time.

1.  Plan Sponsors Generally

The expanded exemptions in these interim final rules cover any kind of non-governmental employer plan sponsor with the requisite objections but, for the sake of clarity, they include an illustrative, non-exhaustive list of employers whose objections qualify the plans they sponsor for an exemption.

Under these interim final rules, the Departments do not limit the Guidelines exemption with reference to nonprofit status or to sections 6033(a)(3)(A)(i) or (iii) of the Code, as previous rules have done.  A significant majority of States either impose no contraceptive coverage requirement or offer broader exemptions than the exemption contained in the July 2015 final regulations.[57]  Although the practice of States is by no means a limit on the discretion delegated to HRSA by the Affordable Care Act, nor a statement about what the Federal Government may do consistent with RFRA or other limitations in federal law, such State practice can be

---

[57] See Guttmacher Institute, "Insurance Coverage of Contraceptives" available at https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

informative as to the viability of broad protections for religious liberty.  In this case, such practice supports the Departments' decision to expand the federal exemption, bringing the Federal Government's practice into greater alignment with the practices of the majority of the States.

2.   Section 147.132(a)(1)(i)(A)

Despite not limiting the exemption to certain organizations referred to in section 6033(a)(3)(A)(i) or (iii) of the Code, the exemption in these rules includes such organizations. Section 147.132(a)(1)(i)(A) specifies, as under the prior exemption, that the exemption covers "a group health plan established or maintained by ... [a] church, the integrated auxiliary of a church, a convention or association of churches, or a religious order."  In the preamble to rules setting forth the prior exemption at §147.132(a), the Departments interpreted this same language used in those rules by declaring that "[t]he final regulations continue to provide that the availability of the exemption or accommodation be determined on an employer by employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents."  (78 FR 39886).  Therefore, under the prior exemption, if an employer participated in a house of worship's plan—perhaps because it was affiliated with a house of worship—but was not an integrated auxiliary or a house of worship itself, that employer was not considered to be covered by the exemption, even though it was, in the ordinary meaning of the text of the prior regulation, participating in a "plan established or maintained by a [house of worship]."

Under these interim final rules, however, the Departments intend that, when this regulation text exempts a plan "established or maintained by" a house of worship or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but

will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary.  This interpretation better conforms to the text of the regulation setting forth the exemption—in both the prior regulation and in the text set forth in these interim final rules.  It also offers appropriate respect to houses of worship and their integrated auxiliaries not only in their internal employment practices but in their choice of organizational form and/or in their activity of establishing or maintaining health plans for employees of associated employers that do not meet the threshold of being integrated auxiliaries. Moreover, under this interpretation, houses of worship would not be faced with the potential prospect of services to which they have a religious objection being covered for employees of an associated employer participating in a plan they have established and maintain.

The Departments do not believe there is a sufficient factual basis to exclude from this part of the exemption entities that are so closely associated with a house of worship or integrated auxiliary that they are permitted participation in its health plan, but are not themselves integrated auxiliaries.  Additionally, this interpretation is not inconsistent with the operation of the accommodation under the prior rule, to the extent that, in practice and as discussed elsewhere herein, it does not force contraceptive coverage to be provided on behalf of the plan participants of many religious organizations in a self-insured church plan exempt from ERISA—which are exempt in part because the plans are established and maintained by a church.  (Section 3(33)(A) of ERISA)  In several lawsuits challenging the Mandate, the Departments took the position that some plans established and maintained by houses of worship, but that included entities that were not integrated auxiliaries, were church plans under section 3(33) of ERISA and, thus, the Government "has no authority to require the plaintiffs' TPAs to provide contraceptive coverage at this time." Roman Catholic Archdiocese of N.Y. v. Sebelius, 987 F. Supp. 2d 232, 242

(E.D.N.Y. 2013).  Therefore the Departments believe it is most appropriate to use a plan basis, not an employer by employer basis, to determine the scope of an exemption for a group health plan established or maintained by a house of worship or integrated auxiliary.

3.   Section 147.132(a)(1)(i)(B)

Section 147.132(a)(1)(i)(B) of the rules specifies that the exemption includes the plans of plan sponsors that are nonprofit organizations.

4.   Section 147.132(a)(1)(i)(C)

Under § 147.132(a)(1)(i)(C), the rules extend the exemption to the plans of closely held for-profit entities.  This is consistent with the Supreme Court's ruling in Hobby Lobby, which declared that a corporate entity is capable of possessing and pursuing non-pecuniary goals (in Hobby Lobby, religion), regardless of whether the entity operates as a nonprofit organization, and rejecting the Departments' argument to the contrary.  (134 S. Ct. 2768–75)  Some reports and industry experts have indicated that not many for-profit entities beyond those that had originally brought suit have sought relief from the Mandate after Hobby Lobby.[58]

5.   Section 147.132(a)(1)(i)(D)

Under § 147.132(a)(1)(i)(D), the rules extend the exemption to the plans of for-profit entities that are not closely held.  The July 2015 final regulations extended the accommodation to for-profit entities only if they are closely held, by positively defining what constitutes a closely held entity.  The Departments implicitly recognized the difficulty of providing an affirmative definition of closely held entities in the July 2015 final regulations when we adopted a definition that included entities that are merely "substantially similar" to certain specified parameters, and we allowed entities that were not sure if they met the definition to inquire with HHS;  HHS was

---

[58] See Jennifer Haberkorn, "Two years later, few Hobby Lobby copycats emerge," Politico (Oct. 11, 2016), available at http://www.politico.com/story/2016/10/obamacare-birth-control-mandate-employers-229627.

permitted to decline to answer the inquiry, at which time the entity would be deemed to qualify

as an eligible organization.  The exemptions in these interim final rules do not need to address

this difficulty because they include both for-profit entities that are closely held and for-profit

entities that are not closely held.[59]  The mechanisms for determining whether a company has

adopted and holds such principles or views is a matter of well-established State law with respect

to corporate decision-making,[60] and the Departments expect that application of such laws would

cabin the scope of this exemption.

      In including entities in the exemption that are not closely held, these interim final rules

provide for the possibility that some publicly traded entities may use the exemption.  Even

though the Supreme Court did not extend its holding in Hobby Lobby to publicly traded

corporations (the matter could be resolved without deciding that question), the Court did instruct

that RFRA applies to corporations because they are "persons" as that term is defined in 1 U.S.C.

1.  Given that the definition under 1 U.S.C. 1 applies to any corporation, the Departments

consider it appropriate to extend the exemption set forth in these interim final rules to for-profit

corporations whether or not they are closely held.  The Departments are generally aware that in a

country as large as America comprised of a supermajority of religious persons, some publicly

traded entities might claim a religious character for their company, or that the majority of shares

(or voting shares) of some publicly traded companies might be controlled by a small group of

---

[59] In the companion interim final rules published elsewhere in this **Federal Register**, the Departments provide an exemption on an interim final basis to closely held entities by using a negative definition: entities that do not have publicly traded ownership interests as defined by certain securities required to be registered under section 12 of the Securities Exchange Act of 1934.  Although this is a more workable definition than set forth in our previous rules, we have determined that it is appropriate to offer the expanded religious exemptions to certain entities whether or not they have publicly traded ownership interests.

[60] Although the Departments do not prescribe any form or notification, they would expect that such principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which they are incorporated or organized.

religiously devout persons so as to set forth such a religious character.[61]  The fact that such a company is religious does not mean that it will have an objection to contraceptive coverage, and there are many fewer publicly traded companies than there are closely held ones.  But our experience with closely held companies is that some, albeit a small minority, do have religious objections to contraceptive coverage.  Thus we consider it possible, though very unlikely, that a religious publicly traded company might have objections to contraceptive coverage.  At the same time, we are not aware of any publicly traded entities that challenged the Mandate specifically either publicly or in court.  The Departments agree with the Supreme Court that it is improbable that many publicly traded companies with numerous "unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs" and thereby qualify for the exemption.  (134 S. Ct. at 2774)

6.  Section 147.132(a)(1)(i)(E)

        Under § 147.132(a)(1)(i)(E), the rules extend the exemption to the plans of any other non-governmental employer.  The plans of governmental employers are not covered by the plan sponsor exemption of § 147.132(a)(1)(i).  The Departments are not aware of reasons why it would be appropriate or necessary to offer religious exemptions to governmental employer plan sponsors in the United States with respect to the contraceptive Mandate.  But, as discussed below, governmental employers are permitted to respect an individual's objection under § 147.132(b) and thus to provide health insurance coverage without the objected-to contraceptive coverage to such individual.  Where that exemption is operative, the Guidelines may not be construed to prevent a willing governmental plan sponsor of a group health plan from offering a

---

[61] See, e.g., Nasdaq.com, "4 Publicly Traded Religious Companies if You're Looking to Invest in Faith" (Feb. 7, 2014), available at http://www.nasdaq.com/article/4-publicly-traded-religious-companies-if-youre-looking-to-invest-in-faith-cm324665.

separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

By the general extension of the exemption to the plans of plan sponsors in § 147.132(a)(1)(i), these interim final rules also exempt group health plans sponsored by an entity other than an employer (for example, a union) that objects based on sincerely held religious beliefs to coverage of contraceptives or sterilization.

7. Section 147.132(a)(1)(ii)

As in the previous rules, the plans of institutions of higher education that arrange student health insurance coverage will continue to be treated similarly to the way in which the plans of employers are treated, but for the purposes of such plans being exempt or electing the optional accommodation, rather than merely being eligible for the accommodation as in the previous rule. These interim final rules specify, in § 147.132(a)(1)(ii), that the exemption is extended, in the case of institutions of higher education (as defined in 20 U.S.C. 1002), to their arrangement of student health insurance coverage, in a manner comparable to the applicability of the exemption for group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor.  As mentioned above, because the Affordable Care Act does not require institutions of higher education to arrange student coverage, some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or use the accommodation.  Extending the exemption in these interim final rules may remove an obstacle to such entities deciding to offer student plans, thereby giving students another health insurance option.

Exhibit A

E.  Exemption for Issuers

These interim final rules extend the exemption, in § 147.132(a)(1)(iii), to health insurance issuers offering group or individual health insurance coverage that sincerely hold their own religious objections to providing coverage for contraceptive services.

The Departments are not currently aware of health insurance issuers that possess their own religious objections to offering contraceptive coverage.  Nevertheless, many Federal health care conscience laws and regulations protect issuers or plans specifically.  For example, 42 U.S.C. 1395w-22(j)(3)(B) and 1396u-2(b)(3) protect plans or managed care organizations in Medicaid or Medicare Advantage.  The Weldon Amendment protects HMOs, health insurance plans, and any other health care organizations are protected from being required to provide coverage or pay for abortions.  See, for example, Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, Div. H, Title V, Sec. 507(d).  Congress also declared this year that "it is the intent of Congress" to include a "conscience clause" which provides exceptions for religious beliefs if the District of Columbia requires "the provision of contraceptive coverage by health insurance plans."  See Id. at Div. C, Title VIII, Sec. 808.  In light of the clearly expressed intent of Congress to protect religious liberty, particularly in certain health care contexts, along with the specific efforts to protect issuers, the Departments have concluded that an exemption for issuers is appropriate.

As discussed above, where the exemption for plan sponsors or institutions of higher education applies, issuers are exempt under those sections with respect to providing coverage in those plans.  The issuer exemption in § 147.132(a)(1)(iii) adds to that protection, but the additional protection operates in a different way than the plan sponsor exemption operates.  As set forth in these interim final rules, the only plan sponsors, or in the case of individual insurance

coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an exempt issuer that does not cover some or all contraceptive services are plan sponsors or individuals who themselves object and are otherwise exempt based on their objection.  Thus, the issuer exemption specifies that where a health insurance issuer providing group health insurance coverage is exempt under paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under 42 CFR 147.130(a)(1)(iv) unless the plan is otherwise exempt from that requirement. Accordingly, the only plan sponsors, or in the case of individual insurance coverage, individuals, who are eligible to purchase or enroll in health insurance coverage offered by an issuer that is exempt under this paragraph (a)(1)(iii) that does not include coverage for some or all contraceptive services are plan sponsors or individuals who themselves object and are exempt.  Issuers that hold religious objections should identify to plan sponsors the lack of contraceptive coverage in any health insurance coverage being offered that is based on the issuer's exemption, and communicate the group health plan's independent obligation to provide contraceptive coverage, unless the group health plan itself is exempt under regulations governing the Mandate.

     In this way, the issuer exemption serves to protect objecting issuers both from being asked or required to issue policies that cover contraception in violation of the issuers' sincerely held religious beliefs, and from being asked or required to issue policies that omit contraceptive coverage to non-exempt entities or individuals, thus subjecting the issuers to potential liability if those plans are not exempt from the Guidelines.  At the same time, the issuer exemption will not serve to remove contraceptive coverage obligations from any plan or plan sponsor that is not also exempt, nor will it prevent other issuers from being required to provide contraceptive coverage in individual insurance coverage.  Permitting issuers to object to offering contraceptive coverage

based on sincerely held religious beliefs will allow issuers to continue to offer coverage to plan sponsors and individuals, without subjecting them to liability under section 2713(a)(4) of the PHS Act or related provisions for their failure to provide contraceptive coverage.

The issuer exemption does not specifically include third party administrators, although the optional accommodation process provided under these interim final rules specifies that third party administrators cannot be required to contract with an entity that invokes that process. Some religious third party administrators have brought suit in conjunction with suits brought by organizations enrolled in ERISA-exempt church plans. Such plans are now exempt under these interim final rules, and their third party administrators, as claims processors, are under no obligation under section 2713(a)(4) of the PHS Act to provide benefits for contraceptive services, as that section applies only to plans and issuers. In the case of ERISA-covered plans, plan administrators are obligated under ERISA to follow the plan terms, but it is the Departments' understanding that third party administrators are not typically designated as plan administrators under section 3(16) of ERISA and, therefore, would not normally act as plan administrators under section 3(16) of ERISA. Therefore, to the Departments' knowledge, it is only under the existing accommodation process that third party administrators are required to undertake any obligations to provide or arrange for contraceptive coverage to which they might object. These interim final rules make the accommodation process optional for employers and other plan sponsors, and specify that third party administrators that have their own objection to complying with the accommodation process may decline to enter into, or continue, contracts as third party administrators of such plans. For these reasons, these interim final rules do not otherwise exempt third party administrators. The Departments solicit public comment, however, on whether there are situations where there may be an additional need to provide distinct

protections for third party administrators that may have religious beliefs implicated by the Mandate.

F.   Scope of Objections Needed for the Objecting Entity Exemption

Exemptions for objecting entities specify that they apply where the entities object as specified in § 147.132(a)(2).  That paragraph specifies that exemptions for objecting entities will apply to the extent that an entity described in §147.132(a)(1) objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

G.   Individual Exemption

These interim final rules include a special rule pertaining to individuals (referred to here as the "individual exemption").  Section 147.132(b) provides that nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv), may be construed to prevent a willing plan sponsor of a group health plan or a willing health insurance issuer offering group or individual health insurance coverage, from offering a separate benefit package option, or a separate policy, certificate, or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on the individual's sincerely held religious beliefs.  The individual exemption extends to the coverage unit in which the plan participant, or subscriber in the individual market, is enrolled (for instance, to family coverage covering the participant and his or her beneficiaries enrolled under the plan), but does not relieve the plan's or issuer's obligation to comply with the Mandate with respect to the group health plan at large or, as applicable, to any other individual policies the issuer offers.

This individual exemption allows plan sponsors and issuers that do not specifically object to contraceptive coverage to offer religiously acceptable coverage to their participants or subscribers who do object, while offering coverage that includes contraception to participants or subscribers who do not object.  This individual exemption can apply with respect to individuals in plans sponsored by private employers or governmental employers.  For example, in one case brought against the Departments, the State of Missouri enacted a law under which the State is not permitted to discriminate against insurance issuers that offer health plans without coverage for contraception based on employees' religious beliefs, or against the individual employees who accept such offers.  See Wieland, 196 F. Supp. 3d at 1015–16 (quoting Mo. Rev. Stat. 191.724). Under the individual exemption of these interim final rules, employers sponsoring governmental plans would be free to honor the objections of individual employees by offering them plans that omit contraceptive coverage, even if those governmental entities do not object to offering contraceptive coverage in general.

This "individual exemption" cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. Nor can the individual exemption be construed to require the guaranteed availability of coverage omitting contraception to a plan sponsor or individual who does not have a sincerely held religious objection.  This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4) of the PHS Act, and does not affect any other Federal or State law governing the plan or coverage.  Thus, if there are other applicable laws or plan terms governing the benefits, these interim final rules do not affect such other laws or terms.

Exhibit A

The Departments believe the individual exemption will help to meet the Affordable Care Act's goal of increasing health coverage because it will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs.[62]  At the same time, this individual exemption "does not undermine the governmental interests furthered by the contraceptive coverage requirement,"[63] because, when the exemption is applicable, the individual does not want the coverage, and therefore would not use the objectionable items even if they were covered.

H.  Optional Accommodation

Despite expanding the scope of the exemption, these rules also keep the accommodation process, but revise it so as to make it optional.  In this way, objecting employers are no longer required to choose between direct compliance or compliance through the accommodation.  These rules maintain the location of the accommodation process in the Code of Federal Regulations at 45 CFR 147.131, 26 CFR 54.9815-2713A, and 29 CFR 2590.715-2713A.  These rules, by virtue of expanding the plan sponsor exemption beyond houses of worship and integrated auxiliaries that were previously exempt, and beyond religious nonprofit groups that were previously accommodated, and by defining eligible organizations for the accommodation with reference to those covered by the exemption, likewise expand the kinds of entities that may use the optional accommodation.  This includes plan sponsors with sincerely held religious beliefs for the reasons described above.  Consequently, under these interim final rules, objecting employers may make use of the exemption, or may choose to pursue the optional accommodation process.  If an eligible organization pursues the optional accommodation process through the EBSA Form 700

---

[62] See, for example, Wieland, 196 F. Supp. 3d at 1017, and March for Life, 128 F. Supp. 3d at 130, where the courts noted that the individual employee plaintiffs indicated that they viewed the Mandate as pressuring them to "forgo health insurance altogether."

[63] 78 FR 39874.

or other specified notice to HHS, it voluntarily shifts an obligation to provide separate but seamless contraceptive coverage to its issuer or third party administrator.

The fees adjustment process for qualifying health issuers or third party administrators pursuant to 45 CFR 156.50 is not modified, and (as specified therein) requires for its applicability that an exception under OMB Circular No. A-25R be in effect as the Secretary of the Department of Health and Human Services requests.

If an eligible organization wishes to revoke its use of the accommodation, it can do so under these interim final rules and operate under its exempt status.  As part of its revocation, the issuer or third party administrator of the eligible organization must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services.  This revocation process applies both prospectively to eligible organizations who decide at a later date to avail themselves of the optional accommodation and then decide to revoke that accommodation, as well as to organizations that were included in the accommodation prior to the effective date of these interim final rules either by their submission of an EBSA Form 700 or notification, or by some other means under which their third party administrator or issuer was notified by DOL or HHS that the accommodation applies.  Consistent with other applicable laws, the issuer or third party administrator of an eligible organization must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption.  If contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, the revocation will be effective on the 1st day of the 1st plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of

notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act,[64] if applicable, to revoke its use of the accommodation process.

The Departments have eliminated the provision in the previous accommodation under which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect.  Because any organization with a sincerely held religious objection to contraceptive coverage is now eligible for the optional accommodation under these interim final rules and is also exempt, the Departments believe there is minimal opportunity for mistake or misrepresentation by the organization, and the reliance provision is no longer necessary.

I.   Definition of Contraceptive Services for the Purpose of these Rules

The interim final rules specify that when the rules refer to "contraceptive" services, benefits, or coverage, such terms include contraceptive or sterilization items, services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).  This was the case under the previous rules, as expressed in the preamble text of the various iterations of the regulations, but the Departments wish to make the scope clear by specifying it in the regulatory text.

J.   Conclusion

The Departments believe that the Guidelines and the exemptions expanded herein will advance the limited purposes for which Congress imposed section 2713 of the PHS Act, while acting consistently with Congress' well-established record of allowing for religious exemptions

---

[64] See also 26 CFR 54.9815-2715(b); 29 CFR  2590.715-2715(b); 45 CFR 147.200(b).

with respect to especially sensitive health care and health insurance requirements. These interim final rules leave fully in place over a dozen Federal programs that provide, or subsidize, contraceptives for women, including for low income women based on financial need. These interim final rules also maintain HRSA's discretion to decide whether to continue to require contraceptive coverage under the Guidelines (in plans where Congress applied section 2713 of the PHS Act) if no objection exists. The Departments believe this array of programs and requirements better serves the interest of providing contraceptive coverage while protecting the conscience rights of entities that have sincerely held religious objections to some or all contraceptive or sterilization services.

The Departments request and encourage public comments on all matters addressed in these interim final rules.

## V.      Interim Final Rules, Request for Comments and Waiver of Delay of Effective Date

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include sections 2701 through 2728 of the PHS Act and the incorporation of those sections into section 715 of ERISA and section 9815 of the Code. These interim final rules fall under those statutory authorized justifications, as did previous rules on this matter (75 FR 41726; 76 FR 46621; 79 FR 51092).

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements – except when an agency, for good cause, finds that

Exhibit A

notice and public comment thereon are impracticable, unnecessary, or contrary to the public

interest.  These provisions of the APA do not apply here because of the specific authority granted

to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the

PHS Act.

      Even if these provisions of the APA applied, they would be satisfied:  The Departments

have determined that it would be impracticable and contrary to the public interest to delay

putting these provisions in place until a full public notice-and-comment process is completed.

As discussed earlier, the Departments have issued three interim final rules implementing this

section of the PHS Act because of the immediate needs of covered entities and the weighty

matters implicated by the HRSA Guidelines.  As recently as December 20, 2016, HRSA updated

those Guidelines without engaging in the regulatory process (because doing so is not a legal

requirement), and announced that it plans to continue to update the Guidelines.

      Dozens of lawsuits over the Mandate have been pending for nearly 5 years.  The Supreme

Court remanded several of those cases more than a year ago, stating that on remand "[w]e

anticipate that the Courts of Appeals will allow the parties sufficient time to resolve any

outstanding issues between them".  Zubik, 136 S. Ct. at 1560.  During that time, Courts of

Appeals have been asking the parties in those cases to submit status reports every 30 through 90

days.  Those status reports have informed the courts that the parties were in discussions, and

about the RFI issued in late 2016 and its subsequent comment process and the FAQ the

Departments issued indicating that we could not find a way at that time to amend the

accommodation process so as to satisfy objecting eligible organizations while pursuing the

Departments' policy goals.  Since then, several courts have issued orders setting more pressing

deadlines.  For example, on March 10, 2017, the United States Court of Appeals for the Seventh

Exhibit A

Circuit ordered that, by May 1, 2017, "the court expects to see either a report of an agreement to resolve the case or detailed reports on the parties' respective positions.  In the event no agreement is reported on or before May 1, 2017, the court will plan to schedule oral argument on the merits of the case on short notice after that date".  The Departments submitted a status report but were unable to set forth their specific position because this interim final rule was not yet on public display. Instead, the Departments informed the Court that we "are now considering whether further administrative action would be appropriate".  In response, the court extended the deadline to June 1, 2017, again declaring the court expected "to see either a report of an agreement to resolve the case or detailed reports on the parties' respective positions".  The Departments were again unable to set forth their position in that status report, but were able to state that the "Departments of Health and Human Services, Labor, and the Treasury are engaged in rulemaking to reconsider the regulations at issue here," citing https://www.reginfo.gov/public/do/eoDetails?rrid=127381.

As discussed above, the Departments have concluded that, in many instances, requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncomplaince has violated RFRA.  Good cause exists to issue the expanded exemption in these interim final rules in order to cure such violations (whether among litigants or among similarly situated parties that have not litigated), to help settle or resolve cases, and to ensure, moving forward, that our regulations are consistent with any approach we have taken in resolving certain litigation matters.

The Departments have also been subject to temporary injunctions protecting many religious nonprofit organizations from being subject to the accommodation process against their wishes, while many other organizations are fully exempt, have permanent court orders blocking

the contraceptive coverage requirement, or are not subject to section 2713 of the PHS Act and its

enforcement due to Congress' limited application of that requirement.  Good cause exists to

change the Departments' previous rules to direct HRSA to bring its Guidelines in accord with the

legal realities and remove the threat of a future violation of religious beliefs, including where

such violations are contrary to Federal law.

    Other objecting entities similarly have not had the protection of court injunctions.  This

includes some nonprofit entities that have sued the Departments, but it also includes some

organizations that do not have lawsuits pending against us.  For example, many of the closely

held for-profit companies that brought the array of lawsuits challenging the Mandate leading up

to the decision in Hobby Lobby are not protected by injunctions from the current rules, including

the requirement that they either fully comply with the Mandate or subject themselves to the

accommodation.  Continuing to apply the Mandate's regulatory burden on individuals and

organizations with religious beliefs against it could serve as a deterrent for citizens who might

consider forming new entities—nonprofit or for-profit—and to offering health insurance in

employer-sponsored plans or plans arranged by institutions of higher education.  Delaying the

protection afforded by these interim final rules would be contrary to the public interest because it

would serve to extend for many months the harm caused to all entities and individuals with

religious objections to the Mandate.  Good cause exists to provide immediate resolution to this

myriad of situations rather than leaving them to continued uncertainty, inconsistency, and cost

during litigation challenging the previous rules.

    These interim final rules provide a specific policy resolution that courts have been

waiting to receive from the Departments for more than a year.  If the Departments were to

publish a notice of proposed rulemaking instead of these interim final rules, many more months

Exhibit A

could pass before the current Mandate is lifted from the entities receiving the expanded exemption, during which time those entities would be deprived of the relief clearly set forth in these interim final rules.  In response to several of the previous rules on this issue—including three issued as interim final rules under the statutory authority cited above—the Departments received more than 100,000 public comments on multiple occasions.  Those comments included extensive discussion about whether and by what extent to expand the exemption.  Most recently, on July 26, 2016, the Departments issued a request for information (81 FR 47741) and received over 54,000 public comments about different possible ways to resolve these issues.  In connection with past regulations, the Departments have offered or expanded a temporary safe harbor allowing organizations that were not exempt from the HRSA Guidelines to operate out of compliance with the Guidelines.  The Departments will fully consider comments submitted in response to these interim final rules, but believe that good cause exists to issue the rules on an interim final basis before the comments are submitted and reviewed.

As the United States Court of Appeals for the D.C. Circuit stated with respect to an earlier interim final rule promulgated with respect to this issue in Priests for Life v. U.S. Department of Health and Human Services, 772 F.3d 229, 276 (D.C. Cir. 2014), vacated on other grounds, Zubik v. Burwell, 136 S. Ct. 1557 (2016), "[S]everal reasons support HHS's decision not to engage in notice and comment here".  Among other things, the Court noted that "the agency made a good cause finding in the rule it issued"; that "the regulations the interim final rule modifies were recently enacted pursuant to notice and comment rulemaking, and presented virtually identical issues"; that "HHS will expose its interim rule to notice and comment before its permanent implementation"; and that "delay in implementation of the rule would interfere

with the prompt availability of contraceptive coverage and delay the implementation of the alternative opt-out for religious objectors". Id. at 277.

Delaying the availability of the expanded exemption would delay the ability of those organizations and individuals to avail themselves of the relief afforded by these interim final rules.  Good cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis.  Good cause is also supported by the effect of these interim final rules in bringing to a close the uncertainty caused by years of litigation and regulatory changes made under section 2713(a)(4) of the PHS Act.  Issuing interim final rules with a comment period provides the public with an opportunity to comment on whether these regulations expanding the exemption should be made permanent or subject to modification without delaying the effective date of the regulations.

Delaying the availability of the expanded exemption would also increase the costs of health insurance.  As reflected in litigation pertaining to the Mandate, some entities are in grandfathered health plans that do not cover contraception.  They wish to make changes to their health plans that will reduce the costs of insurance coverage for their beneficiaries or policyholders, but which would cause the plans to lose grandfathered status.  They are refraining from making those changes—and therefore are continuing to incur and pass on higher insurance costs—to prevent the Mandate from applying to their plans in violation of their consciences. Issuing these rules on an interim final basis is necessary in order to help reduce the costs of health insurance for such entities and their plan participants.

Exhibit A

These interim final rules also set forth an optional accommodation process, and expand eligibility for that process to a broader category of entities.  Delaying the availability of the optional accommodation process would delay the ability of organizations that do not now qualify for the accommodation, but wish to opt into it, to be able to do so and therefore to provide a mechanism for contraceptive coverage  to be provided to their employees while the organization's religious objections are accommodated.

For the foregoing reasons, the Departments have determined that it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final rules into effect, and that it is in the public interest to promulgate interim final rules.  For the same reasons, the Departments have determined, consistent with section 553(d) of the APA (5 U.S.C. 553(d)), that there is good cause to make these interim final rules effective immediately upon filing at the Office of the **Federal Register**.

## VI.    Economic Impact and Paperwork Burden

We have examined the impacts of the interim final rules as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96 354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104-4), Executive Order 13132 on Federalism (August 4, 1999), the Congressional Review Act (5 U.S.C. 804(2) and Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017).

Exhibit A

A.  Executive Orders 12866 and 13563—Department of HHS and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity).  Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB).  As discussed below regarding anticipated effects of these rules and the Paperwork Reduction Act, these interim final rules are not likely to have economic impacts of $100 million or more in any 1 year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.  However, OMB has determined that the actions are significant within the meaning

Exhibit A

of section 3(f)(4) of the Executive Order.  Therefore, OMB has reviewed these final regulations, and the Departments have provided the following assessment of their impact.

1.  Need for Regulatory Action

These interim final rules amend the Departments' July 2015 final regulations to expand the exemption from the requirement to provide coverage for contraceptives and sterilization, established under the HRSA Guidelines, promulgated under section 2713(a)(4) of the PHS Act, section 715(a)(1) of the ERISA, and section 9815(a)(1) of the Code, and to revise the accommodation process to make it optional for eligible organizations.  The expanded exemption would apply to individuals and entities that have religious objections to some (or all) of the contraceptive and/or sterilization services that would be covered under the Guidelines.  Such action is taken, among other reasons, to provide for participation in the health insurance market by certain entities or individuals free from penalties for violating sincerely held religious beliefs opposed to providing or receiving coverage of contraceptive services, and to resolve many of the lawsuits that have been filed against the Departments.

2.  Anticipated Effects

The Departments assess this interim final rule together with a companion interim final rule concerning moral but non-religious conscientious objections to contraception, published elsewhere in this **Federal Register**.  Regarding entities that are extended an exemption, absent expansion of the exemption the Guidelines would require many of these entities and individuals to either: pay for coverage of contraceptive services that they find religiously objectionable; submit self-certifications that would result in their issuer or third party administrator paying for such services for their employees, which some entities also believe entangles them in the provision of such objectionable coverage; or, pay tax penalties or be subject to other adverse

Exhibit A

consequences for non-compliance with these requirements.  These interim final rules remove

certain associated burdens imposed on these entities and individuals—that is, by recognizing

their religious objections and exempting them—on the basis of such objections—from the

contraceptive and/or sterilization coverage requirement of the HRSA Guidelines and making the

accommodation process optional for eligible organizations.

To the extent that entities choose to revoke their accommodated status to make use of the

expanded exemption immediately, a notice will need to be sent to enrollees (either by the entity

or by the issuer or third party administrator) that their contraceptive coverage is changing, and

guidance will reflect that such a notice requirement is imposed no more than is already required

by preexisting rules that require notices to be sent to enrollees of changes to coverage during a

plan year.  If the entities wait until the start of their next plan year to change to exempt status,

instead of doing so during a plan year, those entities generally will also be able to avoid sending

any supplementary notices in addition to what they would otherwise normally send prior to the

start of a new plan year.  Additionally, these interim final rules provide such entities with an

offsetting regulatory benefit by the exemption itself and its relief of burdens on their religious

beliefs.  As discussed below, assuming that more than half of entities that have been using the

previous accommodation will seek immediate revocation of their accommodated status and

notices will be sent to all their enrollees, the total estimated cost of sending those notices will be

$51,990.

The Departments estimate that these interim final rules will not result in any additional

burdens or costs on issuers or third party administrators.  As discussed below, the Departments

believe that 109 of the 209 entities making use of the accommodation process will instead make

use of their newly exempt status.  In contrast, the Departments expect that a much smaller

number (which we assume to be 9) will make use of the accommodation that were not provided access to it previously.  Reduced burdens for issuers and third party administrators due to reductions in use of the accommodation will more than offset increased obligations on issuers and third party administrators serving the fewer number of entities that will newly opt into the accommodation.  This will lead to a net decrease in burdens and costs on issuers and third party administrators, who will no longer have continuing obligations imposed on them by the accommodation.

These interim final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services.  The Departments do not have sufficient data to determine the actual effect of these rules on plan participants and beneficiaries, including for costs they may incur for contraceptive coverage, nor of unintended pregnancies that may occur.  As discussed above and for reasons explained here, there are multiple levels of uncertainty involved in measuring the effect of the expanded exemption, including but not limited to--

- how many entities will make use of their newly exempt status.

- how many entities will opt into the accommodation maintained by these rules, under which their plan participants will continue receiving contraceptive coverage.

- which contraceptive methods some newly exempt entities will continue to provide without cost-sharing despite the entity objecting to other methods (for example, as reflected in Hobby Lobby, several objecting entities still provide coverage for 14 of the 18 women's contraceptive or sterilization methods, 134 S. Ct. at 2766).

- how many women will be covered by plans of entities using their newly exempt status.

Exhibit A

- which of the women covered by those plans want and would have used contraceptive coverage or payments for contraceptive methods that are no longer covered by such plans.

- whether, given the broad availability of contraceptives and their relatively low cost, such women will obtain and use contraception even if it is not covered.

- the degree to which such women are in the category of women identified by IOM as most at risk of unintended pregnancy.

- the degree to which unintended pregnancies may result among those women, which would be attributable as an effect of these rules only if the women did not otherwise use contraception or a particular contraceptive method due to their plan making use of its newly exempt status.

- the degree to which such unintended pregnancies may be associated with negative health effects, or whether such effects may be offset by other factors, such as the fact that those women will be otherwise enrolled in insurance coverage.

- the extent to which such women will qualify for alternative sources of contraceptive access, such as through a parent's or spouse's plan, or through one of the many governmental programs that subsidize contraceptive coverage to supplement their access.

The Departments have access to sources of information discussed in the following paragraphs that are relevant to this issue, but those sources do not provide a full picture of the impact of these interim final rules.

First, the prior rules already exempted certain houses of worship and their integrated auxiliaries.  Further, as discussed above, the prior accommodation process allows hundreds of additional religious nonprofit organizations in self-insured church plans that are exempt from

ERISA to file a self-certification or notice that relieves not only themselves but, in effect, their third party administrators of any obligation to provide contraceptive coverage or payments. Although in the latter case, third party administrators are legally permitted to provide the coverage, several self-insured church plans themselves have expressed an objection in litigation to allowing such contraceptive coverage to be provided, and according to information received during litigation, it appears that such contraceptive coverage has not been provided.  In addition, a significant portion of the lawsuits challenging the Mandate were brought by a single firm representing Catholic dioceses and related entities covered by their diocese-sponsored plans.  In that litigation, the Departments took the position that, where those diocese-sponsored plans are self-insured, those plans are likely church plans exempt from ERISA.[65]  For the purposes of considering whether the expanded exemption in these rules affects the persons covered by such diocese-sponsored plans, the Departments continue to assume that such plans are similar to other objecting entities using self-insured church plans with respect to their third party administrators being unlikely to provide contraceptive coverage to plan participants and beneficiaries under the previous rule.  Therefore the Departments estimate that these interim final rules have no significant effect on the contraceptive coverage of women covered by plans of houses of worship and their integrated auxiliaries, entities using a self-insured church plan, or church dioceses sponsoring self-insured plans.

It is possible that an even greater number of litigating or accommodated plans might have made use of self-insured church plan status under the previous accommodation.  Notably, one of

---

[65] See, for example, Brief in Opp. To Pls.' Mot. for Prelim. Inj., Brandt v. Burwell, No. 2:14-cv-681-AJS, doc. # 23 (W.D. Pa. filed June 10, 2014) (arguing that "plaintiffs have not established an injury in fact to the degree plaintiffs have a self-insured church plan," based on the fact that "the same law firm representing the plaintiffs here has suggested in another similar case that all 'Catholic entities like the Archdiocese participate in "church plans."'"); Roman Catholic Archdiocese of N.Y. v. Sebelius, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013) ("because plaintiffs' self-insured plans are church plans, their third party administrators would not be required to provide contraceptive coverage").

the largest nonprofit employers that had filed suit challenging the Mandate had, under these prior

rules, shifted most of their employees into self-insured church plans, and the Departments have

taken the position that various other employers that filed suit were eligible to assume self-insured

church plan status.[66]  The Supreme Court's recent decision in <u>Advocate Health Care Network</u>,

while not involving this Mandate, also clarifies certain circumstances under which religious

hospitals may be eligible for self-insured church plan status.  See 137 S. Ct. at 1656–57, 1663

(holding that a church plan under ERISA can be a plan not established and maintained by a

church, if it is maintained by a principal-purpose organization).

Second, when the Departments previously created the exemption, expanded its

application, and provided an accommodation (which, as mentioned, can lift obligations on self-

insured church plans for hundreds of nonprofit organizations), we concluded that no significant

burden or costs would result at all. (76 FR 46625; 78 FR 39889.)  We reached this conclusion

despite the impact, just described, whereby the previous rule apparently lead to women not

receiving contraceptive coverage through hundreds of nonprofit entities using self-insured

church plans.  We also reached this conclusion without counting any significant burden or cost to

some women covered in the plans of houses of worship or integrated auxiliaries that might want

contraceptive coverage.  This conclusion was based in part on the assertion, set forth in previous

regulations, that employees of houses of worship and integrated auxiliaries likely share their

employers' opposition to contraception.  Many other religious nonprofit entities, however, both

adopt and implement religious principles with similar fervency.  For the reasons discussed

above, the Departments no longer believe we can distinguish many of the women covered in the

plans of religious nonprofit entities from the women covered in the plans of houses of worship

---

[66] See https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf.; see, for example, <u>Roman Catholic Archdiocese of N.Y. v. Sebelius</u>, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013).

and integrated auxiliaries regarding which the Departments assumed share their employers'
objection to contraception, nor from women covered in the plans of religious entities using self-
insured church plans regarding which we chose not to calculate any anticipated effect even
though we conceded we were not requiring their third party administrators to provide
contraceptive coverage.  In the estimates and assumptions below, we include the potential effect
of these interim rules on women covered by such entities, in order to capture all of the
anticipated effects of these rules.

     Third, these interim final rules extend the exemption to for-profit entities.  Among the
for-profit employers that filed suit challenging the Mandate, the one with the most employees
was Hobby Lobby.[67]  As noted above, and like some similar entities, the plaintiffs in Hobby
Lobby were willing to provide coverage with no cost sharing of various contraceptive services:
14 of 18 FDA-approved women's contraceptive and sterilization methods.[68]  (134 S. Ct. at
2766.)  The effect of expanding the exemption to for-profit entities is therefore mitigated to the
extent many of the persons covered by such entities' plans may receive coverage for at least
some contraceptive services. No publicly traded for-profit entities have filed lawsuits challenging
the Mandate. The Departments agree with the Supreme Court's expectation in this regard: "it

---

[67] Verified Complaint ¶ 34, Hobby Lobby Stores, Inc., et al. v. Sebelius, No. 5:12-cv-01000-HE (Sept. 12, 2012
W.D. Okla.) (13,240 employees).

[68] By reference to the FDA Birth Control Guide's list of 18 birth control methods for women and 2 for men,
https://www.fda.gov/downloads/forconsumers/byaudience/forwomen/freepublications/ucm517406.pdf, Hobby
Lobby and entities with similar beliefs were not willing to cover: IUD copper; IUD with progestin; emergency
contraceptive (Levonorgestrel); and emergency contraceptive (Ulipristal Acetate).  See 134 S. Ct. at 2765–66.
Hobby Lobby was willing to cover: sterilization surgery for women; sterilization implant for women; implantable
rod; shot/injection; oral contraceptives ("the Pill"—combined pill); oral contraceptives ("the Pill"—
extended/continuous use/combined pill); oral contraceptives ("the Mini Pill"—progestin only); patch; vaginal
contraceptive ring; diaphragm with spermicide; sponge with spermicide; cervical cap with spermicide; female
condom; spermicide alone. Id.  Among women using these 18 female contraceptive methods, 85 percent use the 14
methods that Hobby Lobby and entities with similar beliefs were willing to cover (22,446,000 out of 26,436,000),
and "[t]he pill and female sterilization have been the two most commonly used methods since 1982." See
Guttmacher Institute, "Contraceptive Use in the United States" (Sept. 2016), available at
https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

seems unlikely that the sort of corporate giants to which HHS refers will often assert RFRA claims.  HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring.  For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable".  Hobby Lobby, 134 S. Ct. at 2774.  Therefore, although publicly traded entities could make use of exempt status under these interim final rules, the Departments do not expect that very many will do so, as compared to the 87 religious closely held for-profit entities that brought litigation challenging the Mandate (some of which might be content with the accommodation).

Fourth, the Departments have a limited amount of information about entities that have made use of the accommodation process as set forth in the previous rules.  HHS previously estimated that 209 entities would make use of the accommodation process.  That estimate was based on HHS's observation in its August 2014 interim final rules and July 2015 final regulations that there were 122 eligible entities that had filed litigation challenging the accommodation process, and 87 closely held for-profit entities that had filed suit challenging the Mandate in general.  (79 FR 51096; 80 FR 41336).  The Departments acknowledged that entities that had not litigated might make use of the accommodation, but we stated we did not have better data to estimate how many might use the accommodation overall.

After issuing those rules, the Departments have not received complete data on the number of entities actually using the accommodation, because the accommodation does not require many accommodated entities to submit information to us. Our limited records indicate that approximately 63 entities have affirmatively submitted notices to HHS to use the

accommodation.  This includes some fully insured and some self-insured plans, but it does not

include entities that may have used the accommodation by submitting an EBSA form 700 self-

certification directly to their issuer or third party administrator.  We have deemed some other

entities as being subject to the accommodation through their litigation filings, but that might not

have led to contraceptive coverage being provided to persons covered in some of those plans,

either because they are exempt as houses of worship or integrated auxiliaries, they are in self-

insured church plans, or we were not aware of their issuers or third party administrators so as to

send them letters obligating them to provide such coverage.  Our records also indicate that 60

plans used the contraceptive user fees adjustments in the 2015 plan year, the last year for which

we have data.  This includes only self-insured plans, and it includes some plans that self-certified

through submitting notices and other plans that, presumably, self-certified through the EBSA

form 700.

These sets of data are not inconsistent with our previous estimate that 209 entities would

use the accommodation, but they indicate that some non-litigating entities used the

accommodation, and some litigating entities did not, possibly amounting to a similar number.

For this reason, and because we do not have more complete data available, we believe the

previous estimate of 209 accommodated entities is still the best estimate available for how many

entities have used the accommodation under the previous rule.  This assumes that the number of

litigating entities that did not use the accommodation is approximately the same as the number of

non-litigating entities that did use it.

In considering how many entities will use the voluntary accommodation moving

forward—and how many will use the expanded exemption—we also do not have specific data.

We expect the 122 nonprofit entities that specifically challenged the accommodation in court to

Exhibit A

use the expanded exemption. But, as noted above, we believe a significant number of them are not presently participating in the accommodation, and that some nonprofit entities in self-insured church plans are not providing contraceptive coverage through their third party administrators even if they are using the accommodation.  Among the 87 for-profit entities that filed suit challenging the Mandate in general, few if any filed suit challenging the accommodation.  We do not know how many of those entities are using the accommodation, how many may be complying with the Mandate fully, how many may be relying on court injunctions to do neither, or how many will use the expanded exemption moving forward.  Among entities that never litigated but used the accommodation, we expect many but not all of them to continue using the accommodation, and we do not have data to estimate how many such entities there are or how many will choose either option.

Overall, therefore, without sufficient data to estimate what the estimated 209 previously accommodated entities will do under these interim final rules, we assume that just over half of them will use the expanded exemption, and just under half will continue their accommodated status under the voluntary process set forth in these rules.  Specifically, we assume that 109 previously accommodated entities will make use of their exempt status, and 100 will continue using the accommodation.  This estimate is based in part on our view that most litigating nonprofit entities would prefer the exemption to the accommodation, but that many of either have not been using the accommodation or, if they have been using it, it is not providing contraceptive coverage for women in their plans where they participate in self-insured church plans.  This estimate is also consistent with our lack of knowledge of how many for-profit entities were using the accommodation and will choose the exemption or the accommodation, given that many of them did not bring legal challenges against the accommodation after Hobby

Lobby.  This estimate is further consistent with our view, explained in more detail below, that some entities that are using the accommodation and did not bring litigation will use the exemption, but many accommodated, non-litigating entities—including the ones with the largest relative workforces among accommodated entities—will continue using the accommodation. The Departments recognize that we do not have better data to estimate the effects of these interim final rules on such entities.

        In addition to these factors, we recognize that the expanded exemption and accommodation are newly available to religious for-profit entities that are not closely held and some other plan sponsors.  As explained above, the Departments believe religious for-profit entities that are not closely held may exist, or may wish to come into being. HHS does not anticipate that there will be significant number of such entities, and among those, we believe that very few if any will use the accommodation.  All of the for-profit entities that have challenged the Mandate have been religious closely held entities.

        It is also possible that religious nonprofit or closely held for-profit entities that were already eligible for the accommodation but did not previously use it will opt into it moving forward, but because they could have done so under the previous rules, their opting into the accommodation is not caused by these rules.

        Without any data to estimate how many of any entities newly eligible for and interested in using the accommodation might exist, HHS assumes for the purposes of estimating the anticipated effect of these rules that less than 10 entities (9) will do so.  Therefore, we estimate that 109 entities will use the voluntary accommodation moving forward, 100 of which were already using the previous accommodation, and that 109 entities that have been using the previous accommodation will use the expanded exemption instead.

Exhibit A

Fifth, in attempting to estimate the anticipated effect of these interim final rules on women receiving contraceptive coverage, the Departments have limited information about the entities that have filed suit challenging the Mandate.  Approximately 209 entities have brought suit challenging the Mandate over more than 5 years.  They have included a broad range of nonprofit entities and closely held for-profit entities.  We discuss a number of potentially relevant points:

First, the Departments do not believe that out-of-pocket litigation costs have been a significant barrier to entities choosing to file suit.  Based on the Departments' knowledge of these cases through public sources and litigation, nearly all the entities were represented pro bono and were subject to little or no discovery during the cases, and multiple public interest law firms publicly provided legal services for entities willing to challenge the Mandate.[69]  (It is noteworthy, however, that such pro bono arrangements and minimization of discovery do not eliminate 100 percent of the time costs of participating in litigation or, as discussed in more detail below, the potential for negative publicity.  Both concerns could have dissuaded participation in lawsuits, and the potential for negative publicity may also dissuade participation in the expanded exemptions.)

Second, prior to the Affordable Care Act, the vast majority of entities already covered contraception, albeit not always without cost-sharing  The Departments do not have data to

---

[69] See, for example, Catholic Diocese of Pittsburgh, "Award-winning attorney 'humbled' by recognition," <u>Pittsburgh Catholic</u> ("Jones Day is doing the cases 'pro bono,' or voluntarily and without payment.") (quoting Paul M. Pohl, Partner, Jones Day), available at http://diopitt.org/pittsburgh-catholic/award-winning-attorney-humbled-recognition; "Little Sisters Fight for Religious Freedom," <u>National Review</u> (Oct. 2, 2013) ("the Becket Fund for Religious Liberty is representing us pro bono, as they do all their clients.") (quoting Sister Constance Veit, L.S.P., communications director for the Little Sisters of the Poor), available at http://www.nationalreview.com/article/360103/little-sisters-fight-religious-freedom-interview; Suzanne Cassidy, "Meet the major legal players in the Conestoga Wood Specialties Supreme Court case," <u>LancasterOnline</u> (Mar. 25, 2014) ("Cortman and the other lawyers arguing on behalf of Conestoga Wood Specialties and Hobby Lobby are offering their services pro bono."), available at http://lancasteronline.com/news/local/meet-the-major-legal-players-in-the-conestoga-wood-specialties/article_302bc8e2-b379-11e3-b669-001a4bcf6878.html.

Exhibit A

indicate why entities that did not cover contraception prior to the Affordable Care Act chose not to cover it. As noted above, however, the Departments have maintained that compliance with the contraceptive Mandate is cost-neutral to issuers, which indicates that no significant financial incentive exists to omit contraceptive coverage.  As indicated by the report by HHS ASPE discussed above, we have assumed that millions of women received preventive services after the Mandate went into effect because nearly all entities complied with the Guidelines.  We are not aware of expressions from most of those entities indicating that they would have sincerely held religious objections to complying with the Mandate, and therefore that they would make use of the expanded exemption provided here.

Third, omitting contraceptive coverage has subjected some entities to serious public criticism and in some cases organized boycotts or opposition campaigns that have been reported in various media and online outlets regarding entities that have filed suit.  The Departments expect that even if some entities might not receive such criticism, many entities will be reluctant to use the expanded exemption unless they are committed to their views to a significant degree.

Overall, the Departments do not know how many entities will use the expanded exemption.  We expect that some non-litigating entities will use it, but given the aforementioned considerations, we believe it might not be very many more.  Moreover, many litigating entities are already exempt or are not providing contraceptive coverage to women in their plans due to their participating in self-insured church plans, so the effect of the expanded exemption among litigating entities is significantly lower than it would be if all the women in their plans were already receiving the coverage.

To calculate the anticipated effects of this rule on contraceptive coverage among women covered by plans provided by litigating entities, we start by examining court documents and

other public sources.[70]  These sources provide some information, albeit incomplete, about how many people are employed by these entities.  As noted above, however, contraceptive coverage among the employees of many litigating entities will not be affected by these rules because some litigating entities were exempt under the prior rule, while others were or appeared to be in self-insured church plans so that women covered in their plans were already not receiving contraceptive coverage.

Among litigating entities that were neither exempt nor likely using self-insured church plans, our best estimate based on court documents and public sources is that such entities employed approximately 65,000 persons, male and female.[71]  The average number of workers at firms offering health benefits that are actually covered by those benefits is 62 percent.[72]  This amounts to approximately 34,000 employees covered under those plans. DOL estimates that for each employee policyholder, there is approximately one dependent.[73]  This amounts to approximately 68,000 covered persons.  Census data indicate that women of childbearing age—

---

[70] Where complaints, affidavits, or other documents filed in court did not indicate the number of employees that work for an entity, and that entity was not apparently exempt as a house of worship or integrated auxiliary, and it was not using the kind of plan that we have stated in litigation qualifies for self-insured church plan status (see, for example, Roman Catholic Archdiocese of N.Y. v. Sebelius, 987 F. Supp. 2d 232, 242 (E.D.N.Y. 2013)), we examined employment data contained in some IRS form W-3's that are publicly available online for certain nonprofit groups, and looked at other websites discussing the number of people employed at certain entities.
[71]  In a small number of lawsuits, named plaintiffs include organizations claiming to have members that seek an exemption.  We have very little information about the number, size, and types of entities those members.  Based on limited information from those cases, however, their membership appears to consist mainly, although not entirely, of houses of worship, integrated auxiliaries, and participants in self-insured plans of churches.  As explained above, the contraceptive coverage of women covered by such plans is not likely to be affected by the expanded exemption in these rules.  However, to account for plans subject to contraceptive coverage obligations among those members we have added 10,000 to our estimate of the number of persons among litigants that may be impacted by these rules.
[72] See Kaiser Family Foundation and Health Research and Educational Trust, "Employer Health Benefits: 2017 Annual Survey" at 57, available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[73] "Health Insurance Coverage Bulletin" Table 4, page 21.  Using March 2015 Annual Social and Economic Supplement to the Current Population Survey.  https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.

that is, women aged 15–44—compose 20.2 percent of the general population.[74]  In addition,

approximately 44.3 percent of women of childbearing age use women's contraceptive methods

covered by the Guidelines.[75]  Therefore, we estimate that approximately 7,221 women of

childbearing age that use contraception covered by the Guidelines are covered by employer

sponsored plans of entities that have filed lawsuits challenging the Mandate, where those plans

are neither exempt under the prior rule nor are self-insured church plans.

   We also estimate that for the educational institutions objecting to the Mandate as applied

to student coverage that they arranged, where the entities were neither exempt under the prior

rule nor were their student plans self-insured, such student plans likely covered approximately

3,300 students.  On average, we expect that approximately half of those students (1,650) are

female.  For the purposes of this estimate, we also assume that female policyholders covered by

plans arranged by institutions of higher education are women of childbearing age.  We expect

that they would have less than the average number of dependents per policyholder than exists in

standard plans, but for the purposes of providing an upper bound to this estimate, we assume that

they would have an average of one dependent per policyholder, thus bringing the number of

policyholders and dependents back up to 3,300.  Many of those dependents are likely not to be

women of childbearing age, but in order to provide an upper bound to this estimate, we assume

they are.  Therefore, for the purposes of this estimate, we assume that the effect of these

expanded exemptions on student plans of litigating entities includes 3,300 women.  Assuming

---

[74] United States Census Bureau, "Age and Sex Composition: 2010" (May 2011), available at
https://www.census.gov/prod/cen2010/briefs/c2010br-03.pdf. The Guidelines' requirement of contraceptive
coverage only applies "for all women with reproductive capacity." https://www.hrsa.gov/womensguidelines/; also,
see 80 FR 40318.  In addition, studies commonly consider the 15–44 age range to assess contraceptive use by
women of childbearing age.  See, for example, Guttmacher Institute, "Contraceptive Use in the United States" (Sept.
2016), available at https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.
[75] See https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states (reporting that of 60,877,000 women
aged 15-44, 26,945,000 use women's contraceptive methods covered by the Guidelines).

that 44.3 perecent of such women use contraception covered by the Guidelines,[76] we estimate that 1,462 of those women would be affected by these rules.

Together, this leads the Departments to estimate that approximately 8,700 women of childbearing age may have their contraception costs affected by plans of litigating entities using these expanded exemptions.  As noted above, the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception (so that fewer of them than the national average might actually use contraception).  Nor do we know how many would have alternative contraceptive access from a parent's or spouse's plan, or from Federal, State, or local governmental programs, nor how many of those women would fall in the category of being most at risk of unintended pregnancy, nor how many of those entities would provide some contraception in their plans while only objecting to certain contraceptives.

Sixth, in a brief filed in the Zubik litigation, the Departments stated that "in 2014, [HHS] provided user-fee reductions to compensate TPAs for making contraceptive coverage available to more than 600,000 employees and beneficiaries," and that "[t]hat figure includes both men and women covered under the relevant plans."[77]  HHS has reviewed the information giving rise to that estimate, and has received updated information for 2015.  In 2014, 612,000 persons were covered by plans claiming contraceptive user fees adjustments, and in 2015, 576,000 persons were covered by such plans.  These numbers include all persons in such plans, not just women of childbearing age.

---

[76] It would appear that a smaller percentage of college-aged women use contraception—and use more expensive methods such as long acting methods or sterilization—than among other women of childbearing age. See NCHS Data Brief, "Current Contraceptive Status Among Women Aged 15-44: United States, 2011-2013" (Dec. 2014), available at https://www.cdc.gov/nchs/data/databriefs/db173.pdf.
[77] Brief of Respondents at 18–19 & n.7, Zubik v. Burwell, No. 14-1418, et al. (U.S. filed Feb. 10, 2016).  The actual number is 612,487.

Exhibit A

HHS's information indicates that religious nonprofit hospitals or health systems sponsored a significant minority of the accommodated self-insured plans that were using contraceptive user fees adjustments, yet those plans covered more than 80 percent of the persons covered in all plans using contraceptive user fees adjustments.  Some of those plans cover nearly 100,000 persons each, and several others cover approximately 40,000 persons each.  In other words, these plans were proportionately much larger than the plans provided by other entities using the contraceptive user fees adjustments.

There are two reasons to believe that a significant fraction of the persons covered by previously accommodated plans provided by religious nonprofit hospitals or health systems may not be affected by the expanded exemption.  A broad range of religious hospitals or health systems have publicly indicated that they do not conscientiously oppose participating in the accommodation.[78]  Of course, some of these religious hospitals or health systems may opt for the expanded exemption under these interim final rules, but others might not. In addition, among plans of religious nonprofit hospitals or health systems, some have indicated that they might be eligible for status as a self-insured church plan.[79]  As discussed above, some litigants challenging the Mandate have appeared, after their complaints were filed, to make use of self-insured church plan status.[80]  (The Departments take no view on the status of these particular plans under

---

[78]  See, for example, https://www.chausa.org/newsroom/women%27s-preventive-health-services-final-rule ("HHS has now established an accommodation that will allow our ministries to continue offering health insurance plans for their employees as they have always done….  We are pleased that our members now have an accommodation that will not require them to contract, provide, pay or refer for contraceptive coverage….  We will work with our members to implement this accommodation.") In comments submitted in previous rules concerning this Mandate, the Catholic Health Association has stated it "is the national leadership organization for the Catholic health ministry, consisting of more than 2,000 Catholic health care sponsors, systems, hospitals, long-term care facilities, and related organizations.  Our ministry is represented in all 50 states and the District of Columbia."  Comments on CMS-9968-ANPRM (dated June 15, 2012).

[79]  See, for example, Brief of the Catholic Health Association of the United States as Amicus Curiae in Support of Petitioners, Advocate Health Care Network, Nos. 16-74, 16-86, 16-258, 2017 WL 371934 at *1 (U.S. filed Jan. 24, 2017) ("CHA members have relied for decades that the 'church plan' exemption contained in" ERISA.).

[80]  See supra note 66.

ERISA, but simply make this observation for the purpose of seeking to estimate the impact of

these interim final rules.)  Nevertheless, overall it seems likely that many of the remaining

religious hospital or health systems plans previously using the accommodation will continue to

opt into the voluntary accommodation under these interim final rules, under which their

employees will still receive contraceptive coverage.  To the extent that plans of religious

hospitals or health systems are able to make use of self-insured church plan status, the previous

accommodation rule would already have allowed them to relieve themselves and their third party

administrators of obligations to provide contraceptive coverage or payments.  Therefore, in such

situations these interim final rules would not have an anticipated effect on the contraceptive

coverage of women in those plans.

        Considering all these data points and limitations, the Departments offer the following

estimate of the number of women who will be impacted by the expanded exemption in these

interim final rules.  The Departments begin with the 8,700 women of childbearing age that use

contraception who we estimate will be affected by use of the expanded exemption among

litigating entities.  In addition to that number, we calculate the following number of women

affected by accommodated entities using the expanded exemption.  As noted above,

approximately 576,000 plan participants and beneficiaries were covered by self-insured plans

that received contraceptive user fee adjustments in 2014.  Although additional self-insured

entities may have participated in the accommodation without making use of contraceptive user

fees adjustments, we do not know what number of entities did so.  We consider it likely that self-

insured entities with relatively larger numbers of covered persons had sufficient financial

incentive to make use of the contraceptive user fees adjustments.  Therefore, without better data

available, we assume that the number of persons covered by self-insured plans using

Exhibit A

contraceptive user fees adjustments approximates the number of persons covered by all self-insured plans using the accommodation.

An additional but unknown number of persons were likely covered in fully insured plans using the accommodation.  The Departments do not have data on how many fully insured plans have been using the accommodation, nor on how many persons were covered by those plans. DOL estimates that, among persons covered by employer sponsored insurance, 56.1 percent are covered by self-insured plans and 43.9 percent are covered by fully insured plans.[81]  Therefore, corresponding to the 576,000 persons covered by self-insured plans using user fee adjustments, we estimate an additional 451,000 persons were covered by fully insured plans using the accommodation.  This yields an estimate of 1,027,000 covered persons of all ages and sexes in plans using the previous accommodation.

As discussed below, and recognizing the limited data available for our estimates, the Departments estimate that 100 of the 209 entities that were using the accommodation under the prior rule will continue to opt into it under these interim final rules.  Notably, however, the data concerning accommodated self-insured plans indicates that plans sponsored by religious hospitals and health systems encompass more than 80 percent of the persons covered in such plans.  In other words, plans sponsored by such entities have a proportionately larger number of covered persons than do plans sponsored by other accommodated entities, which have smaller numbers of covered persons.  As also cited above, many religious hospitals and health systems have indicated that they do not object to the accommodation, and some of those entities might also qualify as self-insured church plans, so that these interim final rules would not impact the

---

[81] "Health Insurance Coverage Bulletin" Table 3A, page 15.  Using March 2015 Annual Social and Economic Supplement to the Current Population Survey. https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.

contraceptive coverage their employees receive.  We do not have specific data on which plans of which sizes will actually continue to opt into the accommodation, nor how many will make use of self-insured church plan status.  We assume that the proportions of covered persons in self-insured plans using contraceptive user fees adjustments also apply in fully insured plans, for which we lack representative data.  Based on these assumptions and without better data available, we assume that the 100 accommodated entities that will remain in the accommodation will account for 75 percent of all the persons previously covered in accommodated plans.  In comparison, we assume the 109 accommodated entities that will make use of the expanded exemption will encompass 25 percent of persons previously covered in accommodated plans.

Applying these percentages to the total number of 1,027,000 persons we estimate are covered in accommodated plans, we estimate that approximately 257,000 persons previously covered in accommodated plans will be covered in the 109 plans that use the expanded exemption, and 770,000 persons will be covered in the estimated 100 plans that continue to use the accommodation.  According to the Census data cited above, 20.2 percent of these persons are women of childbearing age, which amounts to approximately 51,900 women of childbearing age in previously accommodated plans that we estimate will use the expanded exemption.  As noted above, approximately 44.3 percent of women of childbearing age use women's contraceptive methods covered by the Guidelines, so that we expect approximately 23,000 women that use contraception covered by the Guidelines to be affected by accommodated entities using the expanded exemption.

It is not clear the extent to which this number overlaps with the number estimated above of 8,700 women in plans of litigating entities that may be affected by these rules.  Based on our limited information from the litigation and accommodation notices, we expect that the overlap is

significant.  Nevertheless, in order to estimate the possible effects of these rules, we assume there

is no overlap between these two numbers, and therefore that these interim final rules would

affect the contraceptive costs of approximately 31,700 women.

Under the assumptions just discussed, the number of women whose contraceptive costs

will be impacted by the expanded exemption in these interim final rules is less than 0.1 percent

of the 55.6 million women in private plans that HHS ASPE estimated[82] receive preventive

services coverage under the Guidelines.

In order to estimate the cost of contraception to women affected by the expanded

exemption, the Departments are aware that, under the prior accommodation process, the total

user fee adjustment amount for self-insured plans for the 2015 benefit year was $33 million.

These adjustments covered the cost of contraceptive coverage provided to women participants

and beneficiaries in self-insured plans where the employer objected and made use of the

accommodation, and where an authorizing exception under OMB Circular No. A-25R was in

effect as the Secretary of the Department of Health and Human Services requests.  Nine percent

of that amount was attributable to administrative costs and margin, according to the provisions of

45 CFR 156.50(d)(3)(ii).  Thus the amount of the adjustments attributable to the cost of

contraceptive services was about $30 million.  As discussed above, in 2015 that amount

corresponded to 576,000 persons covered by such plans.  Among those persons, as cited above,

approximately 20.2 percent on average were women of childbearing age—that is, approximately

116,000 women. As noted above, approximately 44.3 percent of women of childbearing age use

women's contraceptive methods covered by the Guidelines, which includes 51,400 women in

---

[82] Available at https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans; also, see Abridged Report, available at https://www.womenspreventivehealth.org/wp-content/uploads/2017/01/WPSI_2016AbridgedReport.pdf.

those plans.  Therefore, entities using contraceptive user fees adjustments received approximately $584 per year per woman of childbearing age that use contraception covered by the Guidelines and are covered in their plans.

As discussed above, the Departments estimate that the expanded exemptions will impact the contraceptive costs of approximately 31,700 women of childbearing age that use contraception covered by the Guidelines.  At an average of $584 per year, the financial transfer effects attributable to the interim final rules on those women would be approximately $18.5 million.[83,84]

To account for uncertainty in the estimate, we conducted a second analysis using an alternative framework, in order to thoroughly consider the possible upper bound economic impact of these interim final rules.

As noted above, the HHS ASPE report estimated that 55.6 million women aged 15 to 64 and covered by private insurance had preventive services coverage under the Affordable Care Act.  Approximately 16.2 percent of those women were enrolled in plans on exchanges or were otherwise not covered by employer sponsored insurance, so only 46.6 million women aged 15 to 64 received the coverage through employer sponsored private insurance plans.[85]  In addition,

---

[83] As noted above, the Departments have taken the position that providing contraceptive coverage is cost neutral to issuers. (78 FR 39877). At the same time, because of the up-front costs of some contraceptive or sterilization methods, and because some entities did not cover contraception prior to the Affordable Care Act, premiums may be expected to adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives.  As discussed elsewhere in this analysis, such women may make up approximately 8.9 percent (= 20.2 percent x 44.3 percent) of the covered population, in which case the offset would also be approximately 8.9 percent.

[84] Describing this impact as a transfer reflects an implicit assumption that the same products and services would be used with or without the rule.  Such an assumption is somewhat oversimplified because the interim final rules shift cost burden to consumption decision-makers (that is, the women who choose whether or not to use the relevant contraceptives) and thus can be expected to lead to some decrease in use of the affected drugs and devices and a potential increase in pregnancy—thus leading to a decrease and an increase, respectively, in medical expenditures.

[85] Available at
https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf

some of those private insurance plans were offered by government employers, encompassing

approximately 10.5 million of those women aged 15 to 64.[86]  The expanded exemption in these

interim final rules does not apply to government plan sponsors.  Thus we estimate that the

number of women aged 15 to 64 covered by private sector employer sponsored insurance who

receive preventive services coverage under the Affordable Care Act is approximately 36 million.

Prior to the implementation of the Affordable Care Act, approximately 6 percent of

employer survey respondents did not offer contraceptive coverage, with 31 percent of

respondents not knowing whether they offered such coverage.[87]  The 6 percent may have

included approximately 2.16 million of the women aged 15–64 covered by employer sponsored

insurance plans in the private sector.  According to Census data, 59.9 percent of women aged 15

to 64 are of childbearing age (aged 15 to 44), in this case, 1.3 million.  And as noted above,

approximately 44.3 percent of women of childbearing age use women's contraceptive methods

---

[86] The ASPE study relied on Census data of private health insurance plans, which included plans sponsored by either private or public sector employers.  See Table 2, notes 2 & 3 (explaining the scope of private plans and government plans for purposes of Table 2), available at
https://www.census.gov/content/dam/Census/library/publications/2014/demo/p60-250.pdf.
    According to data tables from the Medical Expenditure Panel Survey (MEPS) of the Agency for Healthcare Research and Quality of HHS (https://meps.ahrq.gov/mepsweb/), State and local governments employ 19,297,960 persons; 99.2 percent of those employers offer health insurance; and 67.4 percent of employees that work at such entities where insurance is offered are enrolled in those plans, amounting to 12.9 million persons enrolled. DOL estimates that in the public sector, for each policyholder there is an average of slightly less than one dependent. "Health Insurance Coverage Bulletin" Table 4, page 21.
https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.  Therefore, State and local government employer plans cover approximately 24.8 million persons of all ages. Census data indicates that on average, 12 percent of persons covered by private insurance plans are aged 65 and older. Using these numbers, we estimate that State and local government employer plans cover approximately 21.9 million persons under age 65.
    The Federal Government has approximately 8.2 million persons covered in its employee health plans. According to information we received from the Office of Personnel Management, this includes 2.1 million employees having 3.2 million dependents, and 1.9 million retirees (annuitants) having 1 million dependents. We do not have information about the ages of these policyholders and dependents, but for the purposes of this estimate we assume the annuitants and their dependents are aged 65 or older and the employees and their dependents are under age 65, so that the Federal Government's employee health plans cover 5.3 million persons under age 65.
    Thus, overall we estimate there are 27.2 million persons under age 65 enrolled in private health insurance sponsored by government employers. Of those, 38.3 percent are women aged 15-64, that is, 10.5 million.
[87] Kaiser Family Foundation & Health Research & Educational Trust, "Employer Health Benefits, 2010 Annual Survey" at 196, available at https://kaiserfamilyfoundation.files.wordpress.com/2013/04/8085.pdf.

covered by the Guidelines. Therefore we estimate that 574,000 women of childbearing age that use contraceptives covered by the Guidelines were covered by plans that omitted contraceptive coverage prior to the Affordable Care Act.[88]

It is unknown what motivated those employers to omit contraceptive coverage—whether they did so for conscientious reasons, or for other reasons.  Despite our lack of information about their motives, we attempt to make a reasonable estimate of the upper bound of the number of those employers that omitted contraception before the Affordable Care Act and that would make use of these expanded exemptions based on sincerely held religious beliefs.

To begin, we estimate that publicly traded companies would not likely make use of these expanded exemptions.  Even though the rule does not preclude publicly traded companies from dropping coverage based on a sincerely held religious belief, it is likely that attempts to object on religious grounds by publicly traded companies would be rare.  The Departments take note of the Supreme Court's decision in <u>Hobby Lobby</u>, where the Court observed that "HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and numerous practical restraints would likely prevent that from occurring.  For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable".  134 S. Ct. at 2774.

---

[88] Some of the 31 percent of survey respondents that did not know about contraceptive coverage may not have offered such coverage.  If it were possible to account for this non-coverage, the estimate of potentially affected covered women could increase. On the other hand, these employers' lack of knowledge about contraceptive coverage suggests that they lacked sincerely held religious beliefs specifically objecting to such coverage—beliefs without which they would not qualify for the expanded exemptions offered by these rules. In that case, omission of such employers and covered women from this estimation approach would be appropriate. Correspondingly, the 6 percent of employers that had direct knowledge about the absence of coverage may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31 percent of survey respondents who did not know whether the coverage was offered.  Yet an entity's mere knowledge about its coverage status does not itself reflect its motive for omitting coverage.  In responding to the survey, the entity may have simply examined its plan document to determine whether or not contraceptive coverage was offered.  As will be relevant in a later portion of the analysis, we have no data indicating what portion of the entities that omitted contraceptive coverage pre-Affordable Care Act did so on the basis of sincerely held religious beliefs, as opposed to doing so for other reasons that would not qualify them for the expanded exemption offered in these interim final rules.

The Departments are aware of several Federal health care conscience laws[89] that in some cases have existed for decades and that protect companies, including publicly traded companies, from discrimination if, for example, they decline to facilitate abortion, but we are not aware of examples where publicly traded companies have made use of these exemptions.  Thus, while we consider it important to include publicly traded companies in the scope of these expanded exemptions for reasons similar to those used by the Congress in RFRA and some health care conscience laws, in estimating the anticipated effects of the expanded exemptions we agree with the Supreme Court that it is improbable any will do so.

This assumption is significant because 31.3 percent of employees in the private sector work for publicly traded companies.[90]  That means that only approximately 394,000 women aged 15 to 44 that use contraceptives covered by the Guidelines were covered by plans of non-publicly traded companies that did not provide contraceptive coverage pre-Affordable Care Act.

Moreover, these interim final rules build on existing rules that already exempt houses of worship and integrated auxiliaries and, as explained above, effectively remove obligations to provide contraceptive coverage within objecting self-insured church plans.  These rules will therefore not effect transfers to women in the plans of such employers.  In attempting to estimate the number of such employers, we consider the following information.  Many Catholic dioceses have litigated or filed public comments opposing the Mandate, representing to the Departments and to courts around the country that official Catholic Church teaching opposes contraception.

---

[89] For example, 42 U.S.C. 300a-7(b), 42 U.S.C. 238n, and Consolidated Appropriations Act of 2017, Div. H, Title V, Sec. 507(d), Pub. L. No. 115-31.

[90] John Asker, et al., "Corporate Investment and Stock Market Listing: A Puzzle?" 28 Review of Financial Studies Issue 2, at 342–390 (Oct. 7, 2014),  available at https://doi.org/10.1093/rfs/hhu077. This is true even though there are only about 4,300 publicly traded companies in the U.S. See Rayhanul Ibrahim, "The number of publicly-traded US companies is down 46% in the past two decades," Yahoo! Finance (Aug. 8, 2016), available at https://finance.yahoo.com/news/jp-startup-public-companies-fewer-000000709.html.

There are 17,651 Catholic parishes in the United States[91], 197 Catholic dioceses,[92] 5,224

Catholic elementary schools, and 1,205 Catholic secondary schools.[93] Not all Catholic schools

are integrated auxiliaries of Catholic churches, but there are other Catholic entities that are

integrated auxiliaries that are not schools, so we use the number of schools to estimate of the

number of integrated auxiliaries.  Among self-insured church plans that oppose the Mandate, the

Department has been sued by two—Guidestone and Christian Brothers.  Guidestone is a plan

organized by the Southern Baptist convention. It covers 38,000 employers, some of which are

exempt as churches or integrated auxiliaries, and some of which are not.[94] Christian Brothers is a

plan that covers Catholic organizations.  It covers Catholic churches and integrated auxiliaries,

which are estimated above, but also it has said in litigation that it also covers about 500

additional entities that are not exempt as churches.  In total, therefore, we estimate that

approximately 62,000 employers among houses of worship, integrated auxiliaries, and church

plans, were exempt or relieved of contraceptive coverage obligations under the previous rules.

We do not know how many persons are covered in the plans of those employers.  Guidestone

reports that among its 38,000 employers, its plan covers approximately 220,000 persons, and its

employers include "churches, mission-sending agencies, hospitals, educational institutions and

other related ministries."  Using that ratio, we estimate that the 62,000 church and church plan

employers among Guidestone, Christian Brothers, and Catholic churches would include 359,000

persons. Among them, as referenced above, 72,500 would be of childbearing age, and 32,100

---

[91] Roman Catholic Diocese of Reno, "Diocese of Reno Directory: 2016-2017," available at
http://www.renodiocese.org/documents/2016/9/2016%202017%20directory.pdf.
[92] Wikipedia, "List of Catholic dioceses in the United States," available at
https://en.wikipedia.org/wiki/List_of_Catholic_dioceses_in_the_United_States.
[93] National Catholic Educational Association, "Catholic School Data," available at
http://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx.
[94] Guidestone Financial Resources, "Who We Serve," available at
https://www.guidestone.org/AboutUs/WhoWeServe.

would use contraceptives covered by the Guidelines.  Therefore, we estimate that the private,

non-publicly traded employers that did not cover contraception pre-Affordable Care Act, and

that were not exempt by the previous rules nor were participants in self-insured church plans that

oppose contraceptive coverage, covered 362,100 women aged 15 to 44 that use contraceptives

covered by the Guidelines.  As noted above, we estimate an average annual expenditure on

contraceptive products and services of $584 per user.  That would amount to $211.5 million in

potential transfer impact among entities that did not cover contraception pre- Affordable Care

Act for any reason.

We do not have data indicating how many of the entities that omitted coverage of

contraception pre- Affordable Care Act did so on the basis of sincerely held religious beliefs that

might qualify them for exempt status under these interim final rules, as opposed to having done

so for other reasons.  Besides the entities that filed lawsuits or submitted public comments

concerning previous rules on this matter, we are not aware of entities that omitted contraception

pre-Affordable Care Act and then opposed the contraceptive coverage requirement after it was

imposed by the Guidelines.  For the following reasons, however, we believe that a reasonable

estimate is that no more than approximately one third of the persons covered by relevant

entities—that is, no more than approximately 120,000 affected women—would likely be subject

to potential transfer impacts under the expanded religious exemptions offered in these interim

final rules.  Consequently, as explained below, we believe that the potential impact of these

interim final rules falls substantially below the $100 million threshold for economically

significant and major rules.

First, as mentioned, we are not aware of information that would lead us to estimate that

all or most entities that omitted coverage of contraception pre-Affordable Care Act did so on the

basis of sincerely held conscientious objections in general or religious beliefs specifically, as opposed to having done so for other reasons.  Moreover, as suggested by the Guidestone data mentioned previously, employers with conscientious objections may tend to have relatively few employees.  Also, avoiding negative publicity, the difficulty of taking away a fringe benefit that employees have become accustomed to having, and avoiding the administrative cost of renegotiating insurance contracts, all provide reasons for some employers not to return to pre-Affordable Care Act lack of contraceptive coverage.  Additionally, as discussed above, many employers with objections to contraception, including several of the largest litigants, only object to some contraceptives and cover as many as 14 of 18 of the contraceptive methods included in the Guidelines.  This will reduce, and potentially eliminate, the contraceptive cost transfer for women covered in their plans.[95]  Furthermore, among nonprofit entities that object to the Mandate, it is possible that a greater share of their employees oppose contraception than among the general population, which should lead to a reduction in the estimate of how many women in those plans actually use contraception.

In addition, not all sincerely held conscientious objections to contraceptive coverage are likely to be held by persons with religious beliefs as distinct from persons with sincerely held non-religious moral convictions, whose objections would not be encompassed by these interim final rules.[96]  We do not have data to indicate, among entities that did not cover contraception

---

[95] On the other hand, a key input in the approach that generated the one third threshold estimate was a survey indicating that six percent of employers did not provide contraceptive coverage pre-Affordable Care Act. Employers that covered some contraceptives pre-Affordable Care Act may have answered "yes" or "don't know" to the survey.  In such cases, the potential transfer estimate has a tendency toward underestimation because the rule's effects on such women—causing their contraceptive coverage to be reduced from all 18 methods to some smaller subset—have been omitted from the calculation.

[96] Such objections may be encompassed by companion interim final rules published elsewhere in this **Federal Register**.  Those rules, however, as an interim final matter, are more narrow in scope than these rules.  For example, in providing expanded exemptions for plan sponsors, they do not encompass companies with certain publicly traded ownership interests.

pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, which ones did so based on religious beliefs and which ones did so instead based on non-religious moral convictions.  Among the general public, polls vary about religious beliefs but one prominent poll shows that 89 percent of Americans say they believe in God, while 11 percent say they do not or are agnostic.[97]  Therefore, we estimate that for every ten entities that omitted contraception pre-Affordable Care Act based on sincerely held conscientious objections as opposed to other reasons, one did so based on sincerely held non-religious moral convictions, and therefore are not affected by the expanded exemption provided by these interim final rules for religious beliefs.

Based on our estimate of an average annual expenditure on contraceptive products and services of $584 per user, the effect of the expanded exemptions on 120,000 women would give rise to approximately $70.1 million in potential transfer impact.  This falls substantially below the $100 million threshold for economically significant and major rules.  In addition, as noted above, premiums may be expected to adjust to reflect changes in coverage, thus partially offsetting the transfer experienced by women who use the affected contraceptives.  As discussed elsewhere in this analysis, such women may make up approximately 8.9 percent (= 20.2 percent x 44.3 percent) of the covered population, in which case the offset would also be approximately 8.9 percent, yielding a potential transfer of $63.8 million.

We request comment on all aspects of the preceding regulatory impact analysis, as well as on how to attribute impacts to this interim final rule and the companion interim final rule concerning exemptions provided based on sincerely held (non-religious) moral convictions published elsewhere in this **Federal Register**.

[97] Gallup, "Most Americans Still Believe in God" (June 14–23, 2016), available at http://www.gallup.com/poll/193271/americans-believe-god.aspx.

Exhibit A

B.  Special Analyses—Department of the Treasury

      For purposes of the Department of the Treasury, certain Internal Revenue Service (IRS) regulations, including this one, are exempt from the requirements in Executive Order 12866, as supplemented by Executive Order 13563.  The Departments anticipate that there will be more entities reluctantly using the existing accommodation that will choose to operate under the newly expanded exemption, than entities that are not currently eligible to use the accommodation that will opt into it.  The effect of this rule will therefore be that fewer overall adjustments are made to the Federally facilitated Exchange user fees for entities using the accommodation process, as long as the Secretary of the Department of Health and Human Services requests and an authorizing exception under OMB Circular No. A-25R is in effect, than would have occurred under the previous rule if this rule were not finalized. Therefore, a regulatory assessment is not required.

C.  Regulatory Flexibility Act

      The Regulatory Flexibility Act (5 U.S.C. 601 et seq.) (RFA) imposes certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 et seq.) and that are likely to have a significant economic impact on a substantial number of small entities.  Under Section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.  The interim final rules are exempt from the APA, both because the PHS Act, ERISA, and the Code contain specific provisions under which the Secretaries may adopt regulations by interim final rule and because the Departments have made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble.  Therefore,

the RFA does not apply and the Departments are not required to either certify that the regulations

or this amendment would not have a significant economic impact on a substantial number of

small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small

entities in connection with their assessment under Executive Order 12866.  The Departments do

not expect that these interim final rules will have a significant economic effect on a substantial

number of small entities, because they will not result in any additional costs to affected entities,

and in many cases will relieve burdens and costs from such entities.  By exempting from the

Mandate small businesses and nonprofit organizations with religious objections to some (or all)

contraceptives and/or sterilization, the Departments have reduced regulatory burden on such

small entities.  Pursuant to section 7805(f) of the Code, these regulations have been submitted to

the Chief Counsel for Advocacy of the Small Business Administration for comment on their

impact on small business.

D.  Paperwork Reduction Act—Department of Health and Human Services

Under the Paperwork Reduction Act of 1995 (the PRA), Federal agencies are required to

publish notice in the **Federal Register** concerning each proposed collection of information.

Interested persons are invited to send comments regarding our burden estimates or any other

aspect of this collection of information, including any of the following subjects:  (1) the necessity

and utility of the proposed information collection for the proper performance of the agency's

functions; (2) the accuracy of the estimated burden; (3) ways to enhance the quality, utility, and

clarity of the information to be collected; and (4) the use of automated collection techniques or

other forms of information technology to minimize the information collection burden.

However, we are requesting an emergency review of the information collection

referenced later in this section.  In compliance with the requirement of section 3506(c)(2)(A) of

the PRA, we have submitted the following for emergency review to the Office of Management

and Budget (OMB).  We are requesting an emergency review and approval under both

5 CFR 1320.13(a)(2)(i) and (iii) of the implementing regulations of the PRA in order to

implement provisions regarding self-certification or notices to HHS from eligible organizations

(§147.131(c)(3)), notice of availability of separate payments for contraceptive services

(§147.131(f)), and notice of revocation of accommodation (§147.131(c)(4)).  In accordance with

5 CFR 1320.13(a)(2)(i), we believe public harm is reasonably likely to ensue if the normal

clearance procedures are followed.  The use of normal clearance procedures is reasonably likely

to prevent or disrupt the collection of information.  Similarly, in accordance with 5 CFR

1320.13(a)(2)(iii), we believe the use of normal clearance procedures is reasonably likely to

cause a statutory or court ordered deadline to be missed.  Many cases have been on remand for

over a year from the Supreme Court, asking the Departments and the parties to resolve this

matter.  These interim final rules extend exemptions to entities, which involves no collection of

information and which the Departments have statutory authority to do by the use of interim final

rules.  If the information collection involved in the amended accommodation process is not

approved on an emergency basis, newly exempt entities that wish to opt into the amended

accommodation process might not be able to do so until normal clearance procedures are

completed.

A description of the information collection provisions implicated in these interim final

rules is given in the following section with an estimate of the annual burden.  Average labor

Exhibit A

costs (including 100 percent fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.[98]

a. ICRs Regarding Self-Certification or Notices to HHS (§147.131(c)(3))

Each organization seeking to be treated as an eligible organization that wishes to use the optional accommodation process offered under these interim final rules must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services.  Specifically, these interim final rules continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, or to notify HHS, of their religious objection to coverage of all or a subset of contraceptive services, as set forth in the July 2015 final regulations.  The burden related to the notice to HHS is currently approved under OMB Control Number 0938-1248 and the burden related to the self-certification (EBSA Form 700) is currently approved under OMB control number 0938-1292.

Notably, however, entities that are participating in the previous accommodation process, where a self-certification or notice has already been submitted, and where the entities choose to continue their accommodated status under these interim final rules, generally do not need to file a new self-certification or notice (unless they change their issuer or third party administrator). As explained above, HHS assumes that, among the 209 entities we estimated are using the previous accommodation, 109 will use the expanded exemption and 100 will continue under the voluntary accommodation.  Those 100 entities will not need to file additional self-certifications or notices.  HHS also assumes that an additional 9 entities that were not using the previous

---

[98] May 2016 National Occupational Employment and Wage Estimates United States found at https://www.bls.gov/oes/current/oes_nat.htm.

accommodation will opt into it.  Those entities will be subject to the self-certification or notice

requirement.

   In order to estimate the cost for an entity that chooses to opt into the accommodation

process, HHS assumes, as it did in its August 2014 interim final rules, that clerical staff for each

eligible organization will gather and enter the necessary information and send the self-

certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[99]

HHS assumes that a compensation and benefits manager and inside legal counsel will review the

self-certification or notice to HHS and a senior executive would execute it.  HHS estimates that

an eligible organization would spend approximately 50 minutes (30 minutes of clerical labor at a

cost of $55.68 per hour,[100] 10 minutes for a compensation and benefits manager at a cost of

$122.02 per hour,[101] 5 minutes for legal counsel at a cost of $134.50 per hour,[102] and 5 minutes

by a senior executive at a cost of $186.88 per hour[103]) preparing and sending the self-certification

or notice to HHS and filing it to meet the recordkeeping requirement.  Therefore, the total annual

burden for preparing and providing the information in the self-certification or notice to HHS will

require approximately 50 minutes for each eligible organization with an equivalent cost burden

of approximately $74.96 for a total hour burden of approximately 7.5 hours with an equivalent

cost of approximately $675 for 9 entities. As DOL and HHS share jurisdiction, they are splitting

---

[99] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.
[100] Occupation code 43-6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84, https://www.bls.gov/oes/current/oes436011.htm
[101] Occupation code 11-3111 for Compensation and Benefits Managers with mean hourly wage $61.01, https://www.bls.gov/oes/current/oes113111.htm
[102] Occupation code 23-1011 for Lawyers with mean hourly wage $67.25, https://www.bls.gov/oes/current/oes231011.htm
[103] Occupation code11-1011 for Chief Executives with mean hourly wage $93.44, https://www.bls.gov/oes/current/oes111011.htm

the hour burden so each will account for approximately 3.75 burden hours with an equivalent

cost of approximately $337.

HHS estimates that each self-certification or notice to HHS will require $0.49 in postage

and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-

certification or notice sent via mail will be $0.54.  For purposes of this analysis, HHS assumes

that 50 percent of self-certifications or notices to HHS will be mailed.  The total cost for sending

the self-certifications or notices to HHS by mail is approximately $2.70 for 5 entities.  As DOL

and HHS share jurisdiction they are splitting the cost burden so each will account for $1.35 of

the cost burden.

b. ICRs Regarding Notice of Availability of Separate Payments for Contraceptive Services

(§147.131(e))

As required by the July 2015 final regulations, a health insurance issuer or third party

administrator providing or arranging separate payments for contraceptive services for

participants and beneficiaries in insured or self-insured group health plans (or student enrollees

and covered dependents in student health insurance coverage) of eligible organizations is

required to provide a written notice to plan participants and beneficiaries (or student enrollees

and covered dependents) informing them of the availability of such payments.  The notice must

be separate from, but contemporaneous with (to the extent possible), any application materials

distributed in connection with enrollment (or re-enrollment) in group or student coverage of the

eligible organization in any plan year to which the accommodation is to apply and will be

provided annually.  To satisfy the notice requirement, issuers and third party administrators may,

but are not required to, use the model language set forth previously by HHS or substantially

similar language.  The burden for this ICR is currently approved under OMB control number

0938-1292.

As mentioned, HHS is anticipating that approximately 109 entities will use the optional

accommodation (100 that used it previously, and 9 that will newly opt into it).  It is unknown

how many issuers or third party administrators provide health insurance coverage or services in

connection with health plans of eligible organizations, but HHS will assume at least 109.  It is

estimated that each issuer or third party administrator will need  approximately 1 hour of clerical

labor (at $55.68 per hour)[104] and 15 minutes of management review (at $117.40 per hour)[105] to

prepare the notices.  The total burden for each issuer or third party administrator to prepare

notices will be 1.25 hours with an equivalent cost of approximately $85.03.  The total burden for

all issuers or third party administrators will be 136 hours, with an equivalent cost of $9,268.  As

DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 68

burden hours with an equivalent cost of $4,634, with approximately 55 respondents.

As discussed above, the Departments estimate that 770,000 persons will be covered in the

plans of the 100 entities that previously used the accommodation and will continue doing so, and

that an additional 9 entities will newly opt into the accommodation.  It is not known how many

persons will be covered in the plans of the 9 entities newly using the accommodation.  Assuming

that those 9 entities will have a similar number of covered persons per entity, we estimate that all

109 accommodated entities will encompass 839,300 covered persons.  We assume that sending

one notice to each participant will satisfy the need to send the notices to all participants and

dependents. Among persons covered by plans, approximately 50.1 percent are participants and

---

[104] Occupation code 43-6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84.
[105] Occupation code 11-1021 General and Operations Managers with mean hourly wage $58.70.

49.9 percent are dependents.[106]  For 109 entities, the total number of notices will be 420,490.

For purposes of this analysis, the Departments also assume that 53.7 percent of notices will be

sent electronically, and 46.3 percent will be mailed.[107]  Therefore, approximately 194,687 notices

will be mailed.  HHS estimates that each notice will require $0.49 in postage and $0.05 in

materials cost (paper and ink) and the total postage and materials cost for each notice sent via

mail will be $0.54.  The total cost for sending approximately 194,687 notices by mail is

approximately $105,131.  As DOL and HHS share jurisdiction, they are splitting the cost burden

so each will account for $52,565 of the cost burden.

c. ICRs Regarding Notice of Revocation of Accommodation (§147.131(c)(4))

      An eligible organization may revoke its use of the accommodation process; its issuer or

third party administrator must provide written notice of such revocation to participants and

beneficiaries as soon as practicable.  As discussed above, HHS estimates that 109 entities that are

using the accommodation process will revoke their use of the accommodation, and will therefore

be required to cause the notification to be sent (the issuer or third party administrator can send

the notice on behalf of the entity).  For the purpose of calculating ICRs associated with

revocations of the accommodation, and for various reasons discussed above, HHS assumes that

---

[106] "Health Insurance Coverage Bulletin" Table 4, page 21.  Using March 2015 Annual Social and Economic Supplement to the Current Population Survey.  https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2015.pdf.

[107] According to data from the National Telecommunications and Information Agency (NTIA), 36.0 percent of individuals age 25 and over have access to the internet at work.  According to a Greenwald & Associates survey, 84 percent of plan participants find it acceptable to make electronic delivery the default option, which is used as the proxy for the number of participants who will not opt out that are automatically enrolled (for a total of 30.2 percent receiving electronic disclosure at work).  Additionally, the NTIA reports that 38.5 percent of individuals age 25 and over have access to the internet outside of work.  According to a Pew Research Center survey, 61 percent of internet users use online banking, which is used as the proxy for the number of internet users who will opt in for electronic disclosure (for a total of 23.5 percent receiving electronic disclosure outside of work).  Combining the 30.2 percent who receive electronic disclosure at work with the 23.5 percent who receive electronic disclosure outside of work produces a total of 53.7 percent who will receive electronic disclosure overall.

litigating entities that were previously using the accommodation and that will revoke it fall within the estimated 109 entities that will revoke the accommodation overall.

As before, HHS assumes that, for each issuer or third party administrator, a manager and inside legal counsel and clerical staff will need approximately 2 hours to prepare and send the notification to participants and beneficiaries and maintain records (30 minutes for a manager at a cost of $117.40 per hour,[108] 30 minutes for legal counsel at a cost of $134.50 per hour[109], 1 hour for clerical labor at a cost of $55.68 per hour[110]).  The burden per respondent will be 2 hours with an equivalent cost of $181.63; for 109 entities, the total burden will be 218 hours with an equivalent cost of approximately $19,798.  As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 109 burden hours with an equivalent cost of approximately $9,899.

As discussed above, HHS estimates that there are 257,000 covered persons in accommodated plans that will revoke their accommodated status and use the expanded exemption.[111]  As before, we use the average of 50.1 percent of covered persons who are policyholders, and estimate that an average of 53.7 percent of notices will be sent electronically and 46.3 percent by mail.  Therefore, approximately 128,757 notices will be sent, of which 59,615 notices will be mailed.  HHS estimates that each notice will require $0.49 in postage and

---

[108] Occupation code 11-1021 for General and Operations Managers with mean hourly wage $58.70, https://www.bls.gov/oes/current/oes111021.htm
[109] Occupation code 23-1011 for Lawyers with mean hourly wage $67.25, https://www.bls.gov/oes/current/oes231011.htm
[110] Occupation code 43-6011 for Executive Secretaries and Executive Administrative Assistants with mean hourly wage $27.84, https://www.bls.gov/oes/current/oes436011.htm
[111] In estimating the number of women that might have their contraceptive coverage affected by the expanded exemption, we indicated that we do not know the extent to which the number of women in accommodated plans affected by these rules overlap with the number of women in plans offered by litigating entities that will be affected by these rules, though we assume there is significant overlap. That uncertainty should not affect the calculation of the ICRs for revocation notices, however. If the two numbers overlap, the estimates of plans revoking the accommodation and policyholders covered in those plans would already include plans and policyholders of litigating entities. If the numbers do not overlap, those litigating entity plans would not presently be enrolled in the accommodation, and therefore would not need to send notices concerning revocation of accommodated status.

Exhibit A

$0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice

sent via mail will be $0.54. The total cost for sending approximately 59,615 notices by mail is

approximately $32,192.  As DOL and HHS share jurisdiction, they are splitting the hour burden

so each will account for 64,379 notices, with an equivalent cost of approximately $16,096.

**Table 1: Summary of Information Collection Burdens**

| Regulation Section | OMB Control Number | Number of respondents | Responses | Burden per Respondent (hours) | Total Annual Burden (hours) | Hourly Labor Cost of Reporting ($) | Total Labor Cost of Reporting ($) | Total Cost ($) |
|---|---|---|---|---|---|---|---|---|
| Self-Certification or Notices to HHS | 0938-NEW | 5* | 5 | 0.83 | 3.75 | $89.95 | $337.31 | $338.66 |
| Notice of Availability of Separate Payments for Contraceptive Services | 0938-NEW | 55* | 210,245 | 1.25 | 68.13 | $68.02 | $4,634.14 | $57,199.59 |
| Notice of Revocation of Accommodation | 0938-NEW | 55* | 64,379 | 2.00 | 109 | $90.82 | $9,898.84 | $25,994.75 |
| Total | | 115* | 274,629 | 4.08 | 180.88 | | $14,870.29 | $83,533.00 |

*The total number of respondents is 227 (= 9+109+109) for both HHS and DOL, but the summaries here and below exceed that total because of rounding up that occurs when sharing the burden between HHS and DOL.

Note: There are no capital/maintenance costs associated with the ICRs contained in this rule; therefore, we have removed the associated column from Table 1. Postage and material costs are included in Total Cost.

We are soliciting comments on all of the information collection requirements contained

in these interim final rules.  In addition, we are also soliciting comments on all of the related

information collection requirements currently approved under 0938-1292 and 0938-1248.  HHS

is requesting a new OMB control number that will ultimately contain the approval for the new

information collection requirements contained in these interim final rules as well as the related

requirements currently approved under 0938-1292 and 0938-1248.  In an effort to consolidate the

number of information collection requests, we will formally discontinue the control numbers

0938-1292 and 0938-1248 once the new information collection request associated with these interim final rules is approved.

To obtain copies of a supporting statement and any related forms for the proposed collection(s) summarized in this notice, you may make your request using one of following:

1.     Access CMS' Web Site address at https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html.

2.     E-mail your request, including your address, phone number, OMB number, and CMS document identifier, to Paperwork@cms.hhs.gov.

3.     Call the Reports Clearance Office at (410) 786-1326.

If you comment on these information collections, that is, reporting, recordkeeping or third-party disclosure requirements, please submit your comments electronically as specified in the ADDRESSES section of these interim final rules with comment period.

E.  Paperwork Reduction Act—Department of Labor

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the ICR for the EBSA Form 700 and alternative notice have previously been approved by OMB under control numbers 1210-0150 and 1210-0152.  A copy of the ICR may be obtained by contacting the PRA addressee shown below or at http://www.RegInfo.gov.  PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N-5718, Washington, DC 20210. Telephone: 202-693-8410; Fax: 202-219-4745.  These are not toll-free numbers.

Exhibit A

These interim final rules amend the ICR by changing the accommodation process to an optional process for exempt organizations and requiring a notice of revocation to be sent by the issuer or third party administrator to participants and beneficiaries in plans whose employer who revokes their accommodation.  DOL submitted the ICRs in order to obtain OMB approval under the PRA for the regulatory revision.  The request was made under emergency clearance procedures specified in regulations at 5 CFR 1320.13.  In an effort to consolidate the number of information collection requests, DOL will combine the ICR related to the OMB control number 1210-0152 with the ICR related to the OMB control number 1210-0150.  Once the ICR is approved DOL will discontinue 1210-0152.  A copy of the information collection request may be obtained free of charge on the RegInfo.gov Web site at http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201705-1210-001.  This approval will allow respondents to temporarily utilize the additional flexibility these interim final regulations provide, while DOL seeks public comment on the collection methods—including their utility and burden.

Consistent with the analysis in the HHS PRA section above, the Departments expect that each of the estimated 9 eligible organizations newly opting into the accommodation will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to self-certify or notify HHS.  Each of the 109 issuers or third party administrators for the 109 eligible organizations that make use of the accommodation overall will distribute Notices of Availability of Separate Payments for Contraceptive Services.  These issuers and third party administrators will spend approximately 1.25 hours in preparation time and incur $0.54 cost per mailed notice.  Notices of Availability of Separate Payments for Contraceptive Services will need to be sent to 420,489 policyholders, and 53.7 percent of the notices will be sent electronically, while 46.3

percent will be mailed.  Finally, 109 entities using the previous accommodation process will

revoke its use and will therefore be required to cause the Notice of Revocation of

Accommodation to be sent (the issuer or third party administrator can send the notice on behalf

of the entity).  These entities will spend approximately two hours in preparation time and incur

$0.54 cost per mailed notice.  Notice of Revocation of Accommodation will need to be sent to an

average of 128,757 policyholders and 53.7 percent of the notices will be sent electronically.  The

DOL information collections in this rule are found in 29 CFR 2510.3-16 and 2590.715-2713A

and are summarized as follows:

> Type of Review: Revised Collection.

> Agency: DOL–EBSA.

> Title: Coverage of Certain Preventive Services under the Affordable Care  Act—Private

Sector.

> OMB Numbers: 1210-0150.

> Affected Public: Private Sector—Not for profit and religious organizations; businesses or

> other for-profits.

> Total Respondents: 114[112] (combined with HHS total is 227).

> Total Responses: 274,628 (combined with HHS total is 549,255).

> Frequency of Response: On occasion.

> Estimated Total Annual Burden Hours: 181 (combined with HHS total is 362 hours).

> Estimated Total Annual Burden Cost: $68,662 (combined with HHS total is $137,325).

> Type of Review: Revised Collection.

> Agency: DOL–EBSA.

---

[112] Denotes that there is an overlap between jurisdiction shared by HHS and DOL over these respondents and
therefore they are included only once in the total.

F.  Regulatory Reform Executive Orders 13765, 13771 and 13777

Executive Order 13765 (January 20, 2017) directs that, "[t]o the maximum extent permitted by law, the Secretary of the Department of Health and Human Services and the heads of all other executive departments and agencies (agencies) with authorities and responsibilities under the Act shall exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the Act that would impose a fiscal burden on any State or a cost, fee, tax, penalty, or regulatory burden on individuals, families, healthcare providers, health insurers, patients, recipients of healthcare services, purchasers of health insurance, or makers of medical devices, products, or medications."  In addition, agencies are directed to "take all actions consistent with law to minimize the unwarranted economic and regulatory burdens of the [Affordable Care Act], and prepare to afford the States more flexibility and control to create a more free and open healthcare market."  These interim final rules exercise the discretion provided to the Departments under the Affordable Care Act, RFRA, and other laws to grant exemptions and thereby minimize regulatory burdens of the Affordable Care Act on the affected entities and recipients of health care services.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated the costs and cost savings attributable to this interim final rule.  As discussed in more detail in the preceding analysis, this interim final rule lessens incremental reporting costs.[113] Therefore, this interim final rule is considered an Executive Order 13771 deregulatory action.

---

[113] Other noteworthy potential impacts encompass potential changes in medical expenditures, including potential decreased expenditures on contraceptive devices and drugs and potential increased expenditures on pregnancy-related medical services. OMB's guidance on EO 13771 implementation (https://www.whitehouse.gov/the-press-office/2017/04/05/memorandum-implementing-executive-order-13771-titled-reducing-regulation) states that impacts should be categorized as consistently as possible within Departments.  The Food and Drug Administration, within HHS, and the Occupational Safety and Health Administration (OSHA) and Mine Safety and Health

F.  Unfunded Mandates Reform Act

      The Unfunded Mandates Reform Act of 1995 (section 202(a) of Pub. L. 104-4), requires

the Departments to prepare a written statement, which includes an assessment of anticipated

costs and benefits, before issuing "any rule that includes any Federal mandate that may result in

the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector,

of $100,000,000 or more (adjusted annually for inflation) in any one year."  The current

threshold after adjustment for inflation is $148 million, using the most current (2016) Implicit

Price Deflater for the Gross Domestic Product.  For purposes of the Unfunded Mandates Reform

Act, these interim final rules do not include any Federal mandate that may result in expenditures

by State, local, or tribal governments, nor do they include any Federal mandates that may impose

an annual burden of $100 million, adjusted for inflation, or more on the private sector.

G.  Federalism

      Executive Order 13132 outlines fundamental principles of federalism, and requires the

adherence to specific criteria by Federal agencies in the process of their formulation and

implementation of policies that have "substantial direct effects" on States, the relationship

between the Federal Government and States, or the distribution of power and responsibilities

among the various levels of Government.  Federal agencies promulgating regulations that have

these federalism implications must consult with State and local officials, and describe the extent

of their consultation and the nature of the concerns of State and local officials in the preamble to

the regulation.

---

Administration (MSHA), within DOL, regularly estimate medical expenditure impacts in the analyses that
accompany their regulations, with the results being categorized as benefits (positive benefits if expenditures
are reduced, negative benefits if expenditures are raised).  Following the FDA, OSHA and MSHA accounting
convention leads to this interim final rule's medical expenditure impacts being categorized as (positive or negative)
benefits, rather than as costs, thus placing them outside of consideration for EO 13771 designation purposes.

Exhibit A

These interim final rules do not have any Federalism implications, since they only provide exemptions from the contraceptive and sterilization coverage requirement in HRSA Guidelines supplied under section 2713 of the PHS Act.

**VII.    Statutory Authority**

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1-2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111-148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

**List of Subjects**

<u>26 CFR Part 54</u>

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

<u>29 CFR Part 2590</u>

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

<u>45 CFR Part 147</u>

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

Exhibit A

CMS-9940-IFC

Kirsten B. Wielobob,
Deputy Commissioner for Services and Enforcement.

Approved:  October 2, 2017.

David J. Kautter,
Assistant Secretary for Tax Policy.

Exhibit A

CMS-9940-IFC

Signed this 4th day of  October, 2017.

_____
Timothy D. Hauser,
Deputy Assistant Secretary for Program Operations,
Employee Benefits Security Administration,
Department of Labor.

Exhibit A

CMS-9940-IFC

Dated:  October 4, 2017.

_____

**Seema Verma,**

Administrator,

Centers for Medicare & Medicaid Services.

Approved:  October 4, 2017.

_____

**Donald Wright,**

Acting Secretary,

Department of Health and Human Services.

Exhibit A

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

For the reasons set forth in this preamble, 26 CFR part 54 is amended as follows:

**PART 54—PENSION EXCISE TAXES**

1.  The authority citation for part 54 continues to read in part as follows:

**Authority**:  26 U.S.C. 7805 * * *

2.  Section 54.9815-2713 is amended by revising paragraphs (a)(1) introductory text and

(a)(1)(iv) to read as follows:

**§ 54.9815–2713 Coverage of preventive health services.**

(a)  *   *   *

(1)  In general. [Reserved].  For further guidance, see § 54.9815-2713T(a)(1) introductory

text.

*   *   *   *   *

(iv)  [Reserved].  For further guidance, see § 54.9815-2713T(a)(1)(iv).

*   *   *   *   *

3.  Section 54.9815-2713T is added to read as follows:

**§ 54.9815–2713T Coverage of preventive health services (temporary).**

(a)  Services--(1)  In general.  Beginning at the time described in paragraph (b) of §

54.9815–2713 and subject to § 54.9815-2713A, a group health plan, or a health insurance issuer

offering group health insurance coverage, must provide coverage for and must not impose any

cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

(i) – (iii) [Reserved]. For further guidance, see § 54.9815-2713(a)(1)(i) through (iii).

Exhibit A

(iv)  With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of § 54.9815–2713 as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of section 2713(a)(4) of the Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

(2) – (c)  [Reserved].  For further guidance, see § 54.9815-2713(a)(2) through (c).

(d)  Effective/Applicability date.  (1) Paragraphs (a) through (c) of this section are applicable beginning on April 16, 2012, except –

(2)  Paragraphs (a)(1) introductory text and (a)(1)(iv) of this section are effective on October 6, 2017.

(e)  Expiration date.  This section expires on October 6, 2020.

4.  Section 54.9815-2713A is revised to read as follows:

**§ 54.9815–2713A Accommodations in connection with coverage of preventive health services.**

(a) through (f) [Reserved].  For further guidance, see § 54.9815-2713AT.

5.  Section 54.9815-2713AT is added to read as follows:

**§ 54.9815–2713AT Accommodations in connection with coverage of preventive health services (temporary).**

(a)  Eligible organizations for optional accommodation.  An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1)  The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2)  Notwithstanding its status under paragraph (a)(1) of this section and under 45 CFR 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (b) or (c) of this section as applicable; and

(3)  [Reserved]

(4)  The organization self-certifies in the form and manner specified by the Secretary of

Labor or provides notice to the Secretary of the Department of Health and Human Services as

described in paragraph (b) or (c) of this section.  To qualify as an eligible organization, the

organization must make such self-certification or notice available for examination upon request

by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this

section applies.  The self-certification or notice must be executed by a person authorized to make

the certification or provide the notice on behalf of the organization, and must be maintained in a

manner consistent with the record retention requirements under section 107 of ERISA.

(5)  An eligible organization may revoke its use of the accommodation process, and its

issuer or third party administrator must provide participants and beneficiaries written notice of

such revocation as specified in guidance issued by the Secretary of the Department of Health and

Human Services.  If contraceptive coverage is currently being offered by an issuer or third party

administrator through the accommodation process, the revocation will be effective on the first

day of the first plan year that begins on or after 30 days after the date of the revocation (to allow

for the provision of notice to plan participants in cases where contraceptive benefits will no

longer be provided).  Alternatively, an eligible organization may give sixty-days notice pursuant

to section 2715(d)(4) of the PHS Act and § 54.9815-2715(b), if applicable, to revoke its use of

the accommodation process.

(b)  <u>Optional accommodation - self-insured group health plans</u>. (1) A group health plan

established or maintained by an eligible organization that provides benefits on a self-insured

basis may voluntarily elect an optional accommodation under which its third party

administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years.  To invoke the optional accommodation process:

(i)  The eligible organization or its plan must contract with one or more third party administrators.

(ii)  The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A)  When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3-16 and this section.

(B)  When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators.  If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect.  The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the

Exhibit A

plan's third party administrators informing the third party administrator that the Secretary of the

Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of

this section and describing the obligations of the third party administrator under 29 CFR 2510.3-

16 and this section.

(2)  If a third party administrator receives a copy of the self-certification from an eligible

organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii)

of this section, and is willing to enter into or remain in a contractual relationship with the eligible

organization or its plan to provide administrative services for the plan, then the third party

administrator will provide or arrange payments for contraceptive services, using one of the

following methods—

(i)  Provide payments for the contraceptive services for plan participants and beneficiaries

without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a

deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the

eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii)  Arrange for an issuer or other entity to provide payments for the contraceptive

services for plan participants and beneficiaries without imposing any cost-sharing requirements

(such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any

portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan

participants or beneficiaries.

(3)  If a third party administrator provides or arranges payments for contraceptive

services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing

or arranging such payments may be reimbursed through an adjustment to the Federally facilitated

Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4)  A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5)  Where an otherwise eligible organization does not contract with a third party administrator and files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects.  The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(6)  Where an otherwise eligible organization is an ERISA-exempt church plan within the meaning of section 3(33) of ERISA and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects.  The third party administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, provide or arrange payments for contraceptive services in accordance with paragraphs (b)(2)(i) or (ii) of this section, and receive reimbursements in accordance with paragraph (b)(3) of this section.

(c)  Optional accommodation - insured group health plans—(1)  General rule.  A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of

contraceptive services for one or more plan years.  To invoke the optional accommodation

process--

(i)  The eligible organization or its plan must contract with one or more health insurance

issuers.

(ii) The eligible organization must provide either a copy of the self-certification to each

issuer providing coverage in connection with the plan or a notice to the Secretary of the

Department of Health and Human Services that it is an eligible organization and of its objection

as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A)  When a self-certification is provided directly to an issuer, the issuer has sole

responsibility for providing such coverage in accordance with § 54.9815-2713.

(B)  When a notice is provided to the Secretary of the Department Health and Human

Services, the notice must include the name of the eligible organization; a statement that it objects

as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an

identification of the subset of contraceptive services to which coverage the eligible organization

objects, if applicable) but that it would like to elect the optional accommodation process; the plan

name and type (that is, whether it is a student health insurance plan within the meaning of 45

CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name

and contact information for any of the plan's health insurance issuers.  If there is a change in any

of the information required to be included in the notice, the eligible organization must provide

updated information to the Secretary of Department of Health and Human Services for the

optional accommodation process to remain in effect.  The Department of Health and Human

Services will send a separate notification to each of the plan's health insurance issuers informing

the issuer that the Secretary of the Department Health and Human Services has received a notice

under paragraph (c)(2)(ii) of this section and describing the obligations of the issuer under this section.

(2)  If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to providing the contraceptive services to which the eligible organization objects, then the issuer will provide payments for contraceptive services as follows—

(i)  The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 54.9815-2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii)  With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.  The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services.  The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815 of the PHS Act.  If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815-2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group

Exhibit A

health plan does not provide coverage.  However, the issuer may provide payments for all

contraceptive services, at the issuer's option.

(3)  A health insurance issuer may not require any documentation other than a copy of the

self-certification from the eligible organization or the notification from the Department of Health

and Human Services described in paragraph (c)(1)(ii) of this section.

(d)  <u>Notice of availability of separate payments for contraceptive services - self-insured

and insured group health plans</u>.  For each plan year to which the optional accommodation in

paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or

arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an

issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this

section, must provide to plan participants and beneficiaries written notice of the availability of

separate payments for contraceptive services contemporaneous with (to the extent possible), but

separate from, any application materials distributed in connection with enrollment (or re-

enrollment) in group health coverage that is effective beginning on the first day of each

applicable plan year.  The notice must specify that the eligible organization does not administer

or fund contraceptive benefits, but that the third party administrator or issuer, as applicable,

provides or arranges separate payments for contraceptive services, and must provide contact

information for questions and complaints.  The following model language, or substantially

similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your

employer has certified that your group health plan qualifies for an accommodation with respect

to the Federal requirement to cover all Food and Drug Administration-approved contraceptive

services for women, as prescribed by a health care provider, without cost sharing.  This means

that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead,

[name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

(e) <u>Definition</u>. For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 54.9815-2713(a)(1)(iv).

(f) <u>Severability</u>. Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

(g) <u>Expiration date</u>. This section expires on October 6, 2020.

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

For the reasons set forth in the preamble, the Department of Labor amends 29 CFR part 2590 as follows:

**PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS**

6.  The authority citation for part 2590 continues to read as follows:

**AUTHORITY:** 29 U.S.C. 1027, 1059, 1135, 1161-1168, 1169, 1181-1183, 1181 note, 1185, 1185a, 1185b, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104-191, 110 Stat. 1936; sec. 401(b), Pub. L. 105-200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110-343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111-148, 124 Stat. 119, as amended by Pub. L. 111-152, 124 Stat. 1029; Division M, Pub. L. 113-235, 128 Stat. 2130; Secretary of Labor's Order 1-2011, 77 FR 1088 (Jan. 9, 2012).

7.  Section 2590.715-2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

**§ 2590.715-2713 Coverage of preventive health services.**

(a)  <u>Services</u>--(1)  <u>In general.</u> Beginning at the time described in paragraph (b) of this section and subject to § 2590.715-2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for and must not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

*   *   *   *   *

(iv)  With respect to women, such additional preventive care and screenings not described in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by

the Health Resources and Services Administration for purposes of section 2713(a)(4) of the

Public Health Service Act, subject to 45 CFR 147.131 and 147.132.

*    *    *    *    *

8.  Section 2590.715-2713A is revised to read as follows:

**§ 2590.715-2713A   Accommodations in connection with coverage of preventive health**

**services.**

(a)  Eligible organizations for optional accommodation.  An eligible organization is an

organization that meets the criteria of paragraphs (a)(1) through (4) of this section.

(1)  The organization is an objecting entity described in 45 CFR 147.132(a)(1)(i) or (ii);

(2)  Notwithstanding its exempt status under 45 CFR 147.132(a), the organization

voluntarily seeks to be considered an eligible organization to invoke the optional accommodation

under paragraph (b) or (c) of this section as applicable; and

(3)  [Reserved]

(4)  The organization self-certifies in the form and manner specified by the Secretary or

provides notice to the Secretary of the Department of Health and Human Services as described in

paragraph (b) or (c) of this section.  To qualify as an eligible organization, the organization must

make such self-certification or notice available for examination upon request by the first day of

the first plan year to which the accommodation in paragraph (b) or (c) of this section applies.

The self-certification or notice must be executed by a person authorized to make the certification

or provide the notice on behalf of the organization, and must be maintained in a manner

consistent with the record retention requirements under section 107 of ERISA.

(5)  An eligible organization may revoke its use of the accommodation process, and its

issuer or third party administrator must provide participants and beneficiaries written notice of

such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. If contraceptive coverage is currently being offered by an issuer or third party administrator through the accommodation process, the revocation will be effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan participants in cases where contraceptive benefits will no longer be provided). Alternatively, an eligible organization may give 60-days notice pursuant to PHS Act section 2715(d)(4) and § 2590.715-2715(b), if applicable, to revoke its use of the accommodation process.

(b) Optional accommodation - self-insured group health plans. (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis may voluntarily elect an optional accommodation under which its third party administrator(s) will provide or arrange payments for all or a subset of contraceptive services for one or more plan years. To invoke the optional accommodation process:

(i) The eligible organization or its plan must contract with one or more third party administrators.

(ii) The eligible organization must provide either a copy of the self-certification to each third party administrator or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in § 2510.3-16 of this chapter and this section.

Exhibit A

(B)  When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable), but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's third party administrators.  If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation process to remain in effect.  The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of the Department of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3-16 of this chapter and this section.

(2)  If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and is willing to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, then the third party administrator will provide or arrange payments for contraceptive services, using one of the following methods—

(i)  Provide payments for the contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii)  Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3)  If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4)  A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(5) Where an otherwise eligible organization does not contract with a third party administrator and it files a self-certification or notice under paragraph (b)(1)(ii) of this section, the obligations under paragraph (b)(2) of this section do not apply, and the otherwise eligible organization is under no requirement to provide coverage or payments for contraceptive services to which it objects.  The plan administrator for that otherwise eligible organization may, if it and the otherwise eligible organization choose, arrange for payments for contraceptive services from

an issuer or other entity in accordance with paragraph (b)(2)(ii) of this section, and such issuer or other entity may receive reimbursements in accordance with paragraph (b)(3) of this section.

(c)  <u>Optional accommodation - insured group health plans</u>—(1)  <u>General rule.</u> A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers may voluntarily elect an optional accommodation under which its health insurance issuer(s) will provide payments for all or a subset of contraceptive services for one or more plan years.  To invoke the optional accommodation process:

(i)  The eligible organization or its plan must contract with one or more health insurance issuers.

(ii)  The eligible organization must provide either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of the Department of Health and Human Services that it is an eligible organization and of its objection as described in 45 CFR 147.132 to coverage for all or a subset of contraceptive services.

(A) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 2590.715-2713.

(B)  When a notice is provided to the Secretary of the Department of Health and Human Services, the notice must include the name of the eligible organization; a statement that it objects as described in 45 CFR 147.132 to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable) but that it would like to elect the optional accommodation process; the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name

and contact information for any of the plan's health insurance issuers.  If there is a change in any

of the information required to be included in the notice, the eligible organization must provide

updated information to the Secretary of Department Health and Human Services for the optional

accommodation process to remain in effect.  The Department of Health and Human Services will

send a separate notification to each of the plan's health insurance issuers informing the issuer

that the Secretary of Health and Human Services has received a notice under paragraph (c)(2)(ii)

of this section and describing the obligations of the issuer under this section.

(2)  If an issuer receives a copy of the self-certification from an eligible organization or

the notification from the Department of Health and Human Services as described in paragraph

(c)(2)(ii) of this section and does not have its own objection as described in 45 CFR 147.132 to

providing the contraceptive services to which the eligible organization objects, then the issuer

will provide payments for contraceptive services as follows—

(i)  The issuer must expressly exclude contraceptive coverage from the group health

insurance coverage provided in connection with the group health plan and provide separate

payments for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv)

for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii)  With respect to payments for contraceptive services, the issuer may not impose any

cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any

premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible

organization, the group health plan, or plan participants or beneficiaries. The issuer must

segregate premium revenue collected from the eligible organization from the monies used to

provide payments for contraceptive services. The issuer must provide payments for contraceptive

services in a manner that is consistent with the requirements under sections 2706, 2709, 2711,

Exhibit A

2713, 2719, and 2719A of the PHS Act, as incorporated into section 715 of ERISA.  If the group

health plan of the eligible organization provides coverage for some but not all of any

contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv), the issuer is

required to provide payments only for those contraceptive services for which the group health

plan does not provide coverage.  However, the issuer may provide payments for all contraceptive

services, at the issuer's option.

   (3)  A health insurance issuer may not require any documentation other than a copy of the

self-certification from the eligible organization or the notification from the Department of Health

and Human Services described in paragraph (c)(1)(ii) of this section.

   (d)  <u>Notice of availability of separate payments for contraceptive services - self-insured

and insured group health plans</u>.  For each plan year to which the optional accommodation in

paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or

arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an

issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this

section, must provide to plan participants and beneficiaries written notice of the availability of

separate payments for contraceptive services contemporaneous with (to the extent possible), but

separate from, any application materials distributed in connection with enrollment (or re-

enrollment) in group health coverage that is effective beginning on the first day of each

applicable plan year.  The notice must specify that the eligible organization does not administer

or fund contraceptive benefits, but that the third party administrator or issuer, as applicable,

provides or arranges separate payments for contraceptive services, and must provide contact

information for questions and complaints.  The following model language, or substantially

similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your

employer has certified that your group health plan qualifies for an accommodation with respect

to the Federal requirement to cover all Food and Drug Administration-approved contraceptive

services for women, as prescribed by a health care provider, without cost sharing.  This means

that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead,

[name of third party administrator/health insurance issuer] will provide or arrange separate

payments for contraceptive services that you use, without cost sharing and at no other cost, for so

long as you are enrolled in your group health plan.  Your employer will not administer or fund

these payments.  If you have any questions about this notice, contact [contact information for

third party administrator/health insurance issuer]."

(e)  <u>Definition</u>.  For the purposes of this section, reference to "contraceptive" services,

benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or

related patient education or counseling, to the extent specified for purposes of § 2590.715-

2713(a)(1)(iv).

(f)  <u>Severability</u>.  Any provision of this section held to be invalid or unenforceable by its

terms, or as applied to any person or circumstance, shall be construed so as to continue to give

maximum effect to the provision permitted by law, unless such holding shall be one of utter

invalidity or unenforceability, in which event the provision shall be severable from this section

and shall not affect the remainder thereof or the application of the provision to persons not

similarly situated or to dissimilar circumstances.

Exhibit A

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

For the reasons set forth in the preamble, the Department of Health and Human Services

amends 45 CFR part 147 as follows:

**PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP**

**AND INDIVIDUAL HEALTH INSURANCE MARKETS**

9.  The authority citation for part 147 continues to read as follows:

**Authority**: Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act

(42 USC 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended.

10.  Section 147.130 is amended by revising paragraphs (a)(1) introductory text and

(a)(1)(iv) to read as follows:

**§ 147.130 Coverage of preventive health services.**

(a) *    *    *

(1)  In general.  Beginning at the time described in paragraph (b) of this section and

subject to §§ 147.131 and 147.132, a group health plan, or a health insurance issuer offering

group or individual health insurance coverage, must provide coverage for and must not impose

any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) for—

*    *    *    *    *

(iv) With respect to women, such additional preventive care and screenings not described

in paragraph (a)(1)(i) of this section as provided for in comprehensive guidelines supported by

the Health Resources and Services Administration for purposes of section 2713(a)(4) of the

Public Health Service Act, subject to §§ 147.131 and 147.132.

*    *    *    *    *

11.  Section 147.131 is revised to read as follows:

**§ 147.131 Accommodations in connection with coverage of certain preventive health services.**

(a) – (b)  [Reserved]

(c)  <u>Eligible organizations for optional accommodation</u>.  An eligible organization is an organization that meets the criteria of paragraphs (c)(1) through (3) of this section.

(1)  The organization is an objecting entity described in § 147.132(a)(1)(i) or (ii).

(2)  Notwithstanding its exempt status under § 147.132(a), the organization voluntarily seeks to be considered an eligible organization to invoke the optional accommodation under paragraph (d) of this section; and

(3)  The organization self-certifies in the form and manner specified by the Secretary or provides notice to the Secretary as described in paragraph (d) of this section.  To qualify as an eligible organization, the organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (d) of this section applies.  The self-certification or notice must be executed by a person authorized to make the certification or provide the notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4)  An eligible organization may revoke its use of the accommodation process, and its issuer must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services.  If contraceptive coverage is currently being offered by an issuer through the accommodation process, the revocation will be effective on the first day of the first plan year that begins on or after 30 days after the date of the revocation (to allow for the provision of notice to plan

participants in cases where contraceptive benefits will no longer be provided).  Alternatively, an

eligible organization may give 60-days notice pursuant to section 2715(d)(4) of the PHS Act and

§ 147.200(b), if applicable, to revoke its use of the accommodation process.

(d)  Optional accommodation—insured group health plans—(1)  General rule.  A group

health plan established or maintained by an eligible organization that provides benefits through

one or more group health insurance issuers may voluntarily elect an optional accommodation

under which its health insurance issuer(s) will provide payments for all or a subset of

contraceptive services for one or more plan years.  To invoke the optional accommodation

process:

(i)  The eligible organization or its plan must contract with one or more health insurance

issuers.

(ii)  The eligible organization must provide either a copy of the self-certification to each

issuer providing coverage in connection with the plan or a notice to the Secretary of the

Department of Health and Human Services that it is an eligible organization and of its objection

as described in § 147.132 to coverage for all or a subset of contraceptive services.

(A)  When a self-certification is provided directly to an issuer, the issuer has sole

responsibility for providing such coverage in accordance with § 147.130(a)(iv).

(B)  When a notice is provided to the Secretary of the Department of Health and Human

Services, the notice must include the name of the eligible organization; a statement that it objects

as described in § 147.132 to coverage of some or all contraceptive services (including an

identification of the subset of contraceptive services to which coverage the eligible organization

objects, if applicable) but that it would like to elect the optional accommodation process; the plan

name and type (that is, whether it is a student health insurance plan within the meaning of §

147.145(a) or a church plan within the meaning of section 3(33) of ERISA); and the name and contact information for any of the plan's health insurance issuers.  If there is a change in any of the information required to be included in the notice, the eligible organization must provide updated information to the Secretary of the Department of Health and Human Services for the optional accommodation to remain in effect.  The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of the Deparement of Health and Human Services has received a notice under paragraph (d)(1)(ii) of this section and describing the obligations of the issuer under this section.

(2)  If an issuer receives a copy of the self-certification from an eligible organization or the notification from the Department of Health and Human Services as described in paragraph (d)(1)(ii) of this section and does not have an objection as described in § 147.132 to providing the contraceptive services identified in the self-certification or the notification from the Department of Health and Human Services, then the issuer will provide payments for contraceptive services as follows—

(i)  The issuer must expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan and provide separate payments for any contraceptive services required to be covered under § 141.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii)  With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.  The issuer must segregate premium revenue

collected from the eligible organization from the monies used to provide payments for

contraceptive services.  The issuer must provide payments for contraceptive services in a manner

that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A

of the PHS Act.  If the group health plan of the eligible organization provides coverage for some

but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the

issuer is required to provide payments only for those contraceptive services for which the group

health plan does not provide coverage.  However, the issuer may provide payments for all

contraceptive services, at the issuer's option.

(3)  A health insurance issuer may not require any documentation other than a copy of the

self-certification from the eligible organization or the notification from the Department of Health

and Human Services described in paragraph (d)(1)(ii) of this section.

(e)  <u>Notice of availability of separate payments for contraceptive services - insured group

health plans and student health insurance coverage.</u>  For each plan year to which the optional

accommodation in paragraph (d) of this section is to apply, an issuer required to provide

payments for contraceptive services pursuant to paragraph (d) of this section must provide to

plan participants and beneficiaries written notice of the availability of separate payments for

contraceptive services contemporaneous with (to the extent possible), but separate from, any

application materials distributed in connection with enrollment (or re-enrollment) in group health

coverage that is effective beginning on the first day of each applicable plan year.  The notice

must specify that the eligible organization does not administer or fund contraceptive benefits, but

that the issuer provides separate payments for contraceptive services, and must provide contact

information for questions and complaints.  The following model language, or substantially

similar language, may be used to satisfy the notice requirement of this paragraph (e) "Your

Exhibit A

[employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing.  This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage.  Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage].  Your [employer/institution of higher education] will not administer or fund these payments . If you have any questions about this notice, contact [contact information for health insurance issuer]."

(f)  <u>Definition</u>.  For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

(g)  <u>Severability</u>.  Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

12.  Add § 147.132 to read as follows:

**§ 147.132 Religious exemptions in connection with coverage of certain preventive health services.**

Exhibit A

(a)  <u>Objecting entities</u>. (1)  Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration will exempt from any guidelines' requirements that relate to the provision of contraceptive services:

(i)  A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (a)(2) of this section.  Such non-governmental plan sponsors include, but are not limited to, the following entities--

(A)  A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order.

(B)  A nonprofit organization.

(C)  A closely held for-profit entity.

(D)  A for-profit entity that is not closely held.

(E)  Any other non-governmental employer.

(ii)  An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (a)(2) of this section.  In the case of student health insurance coverage, this section is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and

(iii)  A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (a)(2) of this section.  Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under § 147.130(a)(1)(iv) unless it is also exempt from that requirement.

(2)  The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.

(b)  Objecting individuals.  Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a)(1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.

(c)  Definition.  For the purposes of this section, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of § 147.130(a)(1)(iv).

Exhibit A

(d) <u>Severability</u>.  Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

[Billing Codes: 4830-01-P; 4510-029-P; 4120-01-P; 6325-64]

[FR Doc. 2017-21851 Filed: 10/6/2017 11:15 am; Publication Date:  10/13/2017]

Exhibit A